**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZA DABESTANI, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:25-cv-02507 |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| GERON CORPORATION, JOHN A. SCARLETT, ANDREW J. GRETHLEIN, MICHELLE J. ROBERTSON, FAYE FELLER, ANIL KAPUR, and JAMES ZIEGLER, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

Plaintiff Reza Dabestani ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Geron Corporation ("Geron" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Geron's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Geron securities between June 7, 2024, to February 25, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning Defendants' expectations for the launch and growth potential of Rytelo (imetelstat). Defendants' statements included, among other things, confidence in Geron's ability to capitalize on the purportedly significant unmet need for the drug and to execute on its commercial plan to target first-line ESA ineligible patients, while continually minimizing the risks associated with the burden of the weekly monitoring requirement for Rytelo and the impacts of seasonality and existing competition on the drug's sales.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Rytelo's potential; notably, that the lack of

awareness for Rytelo, the burden of the continued monitoring requirement, and the impacts of seasonality and existing competition resulted in an inability for Geron to capitalize on the purportedly significant unmet need for the drug, particularly among first-line patients and those outside the academic setting.

4.    On February 26, 2025, Geron announced its financial results for the fourth quarter of fiscal 2024, disclosing that Rytelo's growth had flattened over the preceding months. The Company attributed the diminished growth on seasonality, competition, lack of awareness for Rytelo, and the burden of the monitoring requirement necessary for the drug treatment.

5.    Investors and analysts reacted immediately to Geron's revelation. The price of Geron's common stock declined dramatically. From a closing market price of $2.37 per share on February 25, 2025, Geron's stock price fell to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day.

## JURISDICTION AND VENUE

6.    Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Geron is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**THE PARTIES**

11.    Plaintiff purchased Geron common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Geron is attached hereto.

12.    Geron, Corporation is a California corporation with its principal executive offices located at 919 East Hillsdale Boulevard, Suite 250, Foster City, CA 94404. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GERN."

13.    Defendant John A. Scarlett ("Scarlett") was, at all relevant times, the Chairman of the Board, President, and Chief Executive Officer of Geron.

14.    Defendant Andrew J. Grethlein ("Grethlein") was, at all relevant times, the Executive Vice President and Chief Operating Officer of Geron.

15.    Defendant Michelle J. Robertson ("Robertson") was, at all relevant times, the Executive Vice President, Chief Financial Officer, Treasurer and Principal Financial and Accounting Officer of Geron.

16.    Defendant Faye Feller ("Feller") was, at all relevant times, the Executive Vice President and Chief Medical Officer of Geron.

17.    Defendant Anil Kapur ("Kapur") was, at all relevant times prior to his departure from the Company on August 31, 2024, the Executive Vice President of Corporate Strategy and Chief Commercial Officer of Geron.

18.    Defendant James Ziegler ("Ziegler") was, beginning on September 9, 2024 and for the remainder of at all relevant times, the Executive Vice President of Corporate Strategy and Chief Commercial Officer of Geron.

19.    Defendants John A. Scarlett, Andrew J. Grethlein, Michelle J. Robertson, Faye Feller, Anil Kapur, and James Ziegler are sometimes referred to herein as the "Individual Defendants." Geron together with the Individual Defendants are referred to herein as the "Defendants."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Geron's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information n available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

21.     Geron is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Geron under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.     Company Background

23.     Geron is a commercial-stage biopharmaceutical company with a focus on blood cancer. Geron's primary product is a telomerase inhibitor, imetelstat, which the Company sells under the brand name, Rytelo.  It is designed to reduce the proliferation of malignant cells to permit the production of new healthy cells.

24.     Rytelo was approved by the FDA on June 6, 2024, for the treatment of adult patients with low to intermediate-1 risk myelodysplastic syndromes ("lower-risk MDS"), with transfusion-dependent ("TD") anemia requiring four or more red blood cell units over eight weeks or who have not responded to or have lost response to or are otherwise ineligible for erythropoiesis-stimulating agents ("ESAs").

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**B.    The Defendants Materially Misled Investors Concerning Rytelo's Launch and Subsequent Growth Potential**

*June 7, 2024*

25.    On June 7, 2024, Defendants conducted a special investor call to announce the FDA approval of Rytelo.  As part of the announcement, Defendant Scarlett discussed Rytelo's recent FDA approval, stating, in pertinent part: detailed their expectations for Rytelo's performance on the market, stating, in pertinent part:

> RYTELO is now the first and only FDA-approved telomerase inhibitor.
>
> . . .
>
> The approval of RYTELO, with lower-risk MDS, with transfusion-dependent anemia, broadly across ESA ineligible and ESA relapse and refractory subpopulations, regardless of ring sideroblast or RS status, has the potential to transform the treatment paradigm for these patients who remain in high unmet need despite currently available treatment options. Approximately 10% of lower-risk MDS patients are not eligible for ESAs and have very limited treatment options. RS-positive patients make up approximately 25% of lower-risk MDS patients, and we must continue to experience high transfusion burden despite available therapies.
>
> ***RS-negative patients make up approximately 75% of lower-risk MDS patients in our population particularly vulnerable to poor clinical outcomes. There are approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia.*** We believe that RYTELO can become part of the standard of care and help address unmet need in lower-risk MDS patients with transfusion-dependent anemia who are ESA ineligible, ESA relapsed/refractory RS-negative and ESA relapsed/refractory RS-positive with high transfusion burden.

(Emphasis added).

26.    Defendant Kapur detailed Geron's expectations for Rytelo's performance on the market, pertinently adding the following:

> ***On this next slide, we believe RYTELO offers a compelling value proposition for stakeholders***. Lower-risk MDS is a blood cancer that often progresses to require increasingly intensified management of key symptoms such as anemia and resulting fatigue. Many lower-risk MDS patients with symptomatic anemia frequently become red blood cell transfusion dependent, which has been shown to be associated with short- and long-term clinical consequences that reduce quality of life and survival. ***There is a high unmet treatment need for patients with lower-***

5

*risk MDS as many progress and are not responding to current treatments, achieving a durable response or experiencing extended and continuous red blood cell transfusion independence.*

. . .

From our perspective, these guidelines reflect a lack of effective new treatment options, in particular, for those patients who are ESA ineligible high-transfusion burden patients and for RS negative lower-risk MDS patients who constitute an estimated 75% of this market. This is a need, we believe, RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes. We expect to see RYTELO uptake across ESA ineligible, ESA failed RS-negative and RS-positive high transfusion burden patients. Based on our latest market research, which was completed earlier this month, with 37 community and 20 academic U.S.-based practicing hematologist.

On the left-hand side of this slide, as you can see, our research suggests meaningful RYTELO use in frontline ESA-ineligible patients. The right-hand side of the slide shows the estimated second-line population, approximately 85% of which are expected to be ESA or luspatercept experience. *Our research suggests a broad use of RYTELO across the second line regardless of frontline therapy and particularly for RS-negative patients. Our research supports the significant unmet treatment needs for the low-risk MDS patient population, and we strongly believe that RYTELO can play a meaningful role for eligible low-risk MDS patients moving forward.*

*We plan to conduct a prioritized and targeted launch to a concentrated prescriber base of approximately 8,000 health care professionals. We also plan to cover approximately 2,200 targeted accounts and 70% of the patients are expected to be treated in the community setting with low-risk MDS.* As an infused product, RYTELO will be provider administered. Medicare is expected to be the predominant payer with approximately 84% of the patients falling under the Medicare umbrella.

(Emphasis added).

27.    During the question-and-answer portion of the call that followed, Defendants responded to multiple inquiries regarding how the company expected the launch to proceed during the following pertinent exchanges:

<Q: Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst> Congrats on the approval and the great label. Can you describe more about your expectations for the cadence of the launch? Like what are the lowest hanging fruits to address first? And will there be a bolus of initial patients, things like that?

<A: John A. Scarlett> Anil?

6

<A: Anil Kapur> Sure. Thank you for the question, Tara. I think boluses are hard, Tara, to define and quantify. What I will say is, ***what's become very clear is we are launching in a sensitized market and this market is dissatisfied with current options***. As you say, the patients who are probably at the highest requirement for new therapies include patients who are either RS-negative, which is a large patient population, patients who are high transfusion burden and patients who may have seen both ESAs and/or luspatercept and are looking for better treatment options. And I think we are going to see a mix of all of these patients. ***But in general, the unmet need within this market is very high, and RYTELO has differentiated data to address all of the subpopulations.***

. . .

<Q: Craig for Corrine Johnson – Goldman Sachs - Analyst> . . . So to start us off here, the label indicates that the drug is indicated for patients who require 4 or more transfusions in 8 weeks. So what portion of the patients does this apply to?

<A: John A. Scarlett> Go ahead, Anil.

<A: Anil Kapur> Great question, Craig. So Craig, just to step back for a second. I just want to note again that low-risk MDS is a progressive disease and transfusion burden, as we have seen through all the clinical publications and real-world data, only continues to increase over time and continues to increase from one therapy to another.

Our research and also data that was published by Dr. Rami at ASH 2023 showed from the real-world data set, ***approximately 50% of the patients are high transfusion burdens, which are 4 or more. In addition, our research also indicates that transfusion burden, in the eyes of a physician, is a sliding scale, with many physicians, approximately 80% plus of the physicians we have gone to research with indicating even one or higher on a regular basis is not satisfactory to them. So we expect a vast majority of the patients who are transfusion burden to be provided access to RYTELO.*** In addition, the NCCN guidelines will help with our adoption as well. So I'll just stop here to see if I answered your question.

. . .

<Q: Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst> Many congrats on the approval yesterday. As you sort of model out the launch for imetelstat, what are your expectations for the real world average number of cycles, considering that there are more RS-negative patients in the real world than in the clinical trial settings?

<A: Anil Kapur> So Kalpit, we have not provided that guidance. Our expectation is that duration of treatment across both RS-positive and RS-negative and for all the populations we spoke about is likely to be guided by the totality of clinical evidence and how the patient -- as we said, across the factors, which include

7

achievement of transfusion independence, but also the clinical characteristics that we speak about that physicians monitor for patients, including what they are seeing for hemoglobin rises and how the patient is feeling and decreases in RBC transfusions.

So we will look at RYTELO, we expect RYTELO to behave in a similar way as well within this marketplace and provide more information when appropriate.

<Q: Kalpit R. Patel> Okay. And one more question maybe. Any thoughts on the weekly monitoring requirements for the first 2 cycles and every cycle thereafter? How similar or dissimilar is that from your clinical trial protocol? And does that weekly monitoring impact a particular group of physicians, maybe community doctors? All I'm trying to ask is how reasonable is it to do this for those types of doctors?

<A: Anil Kapur> Faye, do you want to go for it and I can add?

<A: Faye Feller> Yes. Yes. I can take that. Hi Kal. So it is consistent with what was done on the Phase III IMerge study weekly for the first 2 cycles and then monthly prior to dosing in order to manage any potential dose modifications. ***This is pretty standard across 4 hematologists, I would say, as closer monitoring, especially in this patient population, it's often merited regardless of what drug you're starting in the beginning of treatment as a patient adjusts to the new treatment and the side effect profile, while monthly before the infusions is pretty standard.***

I don't know, Anil, if you have anything to add.

<A: Anil Kapur> The only other thing I'll add is, Kalpit, to your question. We also obviously shared our profile and the weekly monitoring is also consistent. ***Many of these patients, as you know, are highly transfusion burden and they are coming to the clinics once a week or at least more than once a month many, many times to get red blood cell transfusion. So this has not been something that has been highlighted as a burden by both community and the academic facilities.***

(Emphasis added).

*July 23, 2024*

28.    On July 23, 2024, Geron issued a press release to announce, "that Anil Kapur, Executive Vice President, Corporate Strategy and Chief Commercial Officer, will depart the Company on August 31, 2024, to pursue other interests."

29.    Defendant Scarlett commented on the release attesting to Defendant Kapur's involvement in Rytelo's initial launch:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

We are encouraged by the uptake of RYTELO™ we are seeing in the first month of launch and by the positive feedback from customers and are confident that our seasoned commercial leadership team will continue to drive this momentum going forward . . . We thank Anil for his significant contributions to our business over the past five years, particularly his strategic vision to define the potential market for RYTELO, his articulation of its value proposition and his foundational leadership in building  strong commercial organization, which I believe has positioned Geron for long-term success. We wish him the best in his future endeavors.

<u>August 8, 2024</u>

30.     On August 8, 2024, Defendants provided their second quarter fiscal year 2024 results.  Notably, this quarter was the first reported following Rytelo's FDA approval and covering the drug's initial launch.  During the corresponding earnings call, Defendant Scarlett began the prepared remarks and provided some early responses to the initial launch, stating in pertinent part:

*It was just 8 weeks ago that FDA approved RYTELO, our branded name for imetelstat as the first and only telomerase. And it was just 6 weeks ago that RYTELO became commercially available in the U.S. With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results.*

*As of July 31, 60% of the top decile 1 to 4 accounts have been reached by our team across both community and academic settings. This has led to gratifying uptake. We estimate again as of July 31 that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch.* The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. *Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways and EMRs, including in the community setting.*

In addition, the MDS NCCN guidelines were updated this July 25 to include RYTELO as a category 1 and 2A treatment for lower-risk MDS patients. *That is, RYTELO is now designated for use in both RS positive and RS negative first-line ESA ineligible patients as well as in both RS positive and RS negative second-line patients regardless of prior first-line treatment. We believe that these favorable NCCN guidelines have put RYTELO in a strong competitive position.*

. . .

With the introduction of RYTELO as a new therapeutic option, we're seeing increasing dialogue among hematologists, rethinking treatment approaches for eligible low-risk MDS patients with transfusion dependent anemia. Consequently,

9

we believe that RYTELO can become part of the standard of care for both eligible first and second-line patients. As shown on this slide, from the approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia, approximately 1 in 10 are ESA ineligible due to serum EPO levels higher than 500 mU/mL.

These first-line patients have limited treatment options. RS-positive patients make up approximately 25% of the lower-risk MDS patient population, many of whom continue to experience high transfusion burden despite available therapies. RS-negative patients make up approximately 75% of lower-risk MDS patient populations, many of whom are particularly vulnerable to poor clinical outcomes and have few other treatment options.

(Emphasis added).

31.     Defendant Grethlein continued the prepared remarks, providing, in pertinent part, expectations for the continued execution and growth of Rytelo by detailing the drug's awareness, benefits of its inclusion on the NCCN guidelines, and success of the company's execution on the drug's launch so far:

*First, we are pleased with the early awareness of RYTELO among prescribers and payers. Based on our market research before FDA approval in May of 2024 of over 100 U.S. hematologists and oncologists, over 80% of those surveyed were aware of imetelstat.* One in 3 surveyed physicians indicated familiarity with the clinical data and *a majority of these physicians look favorably on the efficacy profile and mechanism of action*, which is especially important for a first-in-class treatment.

Payers are expressing high levels of interest and already have a strong understanding of the RYTELO U.S. prescribing information and IMerge Phase 3 clinical data. From an operational perspective, both dosage strengths of RYTELO, the 188 mg vials and 47 mg vials were available in our distribution channel for customers to order from specialty distributors as of June 27, 2024.

Our distribution network is fully activated with our specialty distributor network actively supporting customer demand across hospitals and community oncology clinics. Across the contiguous 48 states, RYTELO is available to HCPs within 24 to 48 hours from our specialty distribution networks. *We also believe that RYTELO's inclusion in the updated NCCN guidelines has been important in spreading awareness among the prescriber community*.

. . .

*We believe that the strong RYTELO value proposition, commercial foundation and the execution of our entire organization is driving encouraging early results*

10

*over these first 6 weeks of launch*. As we commented earlier, we estimate that as of July 31, 2024, approximately 160 patients have received RYTELO. This demand was generated in part by reaching approximately 60% of top decile 1 through 4 accounts and includes orders from roughly 115 unique accounts.

*We are seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts with hospitals ranging from community, academic centers, teaching hospitals and large health systems*. In July, we kicked off our national speakers program with the launch of our national broadcast event featuring medical experts, which garnered over 300 medical professional participants. These events are a critical component of our marketing strategy to make sure HCPs are aware of the new treatment option for their eligible patients.

(Emphasis added).

32.    Defendant Robertson discussed Geron's financial details.  Regarding Rytelo's launch and growth potential, Defendant Robertson stated, in pertinent part:

Based on our current operating plans and assumptions, we believe that our existing cash, cash equivalents and marketable securities, together with our projected revenues from U.S. sales of RYTELO, will be sufficient to fund our projected operating requirements into the second quarter of 2026.

(Emphasis added).

*September 9, 2024*

33.    On September 9, 2024, Geron issued a press release announcing "the appointment of Jim Ziegler as Executive Vice President, Chief Commercial officer, effective today, September 9, 2024," after Defendant Kapur vacated the position at the end of August.

34.    The release highlighted that Defendant Ziegler was hired to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of RYTELO™."

35.    Defendant Scarlett added "Jim brings to Geron an impressive track record of operational excellence, having led multiple high performing teams through product launches. We are thrilled to welcome Jim at this critical time when RYTELO is commercially available in the U.S. and we are seeing encouraging uptake since its launch at the end of June 2024."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

36.    Defendant Ziegler was also quoted in the press release, stating, in pertinent part, "Geron already has a strong commercial organization and infrastructure in place, and I look forward to partnering with the team to drive a successful U.S. launch and the commercial potential of RYTELO."

*November 7, 2024*

37.    On November 7, 2024, Defendants conducted an earnings call corresponding to their third quarter fiscal year 2024 results.  During the call, Defendants Scarlett touted the early success of Rytelo, stating in pertinent part:

> ***In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue which exceeded our expectations.*** The initial quarter of product revenue speaks to our execution as a commercial company as well as the high unmet need in lower risk MDS and the compelling value proposition of RYTELO for hematologists and patients. ***This gives us confidence in future continued demand and momentum for RYTELO.***
>
> Our strong IP position underlies the long-term commercial value proposition for RYTELO. We believe this IP position, including specific claims and our patents covering the indication that's in our FDA label and buttressed by the FDA's grant of orphan drug exclusivity for lower-risk MDS into June of 2031, will provide exclusivity in the United States through August of 2037.
>
> ***Today, our primary focus is on continuing to deliver on the initial success we achieved in the third quarter, getting RYTELO to more eligible lower-risk MDS patients and maximizing our opportunity in the U.S. market.*** In Europe, we believe that the CHMP review of our RYTELO marketing authorization application in lower-risk MDS could be completed in late 2024 or early 2025 with potential EU approval in the first half of 2025. Subject to receiving this approval, we're continuing to prepare for the potential launch of RYTELO in the EU and are planning to commercialize RYTELO in select EU markets beginning in 2026.
>
> . . .
>
> ***In addition to this quarter's strong commercial performance, we were pleased to announce this morning a completion of both the synthetic royalty transaction and a debt financing transaction that together generated $250 million in gross proceeds. These transactions were comprised of $125 million capped synthetic royalty with Royalty Pharma and a $250 million committed senior secured debt facility with funds managed by Pharmakon Advisors, under which we've borrowed $125 million, allowing us to retire existing debt.***

> ***With this new debt facility, we also have access to an additional $125 million. We believe that the favorable terms we achieved in these transactions reflect the significant commercial potential of RYTELO and coming off a successful first quarter of commercial launch provide us with critical flexibility to fuel continued growth and investment in our future***. Michelle will provide more details on these transactions and on our Q3 results later on this call.

(Emphasis added).

38.    Defendant Ziegler similarly praised the Company's early success with the launch of Rytelo and went on to provide details as to the Company's expectations for Rytelo's continued growth, pertinently as follows:

> As Chip highlighted, we achieved $28.2 million in RYTELO net product revenues in our first full quarter of U.S. sales. In the first few months of launch, ***demand has increased month-over-month with Q3 performance exceeding our expectations***. ***Demand from launch through Q3 has come from 388 ordering centers which represents approximately 45% of our key targeted accounts. This strong start reinforces the high unmet need in RYTELO's clinical profile in first-line ESA ineligible and second line plus lower-risk MDS.***

> Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and 1 year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. ***We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient subgroups in both community and academic settings.***

> Patient access is also critical for adoption and uptake and we have achieved significant payer coverage since approval. Payers responsible for approximately 70% of U.S. covered lives have implemented medical coverage policies for RYTELO that are consistent with its FDA label, clinical trials and/or NCCN guidelines. Additionally, our permanent J-code was issued in October 2024 and becomes effective on 1 January 2025. We believe the permanent J-code will streamline billing and reimbursement for centers treating patients with RYTELO.

> ***I also want to acknowledge questions from investors regarding the trajectory of weekly RYTELO sales as reflected in third-party claims data. We believe that while these claims data may reflect trends in demand that are directionally consistent with what we see internally, there are caveats around this data when we compare them to our own insights, including incomplete weekly data capture. Also, we remain in the early stages of launch and continue to expect week-to-week fluctuations regardless of the source of sales data***.

> . . .

*From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.*

*Our #1 commercial priority is to deliver a strong U.S. launch. We are committed to keeping laser-focused on that objective*. We plan to leverage our U.S. launch experience to also prepare for commercialization in select EU countries in 2026 and beyond. Our goal in Europe is to optimize patient access and revenues for imetelstat in prioritized countries. As Chip mentioned, subject to receiving regulatory approval, we are preparing to commercialize RYTELO in select EU countries in 2026. This includes working with experienced third parties who can provide contracted services, including essential critical path activities such as reimbursement, HTA assessments, market access and distribution.

In summary, I want to acknowledge the dedicated cross-functional teams at Geron for all their hard work to ensure that eligible U.S. patients have broad and timely access to RYTELO. I am inspired by how we have remained focused during this time of transition and I am optimistic in the future. *We are very pleased with the strong demand for RYTELO across community and academic settings, favorable payer coverage policies and broad utilization across patient segments. These early launch dynamics reinforce our expectations for continued demand and promising growth.*

(Emphasis added).

39.    The above statements in Paragraphs 25 to 38 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Geron's optimistic reports of Rytelo's launch success and potential growth fell short of reality; the impacts of seasonality, existing competition, and the burden of continued monitoring played a much more significant role in patient starts than Defendants had implied. Moreover, Rytelo lacked the necessary awareness to penetrate the market, resulting in an inability for Geron to capitalize on the purportedly significant unmet need for the drug, particularly among first-line patients and those outside the academic setting.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**C.      The Truth Emerges during Geron's Fourth Quarter Earnings Report**

*February 26, 2025*

40.      On February 26, 2025, Defendants provided their fourth quarter, fiscal year 2024 results, announcing that Rytelo's growth had flattened.  In pertinent part, Defendant Scarlett stated:

> From a financial perspective, we ended the year with a strong cash position of approximately $503 million, which we expect will enable us to reach profitability without additional financing, if our internal sales and operating expense expectations are met.
>
> However, ***despite achieving this revenue in the first 2 quarters of launch, we have observed flat revenue trends over the last few months***. As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call.

(Emphasis added).

41.      Defendant Ziegler reiterated the flatness observed in Rytelo's growth over the past few months and pertinently providing the following details regarding the setback:

> As described previously by Chip, we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024. This demand for RYTELO was supported by strong payer access. Payers responsible for approximately 80% of the U.S. covered lives have implemented medical coverage policies for RYTELO, that are consistent with the FDA label, clinical trials and/or NCCN guidelines.
>
> ***New patient starts and duration of treatment are the key primary drivers of revenue.*** For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately 8 months observed in the Phase III IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge.
>
> ***However, with respect to new patient starts, we have observed flatness over the past few months. Specifically, even though we see RYTELO being utilized across RS-negative and RS-positive first-line ESA ineligible, second-line ESA relapse refractory and third-line plus patients, the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations.***
>
> . . .

We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO in lower-risk MDS, which I will speak to on the next slide.

As shown on Slide 8 in our earnings deck, we estimate that in 2025, the U.S. RYTELO total addressable lower-risk MDS patient population is approximately 15,400 patients and includes patients recommended in the NCCN guidelines. This includes approximately 3,400 first-line ESA ineligible patients, approximately 7,600 second line and 4,400 third-line plus patients with approximately 75% of patients with RS-negative and 25% of patients with RS-positive status.

As I mentioned, our efforts are particularly focused on the eligible RS-negative population where RYTELO is the only drug approved for ESA relapsed/refractory patients. Assuming the duration of treatment observed in IMerge and based on the current net price, ***there is potential to achieve blockbuster status by treating approximately 1/3 of the U.S. RYTELO, total addressable patients.***

(Emphasis added).

42.    During the question-and-answer portion of the call that followed, Defendants responded to multiple inquiries regarding the declining growth trajectory for Rytelo during the following pertinent exchanges:

<Q: Peter Richard Lawson – Barclays Bank PLC – Research Analyst> Maybe first question would just be around how we think about revenues, your commentary around flat revenues over the last few months. Whether you're seeing any week-over-week growth. And I've seen that comment kind of captures January and February. And then the other component would just be around how we think about 1Q revenues themselves, whether that's flat or growing versus 4Q, and then anything you can tell us around revenues and costs as we think about 2025?

<A: John A Scarlett> Thanks, Peter. I appreciate the question. So Jim will take this question, which obviously relates to both prior revenues and also for -- you had some questions about potential future revenues in the first quarter. So Jim?

<A: James Ziegler> Peter, so our ***revenues week-over-week have had some variability. But what I would say is our 4- and 8-week rolling averages underscore the flatness that I characterized on the call. And that flatness continued into the prior week leading up to this call***. So it may be a little bit too early to make a full call on Q1 revenues, but I would characterize and reinforce what we said on the earnings call that ***the past couple of months have been relatively flat week-over-week in the 4- and 8-week averages***.

16

. . .

<Q: Tara A. Bancroft – TD Cowen – VP & Senior Equity Research Analyst> So I was hoping you could give us maybe some more detail on the seasonality or patterns in general, not only that you're seeing with RYTELO, but it appears to be impacting MDS as a whole with luspatercept too. So I'm curious to get your thoughts on what's happening at a higher level in this indication? And then separately, maybe, Jim, if you could tell us more about the expected cadence of growth this year that we could see with your implemented changes that you suggested?

<A: John A Scarlett> No, go ahead, to detail on the seasonality and the expected cadence.

<A: James Ziegler> Great. So we have started -- or *we saw some seasonality beginning around the holidays, Thanksgiving more specifically. And there is some hesitancy in the market to start some of these products that require, in our case, some monitoring. So there was a little bit of a delay.*

I agree with you that as we looked at other products in this market, and ran correlations between our trends and others, there was a very high correlation. So it didn't just affect, RYTELO, it affected a primary product that's used in this space as well.

In terms of the expected cadence, it's really driven off of our business driver, right? We characterize the most important business driver for us is new patient starts. *As you know, with launch products, often start in later line, third line plus, which we characterized on this call as seeing that's where the majority of our use was, even though we saw earlier line, second line, first-line use.*

So it really depends on our effectiveness in driving market share, not just in third-line plus, but in earlier line, second line and first-line opportunities. *And our expectation is that as we increase our share of voice, our reach and frequency and together with medical affairs, increase education and awareness, we hope to see greater impact and use across all lines of therap*y. But it's not going to happen overnight. Share of voice and increasing the prescribing behaviors will take some time.

. . .

<Q: Faisal Ali Khurshid – Leerink Partners LLC – Research Analyst> On the trends that you've been seeing, could you comment on like how much of that was an impact on new patient starts as opposed to like discontinuations or dose modifications and holidays? I guess, the reason for the question is even if you're starting mostly in third-line patient, like shouldn't you be kind of like adding patients at a consistent rate? And I guess like people are also wondering like the duration of therapy should still be longer than like the time you've been in the market in third line as well? Or is that not the way to think about it?

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<A: James Ziegler> Faisal, no, I think the way you're thinking about it is exactly right. The primary drivers are new patient starts and duration of treatment. What I said on the call is that duration of treatment at this point, while still early in that, we're only approaching the median duration of treatment in IMerge about right now. That does not appear to be issue based upon our own market research and KOL.

As you know, there isn't perfect data that we can cite only data that we triangulate around. But right now, at this point, we don't believe that duration of treatment is inconsistent with that seen in IMerge. ***And so we have seen some softness and it's related to new patient starts.***

I think the way to characterize it is we saw uptake and unmet need and the treatment was really with some of these early adopters who believe -- who understood and believed in the product and ***it's our obligation to really increase the reach and frequency, the share of voice amongst the majority of physicians who have yet to treat patients with RYTELO***.

. . .

<Q: Gregory Allen Harrison – Scotiabank Global Banking and Markets – Analyst> What feedback are you getting from KOLs and other providers around why they're not using RYTELO as much in earlier lines of therapy? And are there any differences based on setting as far as academic versus community? It sounds like from your comments just now that the bulk may be in academic?

<A: John A. Scarlett> Thanks, Greg. I think the first message that I would share with you is that our MD and our KOL feedback that have used RYTELO, very simply can be summarized as RYTELO works. ***And we see that in our market research and our one-on-one engagements with the KOLs. I think the biggest opportunity for us is to really increase the reach and frequency, our education and awareness and share of voice especially as you point out with the community.***

I'll just give you a very simple mathematic equation. So if you think about the 15,400 patients that we characterize as treatment eligible and you divide that by the number of MDS treating physicians in the U.S. It only leads to a couple of patients on average that each one of these physicians have. So it's really important for us to make sure that we get out to as many of these physicians in a cost-effective way through our sales team, our medical affairs team, and our nonpersonal efforts to really increase the share of voice.

. . .

<Q: Stephen Douglas Willey – Stifel Nicolaus & Company, Inc – Director> Okay. Then maybe just last question. I guess, is what is happening in the U.S., just given the flatness and the trajectory of new patient starts. And I know you're not looking to commercialize in Europe until 2026. But does that now kind of change the

18

cadence of perhaps expansion plans outside of the U.S.? Do you need to get the U.S. on track and kind of growing in a new patient start direction before you embark on anything outside the United States?

<A: John A. Scarlett> Yes, Steve, it's Chip. I think that it would be very easy for us to put our hands on our hearts and say our #1, #2 and #3 focus is on the U.S., the U.S. -- getting the U.S. on track, new patient starts on track, appropriate utilization throughout the areas of high unmet need. And we are absolutely taking care to look at a variety of different options and to start some of the prework for Europe. But I think it would be very, very easy to say that our 90-plus percent of our focus is on the U.S. right now.

. . .

<Q: Emily Claudia Bodnar – H.C. Wainwright & Co., LLC – Vice President & Senior Healthcare Analyst> I guess on the first one, in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re-prescribe it to new patients? Or is it mostly coming from new prescribers, new centers?

. . .

<A: James Ziegler> Great. Thank you. **On new patient starts, we're seeing repeat prescriptions amongst the early adopters largely at many of the academic medical centers. In the community, it's a little bit more diffused.** So there, we're seeing more breadth than depth. But over time, as with other product launches, I expect that both breadth and depth will continue to grow, especially as physicians gain clinical experience and success with RYTELO.

. . .

<Q: Kalpit R. Patel – B. Riley Securities, Inc. – Senior Biotech Analyst> Maybe first on the flattening over the past few months. Can you comment on exactly which month you started to see flattening? Was it the beginning of this year? Or was it the beginning of fourth quarter last year?

<A: James Ziegler> Kalpit, it's Jim here. **I would say based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward.** We do see, as you know, in the weekly data, a lot of variability, which is why we incur more to the 4- and the 8-week rolling averages.

. . .

<Q: Kalpit R. Patel> I think we've had that slide in the deck saying that there are 15,000-plus patients eligible potential $1 billion plus in net revenue. Do you still stand by that $1 billion plus number?

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<A: James Ziegler> Yes. The bottom line is for physicians that have used RYTELO and based upon our KOL feedback as well as market research, RYTELO works. It's that simple. It's our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country, but we absolutely do believe in it.

I think our opportunity is to also drive market development and KOL development. As Joe highlighted, there's a significant opportunity for us to increase the awareness, therefore, leading to initial trial. Initial trial will lead to reinforce success and broader use. It will just take a little bit of time.

(Emphasis added).

43.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the June 7, 2024, July 23, 2024, August 8, 2024, September 9, 2024, and November 7, 2024, press releases and shareholder calls. In those statements, Defendants presented a very self-assured account of the launch success and the overall potential of Rytelo, as they continually praised their alleged growth, the significant unmet need for the drug, the impact of Rytelo being placed upon the NCCN guidelines, and the general awareness of Rytelo and its generic identity, imetelstat, while they continually minimized the risks associated with the burden of Rytelo's weekly monitoring requirement and the impacts of both seasonality and existing competition on the drug's sales.

44.     Investors and analysts reacted immediately to Geron's revelation. The price of Geron's common stock declined dramatically. From a closing market price of $2.37 per share on February 25, 2025, Geron's stock price fell to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day.

45.     A number of well-known analysts who had been following Geron lowered their stock ratings in response to Geron's disclosures. For example, H.C. Wainwright & Co, while downgrading the stock to a neutral rating, noting that

"the company has noted an 8-week and 4-week trend showing flat revenues since the holiday season. The company announced a plan to shift its strategy, aimed at educating HCPs on Rytelo and expanding awareness of the therapy

. . .

20

The company did not provide specific plans to address awareness aside from increased HCP education and the use of KOLs and medical conferences."

The analyst went on to highlight that the majority of prescriptions remain in the academic setting, stating,

"the company has observed prescribers re-prescribing Rytelo to patients, though mostly in the academic setting and noted that the community setting prescriptions have been more diffused

. . .

In the 3Q24 earnings call, the company noted 65% of prescriptions are in the academic setting, which we expect is still likely the case."

The analyst also pointed to the lack of first line new patient starts and pointed to competition as a likely factor, stating, in pertinent part:

The company noted that majority of new patient starts have been in 3L low risk myelodysplastic syndrome (LR-MDS) patients, while *the company's commercial plan is to target 1L ESA ineligible and 2L ESA refractory patients, as per the label*. We note that 1L and 2L patients tend to have longer duration on therapy and are less pre-treated, increasing potential for long term use

. . .

We remind *that luspatercept was approved for 1L patients in 2023*, which maybe causing a shift in prescriber patters and treatment paradigm. *We believe some HCPs who are still using ESAs in 1L are likely then using luspatercept in 2L and then Rytelo in 3L*

. . .

*[We] believe 2024 could have been impacted by upfront demand which may not be representative of realistic growth rate for future quarters.*

(Emphasis added).

46.    Similarly, Barclays, in lowering their price target 56%, similarly highlighted "*Rytelo new patient start flatness* over the past few months (specifically 4- and 8-week rolling averages), with *seasonality impact* that started around the Thanksgiving holidays in 2024, *and some hesitancy around starting products that require monitoring*" (emphasis added). The Company further noted that "[c]ompetitive dynamics also appear to be a headwind, and the

21

majority of new starts are coming from the 3L+LR-MDS setting, while second line starts have been lower than expectations."

47.    The fact that these analysts, and others, discussed Rytelo's flat performance and Geron's below-expectation projections for the drug suggest the public placed significant weight on Geron's prior statements regarding Rytelo's anticipated performance. The frequent, in-depth discussion of Geron's guidance confirms that Defendants' statements during the Class Period were material.

### D.    Loss Causation and Economic Loss

48.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Geron's common stock and operated as a fraud or deceit on Class Period purchasers of Geron's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Geron's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Geron's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

49.    Geron's stock price fell in response to the corrective event on February 26, 2025, as alleged *supra*. On February 26, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Geron's forecasting processes and growth guidance for Rytelo.

50.    In particular, on February 26, 2025, Geron announced that Rytelo's growth had flattened over the past few months and had remained flat into the next quarter.

### E.    Presumption of Reliance; Fraud-On-The-Market

51.    At all relevant times, the market for Geron's common stock was an efficient market for the following reasons, among others:

(a)    Geron's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

22

(b)    Geron communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Geron was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Geron was reflected in and incorporated into the Company's stock price during the Class Period.

52.    As a result of the foregoing, the market for Geron's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Geron's stock price. Under these circumstances, all purchasers of Geron's common stock during the Class Period suffered similar injury through their purchase of Geron's common stock at artificially inflated prices, and a presumption of reliance applies.

53.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**F.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

54.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

55.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

56.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Geron who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Geron's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Geron's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Geron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 21, 2025, there were 636.9 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

59.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Geron;

(c)    whether the Individual Defendants caused Geron to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Geron's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

63.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

65.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Geron common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Geron's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

66.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

26

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Geron's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

67.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

68.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Geron's internal affairs.

69.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Geron's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Geron's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Geron's common stock at artificially

inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

70.    During the Class Period, Geron's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Geron's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Geron's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Geron's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

71.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

73.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

74.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Geron's misstatements.

75.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Geron which had become materially false or misleading.

76.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Geron disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Geron to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Geron's common stock.

77.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Geron to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

78.    By reason of the above conduct, the Individual Defendants and/or Geron are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

1    B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason

2    of the acts and transactions alleged herein;

3    C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-

4    judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

5    D.    Awarding such other and further relief as this Court may deem just and proper.

6    **<u>DEMAND FOR TRIAL BY JURY</u>**

7    Plaintiff hereby demands a trial by jury.

8

9    Dated:  March 13, 2025                                Respectfully submitted,

10

11                                                                    **LEVI & KORSINSKY LLP**

12

13                                                                     /s/ Adam Apton
                                                                    Adam M. Apton (SBN 316506)
14                                                                   1160 Battery Street East, Suite 100
                                                                    San Francisco, CA 94111
15                                                                   Tel: (415) 373-1671
                                                                    Email: aapton@zlk.com
16

17                                                                   *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS