**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Co-Lead Plaintiffs Robbie Dickson and Joseph M. Stacy, Jr.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE GERON CORPORATION SECURITIES LITIGATION | Master File No. 3:25-cv-02507-CRB<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 4

II. JURISDICTION AND VENUE ........ 6

III. THE PARTIES ........ 6

IV. ADDITIONAL RELEVANT NON-PARTIES ........ 8

V. ADDITIONAL SUBSTANTIVE ALLEGATIONS ........ 9

A. Geron's Only Drug Product, Rytelo, is Susceptible to Certain Side Effects and Treatment Requires Close Monitoring to Manage Dosage ........ 9

B. As Geron's Future Financial Viability and Growth Depended on the Successful Commercial Launch of Rytelo, Defendants Falsely Told Investors That Rytelo Would Be Widely Used as a First and Second-Line Therapy ........ 11

C. Defendants Falsely Told the Market That Geron Had All the Necessary Pieces in Place for A Successful Commercial Launch of Rytelo to a Broad Market ........ 13

D. Upon FDA Approval, Geron Proceeds with the Commercial Launch of Rytelo Without Any Marketing Materials or Having Adequately Educated Physicians ........ 14

1. Internal Turmoil Among Executives Causes Confusion and Conflict Leading up to the Commercial Launch ........ 15

2. Defendants Fail to Educate Community Physicians Who Would Be the Primary Rytelo Subscribers ........ 16

3. Geron Lacked Any Marketing and Educational Materials to Inform Community Physicians About Rytelo ........ 17

E. After Rytelo's Commercial Launch, Sales Quickly Flatline Causing Geron to Replace its Chief Commercial Officer and Overhaul its Sales Strategy ........ 18

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS ........ 19

A. February 28, 2024 – 2023 Form 10-K ........ 19

B. February 28, 2024 – Q4 2023 Earnings Call ........ 23

C. May 2, 2024 – Q1 2024 Form 10-Q ........ 27

D. May 2, 2024 – Q1 2024 Earnings Call ........ 29

E. June 7, 2024 – Special Call ........ 35

F. August 8, 2024 – Q2 2024 Form 10-Q ........ 40

G. August 8, 2024 – Q2 2024 Earnings Call ..... 45

H. November 7, 2024 – Q3 2024 Form 10-Q ..... 49

I. November 7, 2024 – Q3 2024 Earnings Call ..... 54

J. November 18, 2024 – Stifel 2024 Healthcare Conference ..... 62

K. December 4, 2024 – 7th Annual Evercore HealthCONx Conference ..... 69

VII. THE TRUTH EMERGES ..... 73

VIII. POST-CLASS PERIOD EVENTS ..... 81

IX. ADDITIONAL SCIENTER ALLEGATIONS ..... 82

A. Defendants' Actual Knowledge and/or Recklessness ..... 82

1. Defendants' End of Class Period Admission That They Knew Sales Had Flattened by at Least November 2024 Because Rytelo Failed to Educate Community Physicians and the Academics that Were Prescribing Rytelo Did So Only as a Third-Line Treatment ..... 82

2. Defendants Admittedly Track Rytelo Sales Data On A Weekly Basis ..... 83

3. Executive Departures Strongly Supports Scienter ..... 83

4. That Rytelo Was Geron's Only FDA-Approved Drug Product Creates A Strong Inference of Scienter ..... 86

5. Analysts Negative Reactions Support Scienter ..... 86

B. Defendants/ Motive and Opportunity to Commit Fraud ..... 87

1. Suspicious Stock Sales Strongly Support Scienter ..... 87

2. Defendants Were Motivated to Materially Overstate the Market for Rytelo to Raise Desperately Needed Cash to Fund Operations and Drug Development. ..... 90

3. Defendants Were Motivated to Expand Quickly Due to Patent Expirations ..... 92

X. LOSS CAUSATION AND ECONOMIC LOSS ..... 92

XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET ..... 94

XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE ..... 95

XIII. CLASS ACTION ALLEGATIONS ..... 96

XIV. COUNT I ..... 98

XV. COUNT II ........ 101

XVI. PRAYER FOR RELIEF ........ 102

XVII. DEMAND FOR TRIAL BY JURY ........ 102

Court-appointed Lead Plaintiffs Robbie Dickson and Joseph M. Stacy, Jr. ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Geron Corporation ("Geron" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Geron's public documents, conference calls transcripts, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews with former Geron employees; and (e) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within the defendants' control.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Geron common stock between February 28, 2024 and February 25, 2025, inclusive (the "Class Period") and were damaged thereby, seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. This action alleges that Defendants engaged in a scheme in which they concealed a catastrophic operational failure at the heart of the Company's business: the botched commercial launch of Geron's only product, Rytelo. For years, Geron's entire corporate existence hinged on this single bet-the-company moment. With its primary patent nearing expiration, and Rytelo comprising the only source of Geron's product revenue, a successful launch was not just an opportunity, but a necessity.

3. Accordingly, Defendants assured investors that they were exceptionally well-prepared for a seamless and successful commercial launch. They touted a "fully integrated" and

"highly experienced commercial and medical affairs team[,]" a sales force that was "prepared to be deployed," and a sophisticated strategy to educate the key prescriber base of "community physicians" who they claimed would be the primary drivers of Rytelo's success. This was the narrative they sold to the market: a Company perfectly positioned to execute a blockbuster launch.

4. In reality, as confirmed by former Geron employees, the Rytelo launch was a disaster, plagued by internal chaos and a complete failure of execution. The Company's medical and commercial teams were in a state of open conflict, with senior executives giving "conflicting directives" that paralyzed the field teams. The sales force was sent into the market without any marketing materials beyond the bare FDA prescribing information—a shocking failure of preparation. Most critically, Defendants had completely failed to educate their primary target market—community physicians. Confidential Witnesses confirm that the "vast majority of community physicians had never even heard of Rytelo" at the time of the launch. Defendants knew the commercial launch was not going well because they abruptly terminated Defendant Kapur, the Chief Commercial Officer overseeing the launch, from the Company in July of 2024 and overhauled the sales strategy for Rytelo.

5. Faced with this internal disaster, Defendants actively concealed the operational failures by touting "gratifying uptake[]" and "strong steady growth" of Rytelo sales. In reality, the initial sales were a short-lived "bolus" from a handful early adopters at academic centers that had been involved in the clinical trials. This masked the underlying truth: by September 2024, just weeks after the launch, new patient starts and revenue had already flattened. Defendants knew this, tracking sales on a weekly basis, but concealed the disastrous trend for more than five months. Analysts noted there was "cause for concern at this early stage of the launch."

6. The scheme culminated on February 26, 2025, when Defendants were finally forced to reveal the truth, admitting that Rytelo's growth had flatlined and that the majority of its use was as a third-line, last-resort therapy, not the blockbuster first and second-line treatment they had promised investors.

7. The market's reaction was swift and catastrophic. In a single day, Geron's stock price plummeted by over 32%, erasing hundreds of millions of dollars in shareholder value. The

fallout culminated with the ouster of Geron's CEO of 14 years—a final admission of accountability for the concealed disaster. Insiders at Geron knew they were botching the commercial launch and sold 100% their shares of Geron stock at a time when Geron's common stock was trading at artificially high prices, pocketing a total of over $6.3 million before the truth came out.

8. This action seeks to hold Defendants responsible for the devastating losses caused by their fraudulent scheme.

## II. JURISDICTION AND VENUE

9. Plaintiffs bring this action on behalf of themselves and other similarly situated investors to recover losses sustained in connection with Defendants' fraud.

10. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Geron is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. THE PARTIES

14. Plaintiff Robbie Dickson purchased Geron common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff Dickson's certification evidencing his transaction(s) in Geron was submitted in connection with his lead plaintiff application (ECF No. 17-2), which is incorporated herein.

15. Plaintiff Joseph M. Stacy, Jr. purchased Geron common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff Stacy's certification evidencing his transaction(s) in Geron was submitted in connection with his lead plaintiff application (ECF No. 17-2), which is incorporated herein.

16. Geron Corporation is a California corporation with its principal executive offices located at 919 East Hillsdale Boulevard, Suite 250, Foster City, CA 94404. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GERN."

17. Defendant John A. Scarlett ("Scarlett") was, at all relevant times, the Chairman of the Board, President, and Chief Executive Officer ("CEO") of Geron. Scarlett served as the CEO and a director since September 2011 and was appointed to Chairman of the Board in December 2018. On March 11, 2025, Geron abruptly announced that Scarlett would be stepping down as CEO after nearly fourteen years at Geron and further resigned from Geron's board of directors in connection with his departure as CEO.

18. Defendant Andrew J. Grethlein ("Grethlein") was, at all relevant times, the Executive Vice President and Chief Operating Officer ("COO") of Geron. Grethlein joined Geron in September 2012 as the Executive Vice President of Technical Operations and then served as the Executive Vice President of Development and Technical Operations from July 2014 to January 2019. Grethlein has served as the COO since January 2019.

19. Defendant Michelle J. Robertson ("Robertson") was, at all relevant times, the Executive Vice President, Chief Financial Officer ("CFO") Treasurer and Principal Financial and Accounting Officer of Geron. She has served as CFO since September 2023.

20. Defendant Faye Feller ("Feller") was, at all relevant times, the Executive Vice President and Chief Medical Officer ("CMO") of Geron. Feller joined Geron in April 2019 as the Vice President of Clinical Development and then served as CMO starting in July 2022.

21. Defendant Anil Kapur ("Kapur") was, at all relevant times prior to his departure from the Company on August 31, 2024, the Executive Vice President of Corporate Strategy and Chief Commercial Officer of Geron.

22. Defendant James Ziegler ("Ziegler") started at Geron on September 9, 2024, and for the remainder of at all relevant times, was the Executive Vice President and Chief Commercial Officer ("CCO") of Geron.

23. Defendants John A. Scarlett, Andrew J. Grethlein, Michelle J. Robertson, Faye Feller, Anil Kapur, and James Ziegler are sometimes referred to herein as the "Individual Defendants." Geron together with the Individual Defendants are referred to herein as the "Defendants."

24. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Geron's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

25. Geron is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Geron under respondeat superior and agency principles.

## IV. ADDITIONAL RELEVANT NON-PARTIES

26. CW1 was a Key Account Manager at Geron from the second quarter 2024 until the second quarter 2025, responsible for sales and prescriber education focused on educating providers about Rytelo and selling Rytelo.

27. CW2 was a Medical Science Liaison at Geron from April 2023 until April 2024 reporting to former Executive Director of Medical Affairs, Michael Steidle. As a Medical Science Liaison ("MSL"), CW2 was responsible for speaking with hematology doctors about myelodysplastic syndromes prior to Rytelo's approval. While CW2 was initially hired as a Clinical Educator, CW2's title was changed to MSL in January 2024 focusing on pre-launch activities where the Clinical Educator role focused on commercial, post-launch activities.

## V. ADDITIONAL SUBSTANTIVE ALLEGATIONS

### A. Geron's Only Drug Product, Rytelo, is Susceptible to Certain Side Effects and Treatment Requires Close Monitoring to Manage Dosage

28. Geron is a late-stage biopharmaceutical company pursuing therapies to extend the lives of patients with hematologic malignancies. The Company's main product is a telomerase inhibitor called imetelstat, which Geron sells under the brand name, Rytelo. Rytelo is designed to reduce the proliferation of malignant cells to permit the production of new healthy cells.

29. The FDA approved Rytelo on June 6, 2024 for the treatment of adult patients with low to intermediate-1 risk myelodysplastic syndromes ("lower-risk MDS"), with transfusion-dependent anemia requiring four or more red blood cell units over eight weeks or who have not responded to or have lost response to or are otherwise ineligible for erythropoiesis-stimulating agents ("ESAs").

30. Myelodysplastic syndromes ("MDS") are blood disorders which originate in the bone marrow and are characterized by ineffective blood cell production. MDS is generally classified and treated as a type of blood cancer. MDS is primarily a disease of the elderly, with a median age at diagnosis of around 70 years. Higher-risk MDS is characterized by a higher percentage of abnormal blast cells in the bone marrow (between 10-20%), is more severe, and progresses rapidly. Lower-risk MDS is characterized by a lower percentage of abnormal blast cells (less than 5%), is less severe, and progresses more slowly.

31. Low-risk MDS often presents with mild to moderate cytopenias. Cytopenias are conditions characterized by a reduction in the number of one or more types of blood cells in the body, such as red blood cells (anemia), white blood cells (leukopenia), and/or

platelets (thrombocytopenia). Anemia, a reduction of red blood cells, is typically one of the most prominent cytopenias observed. Chronic anemia is the predominant clinical problem in patients who have both high and lower-risk MDS. Many patients with anemia become dependent on red blood cell transfusions, which can be associated with clinical consequences and decreased quality of life.

32. The current standard of care for the treatment of lower-risk MDS is the use of ESAs such as erythropoietin, or EPO, to address the patient's chronic anemia. Although ESAs provide an improvement in anemia in approximately 50% of patients, the effect is transient with a median duration of response of approximately two years.

33. Once ESAs are no longer effective, serial blood transfusions are often administered that can cause damaging effects to other organs due to iron overload, resulting in poorer overall survival and a higher risk of developing acute myeloid leukemia. In addition, other best available therapies are used without durable effect for the patient. According to Geron, approximately 10% of lower-risk MDS patients are not eligible for ESAs, representing a "very high unmet need subgroup."

34. Among lower-risk MDS patients, there are ringed sideroblast positive, or RS-positive patients, and ringed sideroblast negative, or RS-negative patients. RS-negative patients make up approximately 75% of lower-risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are limited options for the treatment of anemia in RS-negative patients once they are relapsed or refractory to ESAs. RS-positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high transfusion burden lack effective treatment options.

35. On July 26, 2024, Geron announced the MDS National Comprehensive Cancer Network ("NCCN") Guidelines® were updated to include imetelstat as a Category 1 treatment in second-line RS-positive and RS-negative patients regardless of prior treatment and as a Category 2A treatment for first-line ESA-ineligible RS positive and RS negative patients.

36. Geron claims that in lower-risk MDS, Rytelo produces "meaningful and durable transfusion independence, activity across MDS patient subtypes, and potential disease-modifying

activity achievable with imetelstat treatment," which "are differentiators compared to currently approved products as well as investigational drugs currently in clinical development."

37. Rytelo, however, often causes certain side effects, including cytopenias and neutropenia, which is a condition associated with a low number of neutrophils, a specific type of white blood cell. In addition, MDS itself generally causes amenia.

38. Given these common side effects, physicians must closely monitor the patient weekly for the first two cycles of Rytelo and then monthly to manage any potential dose modifications where patients exhibit any of the various side effects.

39. Rytelo is given as an intravenous infusion directly into the vein, administered over a period of two hours once every four weeks. In contrast, Reblozyl (luspatercept), a competitor product approved in 2023 as a first-line treatment in patients with low-to intermediate-risk MDS, only requires a subcutaneous injection every three weeks. Thus, physicians viewed Rytelo's administration and monitoring as more burdensome and not a compelling alternative to Reblozyl.

40. Yet, throughout the Class Period, Defendants downplayed the competition and touted Rytelo as having "a well-characterized safety profile with generally manageable and short-lived thrombocytopenia and neutropenia, which are familiar adverse events for hematologists who are experienced with managing cytopenias" that could serve a "high unmet need… in first-line ESA ineligible and second line plus lower-risk MDS." As investors would ultimately learn, however, prescribers preferred Reblozyl (luspatercept) over Rytelo and most were only willing to use Rytelo as a third-line treatment.

### B. <u>As Geron's Future Financial Viability and Growth Depended on the Successful Commercial Launch of Rytelo, Defendants Falsely Told Investors That Rytelo Would Be Widely Used as a First and Second-Line Therapy</u>

41. Rytelo is Geron's only commercial drug product, accounting for 99.4% of its annual revenue. Accordingly, Geron's financial viability and growth depended on its commercial sales of Rytelo.

42. Indeed, in the Company's 2024 Annual Report on Form 10-K for the period ended December 31, 2024 (the "2024 Form 10-K"), Geron stated that Rytelo is "our only product

approved for marketing by the FDA, and our ability to generate revenue from product sales and achieve profitability is ***wholly dependent on our ability to successfully commercialize Rytelo in the U.S***."

43. Defendants further acknowledged that Rytelo was critical to the Company's future growth, stating "our near-term prospects ***are wholly dependent on Rytelo***". Scotiabank analysts also acknowledged Geron's dependence on Rytelo as being vital to the Company, stating on October 15, 2024, that Geron's "***ability to achieve profitability will depend on successful commercialization of Rytelo…***"

44. According to Defendants, low-risk MDS for which Rytelo is indicated is predominantly treated within the community physician setting. CW2 stated that 75% of physicians who prescribe Rytelo are community-based doctors.

45. Geron describes Rytelo to investors as a "transformational treatment option for [] underserved populations." Throughout the Class Period, Defendants touted Rytelo as the likely standard of care for the approved indications going forward, claiming Rytelo would be used for more than just a third-line treatment. Rather, Rytelo would also capture market share as a first and second-line treatment.

46. Indeed, according to Defendants, "the favorable FDA label and National Comprehensive Cancer Network, or NCCN®, Clinical Practice Guidelines in Oncology, or NCCN Guidelines®, position RYTELO as a potential ***blockbuster treatment that can compete for significant market segments*** in lower-risk MDS, including ***first-line*** ESA ineligible patients ***and second-line patients regardless of prior treatment or RS status***."

47. Defendants, thus, publicly claimed a total addressable market ("TAM") for imetelstat of $7 billion consisting of $3.5 billion for relapsed/refractory MF and $3.5 billion for lower-risk MDS based on it being used as a first, second, and third-line therapy.

48. According to CW2, however, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given the nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors

will stick with that option as it is less invasive with fewer side effects, and many patients can continue with transfusions for years.

49. CW1 also said pushing Rytelo as a second-line treatment was outside the label because the label states that patients have to have failed or not been eligible for an ESA. Thus, if a patient gets Reblozyl (luspatercept) first, and not an ESA, using Rytelo next is not second-line. CW1 said, "[i]f a patient gets the other drug, luspatercept first, but they still haven't seen an ESA, it's obviously not second line[.]"

50. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first[.]"

51. At the end of the Class Period, Defendants would admit Rytelo's very early sales came from early adopters and, in fact, "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations."

### C. Defendants Falsely Told the Market That Geron Had All the Necessary Pieces in Place for A Successful Commercial Launch of Rytelo to a Broad Market

52. According to Geron's SEC filings, Defendants recognized that "substantial preparations" were needed for a successful launch and commercialization of Geron's first-ever drug product, Rytelo. Such commercialization preparatory activities "include, among other things, the development of an in-house marketing and sales force, which will continue to require significant capital expenditures, management resources and time."

53. The Company also needed to "effectively train sales personnel ***and equip them with compliant and effective materials***[.]" In fact, according to Geron's SEC filings, its "ability to generate revenues from sales of imetelstat in the U.S.…***depends*** on [the Company] being able to establish sales and marketing capabilities and gain acceptance in the marketplace[.]"

54. Defendants also recognized during the May 2, 2024 earnings call, that "[i]t's also critical that we provide education and support for physicians on the imetelstat safety profile and help them to contextualize and manage cytopenias so they can offer an optimized patient experience and duration of [testing]."

55. In February 2024, Defendants claimed Geron had "onboarded and fully integrated a highly experienced commercial and medical affairs team into Geron[]" in preparation for the launch. On May 2, 2024, Defendants claimed they had "completed the build-out of our full commercial organization with the hiring of our sales force, which has been now integrated and trained so that they will be prepared to be deployed in the field upon potential approval." By August 8, 2024, Defendants reported that "since these commercial and medical field teams were deployed in June, there has been a strong level of in-person access to community and academic accounts and HCPs[]" and that the "medical and commercial field teams have been fully deployed to cover the entire U.S. market.[]"

56. As discussed below, confidential witnesses confirm that Geron had no marketing materials prepared at the time of Rytelo's launch and Geron had not conducted sufficient market research to inform them of Rytelo's addressable market, nor educated the likely prescribing community physicians on Rytelo. Thus, Geron was not prepared at all for the commercial launch of Rytelo.

### D. Upon FDA Approval, Geron Proceeds with the Commercial Launch of Rytelo Without Any Marketing Materials or Having Adequately Educated Physicians

57. Leading up to Rytelo's FDA approval and launch, Defendants repeatedly told the market that Geron was well-prepared for Rytelo's commercial launch and had everything in place, including an already onboarded full commercial and medical affairs team, a commercial supply of Rytelo, a distribution network, internal systems and processes in place, a well-trained sales force and reimbursing payers.

58. Contrary to these statements, Rytelo's commercial launch was complete chaos and the Company had not concreted a launch plan. Nor was Geron prepared with marketing materials or a marketing plan, it had not identified and educated the community physicians that would actually be prescribing Rytelo, and Geron did not have sufficient sales and medical staff to promote and educate prescribers. Indeed, CW1 recalled being "shocked" at the lack of preparation for commercial launch.

### 1. Internal Turmoil Among Executives Causes Confusion and Conflict Leading up to the Commercial Launch

59. At the time CW2 was hired in April 2023, Geron's medical and commercial teams were having serious disagreements about how to launch Rytelo and how to utilize the different people's roles. For instance, CW2 was initially hired as a Clinical Educator responsible for commercial, post-launch activities, but then CW2's title was changed to Medical Science Liaison in January 2024. In this role, CW2 was told to focus on pre-launch activities.

60. Throughout CW2's tenure, CW2 witnessed internal turmoil at Geron, including tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, Vice President of Corporate Strategy and Chief Commercial Officer. For example, "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]"

61. CW2 recalled that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical team between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs. The communication problems between Denise Meyer and Michael Steidle were obvious to CW2 where Steidle wanted to go in one direction with the medical team, and then Meyer came in and changed everything up. CW2 reported that Steidle would tell CW2's team one thing, only to then have backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page." CW2 felt "paralyzed by Michael's direction versus Denise's direction."

62. As a result of the tension at the top, the communication from executive leadership "was always unclear." CW2 said the conflicting instructions caused confusion and problems in the field, which "definitely" impacted Geron's commercial readiness and the commercial launch of the Rytelo. "When leadership isn't on the same page, how can you expect the field to have clear direction?"

63. This confusion continued until well after CW2 left Geron in April of 2024. While CW2 was not at Geron at the time of Rytelo's launch, CW2 kept in touch with current employees

who described the launch as a "cluster." As a result of the disorganization and confusion, Geron would be forced to quickly overhaul management within weeks of Rytelo's launch.

**2. Defendants Fail to Educate Community Physicians Who Would Be the Primary Rytelo Subscribers**

64. The hematologists who treat MDS are generally considered either community or academic healthcare providers. Community healthcare providers are frontline public health professionals who work directly within the communities they serve. Academic healthcare providers usually practice within an academic medical center, or an academic hospital. These providers are often more focused on clinical research and are usually faculty members or affiliated clinicians linked to medical schools or teaching hospitals who frequently work on the clinical trials for the drugs.

65. In February 2024, Defendant Kapur stated that low-risk MDS is predominantly treated within the community setting and claimed that, in preparation for a commercial launch of Rytelo, Geron was having "extensive discussions with both community and academic providers…"

66. On June 7, 2024, when Defendants announced the FDA approval of Rytelo, Kapur stated that "70% of the patients are expected to be treated in the community setting with low-risk MDS." CW2, likewise, estimated that about 75% of physician hematologists are community-based. Accordingly, the market expected the majority of Rytelo sales would come from community healthcare providers.

67. However, unbeknownst to investors, because Geron was unprepared for commercial launch and failed to educate community physicians, Rytelo's revenues primarily originated from early adopters in the academic setting familiar with Rytelo having worked on the clinical trials and were drastically lower than Defendants told the market.

68. In CW2's role as a Medical Science Liaison, CW2 spoke with doctors prior to Rytelo's commercial launch. According to CW2, awareness of Rytelo was low among community healthcare providers before launch. Indeed, CW2 said that the majority of community physicians

CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it. In contrast, hematologists in academia were more likely to be aware of the drug.

69. As Defendants would later admit at the end of the Class Period, this lack of awareness negatively impacted Rytelo's adoption and sales, requiring Geron to "increase education and awareness" and to "really increase the reach and frequency, our education and awareness and share of voice especially[,] as you point out[,] with the community [physicians]."

### 3. Geron Lacked Any Marketing and Educational Materials to Inform Community Physicians About Rytelo

70. According to CW1, Geron did not provide CW1 with any marketing materials, such as pamphlets, case studies or other resources to use in selling Rytelo at the time of its launch. CW1 recalled that it took a substantial amount of time to get marketing materials and the only materials CW1 had available was the "Prescribing Information," which is the FDA-Approved document regarding clinical information for Rytelo.

71. CW2 corroborated the lack of marketing materials and confirmed that the only educational material CW2 had for doctors was the prescribing information. In CW2's other commercial roles at different drug companies, they would typically have a "detail piece," and other materials covering mechanism of action, clinical trials, administration, and side effect management, but at Geron, they did not have such materials.

72. Moreover, Geron's failure to educate physicians adversely impacted Geron's strategy to win over and use key opinion leaders ("KOLs") to promote Rytelo. According to CW2, Geron's early strategy was to focus on KOLs in the hematology space. The idea was to gain their support before launch. "That can influence the hematology community as a whole when you've got a key opinion leader who says, this is a great drug." However, not all KOLs spoke highly of Rytelo. In fact, according to CW2, there was at least one KOL in Houston who chose to use Reblozyl instead of Rytelo.

73. Accordingly, during the February 26, 2025, Q4 earnings call, Defendants admittedly would need to focus on "improving our promotional and sales force effectiveness" to increase what had become flattened sales growth.

**E. After Rytelo's Commercial Launch, Sales Quickly Flatline Causing Geron to Replace its Chief Commercial Officer and Overhaul its Sales Strategy**

74. CW1 and the other sales representatives did not have access to sales data for several months after Rytelo's launch. According to CW1, in the early months after Rytelo's launch, the patient and market access team sent an email every couple of weeks to the sales representatives and VP of Sales, Scott Hudson, containing limited sales data. At first, emails went out when a new account placed its first order, but any follow-up orders or refills were not shared with the sales teams.

75. CW1 asked CW1's manager multiple times for access to sales data because it was imperative to inform the salespeople of how well they were doing. "I probably had two or three different conversations with them, stressing the fact that we had to have that information," CW1 said. CW1 explained that "[t]he sparseness of how it was being given just doesn't translate being successful with accounts and understanding them." The sales representatives were always reassured that the data was coming but it did not come until October or November 2024.

76. At that time around October or November 2024, CW1 was given access to Geron's internal Tableau system used to track sales. CW1 only had access to sales data for CW1's region but believed senior leadership had access to all sales data since Rytelo's commercial launch.

77. As a result of the Company's poor commercial launch and flattening sales, Geron had to overhaul its sales and marketing strategy and management.

78. First, on July 23, 2024, approximately one month after Rytelo's commercial launch, Geron abruptly announced that Anil Kapur, the Chief Commercial Officer, would be departing effective August 31, 2024.

79. On September 9, 2024, Geron announced the appointment of Jim Ziegler as the new Chief Commercial Officer to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of Rytelo."

80. Shortly after, Geron reported that Jim Hassard had joined the Company in November 2024 as Senior Vice President, Sales and Marketing "to improve insights, strategy and execution." Also in November 2024, Geron announced the appointment of Joseph Eid, M.D. as

Executive Vice President of Research and Development, "responsible for driving innovative medical and scientific strategies that support Rytelo commercially and sustain important research and development opportunities for Geron."

81. In January 2025, shortly after the management shake-up, Defendant Ziegler, Geron's new Chief Commercial Officer, held a Fast Start meeting attended by CW1, sales personnel from all the regions, the VP of Sales, Scott Hudson, and Jim Hassard, SVP Sales and Marketing. At the Fast Start meeting, Ziegler told the sales personnel that Rytelo sales had flattened in September and November 2024 and they were not meeting expectations. Ziegler introduced new sales goals at the meeting, which included a heavy focus on prescribing Rytelo as a second-line therapy.

82. According to CW1, Ziegler had fired most of the marketing and IT teams and started hiring new senior leaders. Defendants would later admit during the February 26, 2025 earnings call that, unbeknownst to investors, "we have observed flat revenue trends over the last few months[]" and "that flatness continued into the prior week leading up to this call."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS[1]

### A. <u>February 28, 2024 – 2023 Form 10-K</u>

83. On February 28, 2024, after the market closed, Defendants filed Geron's 2023 Annual Report on Form 10-K with the SEC for the period ended December 31, 2023, signed by Defendants Scarlett and Robertson (the "2023 Form 10-K"). The 2023 Form 10-K contained false and misleading risk disclosures presented as mere hypotheticals, instead of risks that were actually occurring. For instance, under section entitled "Risks Related to Regulatory Approval and Commercialization of Imetelstat" Geron purported to warn that ***if*** Geron is unable to establish effective sales, marketing and distribution capabilities, then Geron would be unable commercialize once imetelstat is approved, when in fact, Geron was ***already*** struggling with its commercial launch preparations. Thus, the risk had already materialized:

[1] Statements alleged to be false and misleading are bolded and underlined. The remaining statements are provided for context.

***<u>If imetelstat is approved for commercialization and we are unable to establish and maintain effective sales, marketing and distribution capabilities or enter into agreements with third parties to commercialize imetelstat, we will be unable to successfully commercialize imetelstat if and when it is approved</u>.***

***

**<u>Our inability to successfully establish and maintain effective commercialization capabilities for imetelstat, if we receive regulatory approval to do so, would severely and adversely affect our financial results, business and business prospects, including the potential commercialization of imetelstat, and the future of imetelstat</u>**.

84. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron's medical and commercial teams were already struggling with effective marketing and education for Rytelo due to internal turmoil and confusion and a lack of experienced staff and marketing materials. As a result, the 2023 Form 10-K did not accurately portray Geron's commercial readiness to launch Rytelo and the warned about risk had materialized, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, CW2 witnessed a lot of internal turmoil and disagreements between the medical and commercial teams on how Rytelo should be launched;

b. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

c. During CW2's tenure from April 2023 to April 2024, CW2 witnessed tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, because "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]";

d. During CW2's tenure from April 2023 to April 2024, CW2 said that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical team, between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs;

e. CW2 reported that during CW2's tenure, Steidle would tell CW2's team one thing only to then have to backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page[;]"

f. During CW2's tenure from April 2023 to April 2024, communication from leadership "was always unclear" which "definitely impacted the commercial launch of the drug[;]"

g. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

h. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

i. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

j. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

k. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

l. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends; and

m. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

85. Additionally in the 2023 Form 10-K, under a section entitled "Commercial Plans for Imetelstat" Geron stated that it had already begun commercial preparations, including "engaging in marketing" and conducting market research:

> <u>**We continue to conduct pre-commercial preparations for the U.S., such as**</u> enhancing and/or establishing company processes and systems to support a potential commercial launch, <u>**refining our market research in lower-risk MDS,**</u>

> **engaging in marketing** and commercial access/reimbursement preparatory efforts, and hiring our sales force, which we expect to occur in the first and second quarters of 2024.

86. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Geron was conducting sufficient market research regarding the potential market for Rytelo and engaging in marketing activities to educate the likely community physician prescribers of Rytelo when, in reality, Geron's medical and commercial teams were struggling with effective marketing and education for Rytelo due to internal turmoil and confusion and a lack of any marketing materials, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, CW2 witnessed a lot of internal turmoil and disagreements between the medical and commercial teams on how Rytelo should be launched;

b. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

c. During CW2's tenure from April 2023 to April 2024, CW2 witnessed tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, because "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]";

d. During CW2's tenure from April 2023 to April 2024, CW2 said that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical team, between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs;

e. CW2 reported that during CW2's tenure, Steidle would tell CW2's team one thing only to then have to backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page[;]"

f. During CW2's tenure from April 2023 to April 2024, communication from leadership "was always unclear" which "definitely impacted the commercial launch of the drug[;]"

g. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

h. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

i. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

j. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country []***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

k. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

l. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends; and

m. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

## B. <u>February 28, 2024 – Q4 2023 Earnings Call</u>

87. On February 28, 2024, Geron hosted a conference call with analysts and investors, to present and discuss the Company's financial and operational results for the fourth quarter 2023 and full year 2023 (the "Q4 2023 Earnings Call"). During the Q4 2023 Earnings Call, Defendant Kapur falsely assured investors that Geron was prepared for the launch of Rytelo with appropriate marketing and educated physicians and that Defendants had already fully onboarded a highly experienced commercial and medical affairs team:

> In preparation of launch, we have also finalized our distribution network and our patient support providers. **<u>In addition, we have onboarded and fully integrated a highly experienced commercial and medical affairs team into Geron</u>**. We continue to transition Geron towards a commercial company with the integration

and adoption of systems and processes to recognize and report revenues **and the continued refinement of engagement plans with marketing, commercial access**, payer, and reimbursement stakeholders.

88. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron's medical and commercial teams were already struggling with effective marketing and education for Rytelo due to internal misunderstandings and turmoil and, thus, Geron did not have an experienced commercial and medical affairs team and had not prepared any marketing and engagement plans, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, CW2 witnessed a lot of internal turmoil and disagreements between the medical and commercial teams on how Rytelo should be launched;

b. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

c. During CW2's tenure from April 2023 to April 2024, CW2 witnessed tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, because "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]";

d. During CW2's tenure from April 2023 to April 2024, CW2 said that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical team, between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs;

e. CW2 reported that during CW2's tenure, Steidle would tell CW2's team one thing only to then have to backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page[;]"

f. During CW2's tenure from April 2023 to April 2024, communication from leadership "was always unclear" which "definitely impacted the commercial launch of the drug[;]"

g. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

h. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

i. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

j. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country []***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

k. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

l. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends; and

m. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

89. During the question and answer portion of the Q4 2023 Earnings Call, an analyst asked about the extra effort needed to educate community physicians, to which Defendant Kapur falsely assured that because Geron purportedly already had extensive discussions with both community and academic providers, the Company would not need to spend much additional efforts with community providers who supposedly had the same perceptions as academics:

> **Ethan Thomas Markowski** *Needham & Company, LLC, Research Division*
> I know you've touched on this before, but how much extra effort do you think you'll have to spend on educating community physicians on managing cytopenias versus academic ones, assuming approval?
>
> **Anil Kapur**, *Chief Commercial Officer*
> **<u>[W]e have had extensive discussions with both community and academic providers</u>**. And just as a reminder for everyone, low-risk MDS is predominantly treated within the community setting. Physicians tell us they have deep experiences with drugs such as len, HMAs, and are very adept at managing heme-related side effects for patients. And for them, they point to prolonged myelosuppression with

HMAs, et cetera, as areas which they have managed successfully for a long period of time… **<u>So we do not see much differences between the community versus the academic hematologist in terms of their perceptions and management of heme toxicities</u>**.

90. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron was not having "extensive" discussions with community providers. In fact Geron had not even prepared any marketing and education materials to provide to community physicians so that they were informed about Rytelo. Thus, Geron struggled to gain acceptance for Rytelo from community health care providers, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

c. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country []***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends; and

g. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid,

M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

### C. May 2, 2024 – Q1 2024 Form 10-Q

91. On May 2, 2024, after the market closed, Defendants filed Geron's Q1 2024 Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2024, signed by Defendant Robertson (the "Q1 2024 Form 10-Q"). The Q1 2024 Form 10-Q contained false and misleading risk disclosures presented as mere hypotheticals, instead of risks that were actually occurring. For instance, under the section entitled "Risks Related to Regulatory Approval and Commercialization of Imetelstat," Geron purported to warn that ***if*** Geron is unable to establish effective sales, marketing and distribution capabilities, then Geron would be unable commercialize once imetelstat is approved, when in fact, Geron was ***already*** struggling with its effective marketing and education efforts. Thus, the risk had already materialized:

> ***If imetelstat is approved for commercialization and we are unable to establish and maintain effective sales, marketing and distribution capabilities or enter into agreements with third parties to commercialize imetelstat, we will be unable to successfully commercialize imetelstat if and when it is approved.***
>
> ***
>
> **Our inability to successfully establish and maintain effective commercialization capabilities for imetelstat, if we receive regulatory approval to do so, would severely and adversely affect our financial results, business and business prospects, including the potential commercialization of imetelstat, and the future of imetelstat**.

92. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron's medical and commercial teams were already struggling with effective marketing and education for Rytelo due to internal misunderstandings and turmoil. As a result, the Q1 2024 Form 10-Q did not accurately portray Geron's commercial readiness to launch Rytelo and the warned about risk had materialized, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, CW2 witnessed a lot of internal turmoil and disagreements between the medical and commercial teams on how Rytelo should be launched;

b. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

c. During CW2's tenure from April 2023 to April 2024, CW2 witnessed tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, because "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]";

d. During CW2's tenure from April 2023 to April 2024, CW2 said that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical team, between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs;

e. CW2 reported that during CW2's tenure, Steidle would tell CW2's team one thing only to then have to backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page[;]"

f. During CW2's tenure from April 2023 to April 2024, communication from leadership "was always unclear" which "definitely impacted the commercial launch of the drug[;]"

g. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

h. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

i. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

j. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country []***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

k. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

l. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends; and

m. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

**D. <u>May 2, 2024 – Q1 2024 Earnings Call</u>**

93. Also on May 2, 2024, Geron hosted a conference call with analysts and investors, to present and discuss the Company's financial and operational results for the first quarter 2024 (the "Q1 2024 Earnings Call"). In his prepared remarks, Defendant Kapur falsely assured investors that imetelstat would have uptake across frontline patients as well as "broad use" in the second-line. In discussing the market for Rytelo, Defendant Kapur claimed Geron expected to see "uptake" across *all* patient groups, including "meaningful" frontline use and "broad use" across the second-line treatment:

> **<u>We expect to see imetelstat uptake across ESA-ineligible, ESA-fail RS-negative, and RS-positive high transfusion burden patients</u>**. Based on our latest 2024 market research of 50 U.S.-based practicing hematologists *across both community and academic settings*. On the left-hand side of the slide, you can see that **<u>our market research suggest meaningful imetelstat use in frontline ESA ineligible patients</u>**, especially those who are RS negative.
>
> The right-hand side of the slide shows the estimated second-line population, approximately 90% of which are expected to be ESA or luspatercept experienced. **<u>Our market leaders suggest a broad use of imetelstat across the second line</u>**, **<u>regardless of frontline therapy, particularly for RS-negative patients</u>**. As you can see on the figures on the right, which are further segmented for RS-positive and RS-negative patients [within] these [subgroups]. Our findings confirm the significant unmet need across the low-risk MDS patient population, and we strongly believe that [if] imetelstat is approved, can play a meaningful role in the treatment paradigm of transfusion-dependent low-risk MDS moving forward.

94. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they lacked any reasonable basis and gave the false impression that Rytelo's lead indications for first and second-line patient segments would generate

significant revenue when in reality, Defendants knew Rytelo's revenues (if any) would come primarily from the third-line patient segment, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. "The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch. CW2 corroborated that there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management, aside from the prescribing information;

c. Defendants had failed to properly educate and target community healthcare providers in community settings, as Defendant Scarlett admitted on the February 26, 2025 earnings call by stating, "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers;

d. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the possible root causes of flat revenue trends;

e. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[]***;"

f. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

g. According to CW1, it is typical for new drugs like Rytelo to have slow adoption because it takes time for prescribing physicians to become comfortable prescribing a new drug. CW1 stated, "[t]hey need to see the evidence and get experience first[.]";

h. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

i. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***[;]" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

95. While discussing Geron's market research, Defendant Kapur falsely claimed that the 50 community and academic U.S. hematologists surveyed viewed Rytelo as the likely "standard of care" across all patient populations, even though, in reality, physicians were reluctant and/or unwilling to use Rytelo at all and, at most were only willing to use it as a third-line therapy due to Geron's failure to inform and educate physicians on Rytelo and its side effects and monitoring requirements:

> Our findings show that these physicians note that achievement of RBCTI and rise in hemoglobin are two key factors that drive their decision-making. Further, they point to the greater than 24-week TI and patient reported outcome data from IMerge as essential considerations. **<u>These physicians view imetelstat as the likely standard of care across the relapsed/refractory RS-negative patient population expressing enthusiasm for the significant efficacy improvement in a population with limited current treatments.</u>** These physicians also note transfusion burden has strong impact on treatment decisions **<u>and believe imetelstat is a compelling option for patients with high transfusion burden due to differentiated data in this patient population.</u>**

96. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because in reality, Rytelo was not used as the "standard of care" and was primarily used as a third-line treatment due to lack of physician awareness and higher administrative burdens and side effects. Thus, Rytelo was not a "compelling option," as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch. CW2 corroborated that there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management, aside from the prescribing information;

c. Defendants had failed to properly educate and target community healthcare providers in community settings, as Defendant Scarlett admitted on the February 26, 2025 earnings call by stating, "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers;

d. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the possible root causes of flat revenue trends;

e. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[]***;"

f. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given the nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

g. According to CW1, it is typical for new drugs like Rytelo to have slow adoption because it takes time for ***prescribing*** physicians to become comfortable prescribing a new drug. CW1 stated, "[t]hey need to see the evidence and get experience first.";

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

97. Also, during the Q1 2024 Earnings Call, Defendant Kapur falsely claimed that Geron had completed preparation for the commercial launch of Rytelo, including *hiring and training all necessary* sales personnel, and identifying the target market of physicians for Rytelo, who were purportedly comfortable with the safety profile for Rytelo:

> As Chip mentioned, in April, <u>**we completed the build-out of our full commercial organization with the hiring of our sales force, which has been now integrated and trained so that they will be prepared to be deployed in the field upon**</u>

> **potential approval**. I've had the privilege of getting to know this team really well, and I'm deeply impressed by their caliber, experience and commitment. We also have commercial supply arrangements in place and have finalized our specialty distribution network and third-party logistics. **From a market perspective, we have worked to identify the concentrated low-risk MDS prescriber base**, and our patient access and affordability solutions are on target for implementation at launch. **To support our launch preparation and commercial strategy, we have collected extensive market insights, which suggests that imetelstat is highly differentiated in this transfusion-dependent low-risk MDS market**. Our research has shown that medical and payer stakeholders are dissatisfied with available options in the low-risk MDS space, which we believe creates an opportunity for imetelstat.
>
> Additionally, they express enthusiasm for the totality of clinical benefits seen with imetelstat, including durable red blood cell transfusion independence, hemoglobin increases and reduction in transfusion burden, **balanced with a generally well-characterized and manageable safety profile**….

98. Defendant Feller further claimed Geron had "**highly skilled medical affairs team in place**" that was "**prepared to be a critical resource in helping support physicians in managing their lower-risk MDS patients**."

99. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron had not hired sufficient medical or sales staff for the Rytelo launch, and had not adequately identified or educated the target market of community physicians, most of whom CWs said were not even aware of Rytelo, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, CW2 witnessed a lot of internal turmoil and disagreements between the medical and commercial teams on how Rytelo should be launched;

b. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

c. During CW2's tenure from April 2023 to April 2024, CW2 witnessed tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, because "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]";

d. During CW2's tenure from April 2023 to April 2024, CW2 said that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical

team, between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs;

e. CW2 reported that during CW2's tenure, Steidle would tell CW2's team one thing only to then have to backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page[;]"

f. During CW2's tenure from April 2023 to April 2024, communication from leadership "was always unclear" which "definitely impacted the commercial launch of the drug[;]"

g. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers, and in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

h. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

i. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

j. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

k. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

l. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends; and

m. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

**E. June 7, 2024 – Special Call**

100. On June 7, 2024, Defendants conducted a special investor call to announce the FDA approval of Rytelo (the "June 7, 2024 Special Call"). As part of the announcement, during the June 7, 2024 Special Call, Defendant Kapur presented a slide and detailed Geron's purported expectations for Rytelo's performance on the market, pertinently adding the following:

> From our perspective, these guidelines reflect a lack of effective new treatment options, in particular, for those patients who are ESA ineligible high-transfusion burden patients and for RS negative lower-risk MDS patients who constitute an estimated 75% of this market. **This is a need, we believe, RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes. We expect to see RYTELO uptake across ESA ineligible, ESA failed RS-negative and RS-positive high transfusion burden patients**. Based on our latest market research, which was completed earlier this month, with 37 community and 20 academic U.S.-based practicing hematologist.
>
> On the left-hand side of this slide, as you can see, **our research suggests meaningful RYTELO use in frontline ESA-ineligible patients**. The right-hand side of the slide shows the estimated second-line population, approximately 85% of which are expected to be ESA or luspatercept experience[d]. **Our research suggests a broad use of RYTELO across the second line regardless of frontline therapy and particularly for RS-negative patients**. Our research supports the significant unmet treatment needs for the low-risk MDS patient population, and we strongly believe that RYTELO can play a meaningful role for eligible low-risk MDS patients moving forward.We plan to conduct a prioritized and targeted launch to a concentrated prescriber base of approximately 8,000 health care professionals. We also plan to cover approximately 2,200 targeted accounts and **70% of the patients are expected to be treated in the community setting with low-risk MDS**. As an infused product, RYTELO will be provider administered. Medicare is expected to be the predominant payer with approximately 84% of the patients falling under the Medicare umbrella.




101. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo was a "powerful[]" and "durable" treatment that would be broadly used as a frontline and second-line therapy, when in reality, Rytelo's revenues would come primarily from the third-line patient segment, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers, and in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch. CW2 corroborated that there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management, aside from the prescribing information;

c. Defendants had failed to properly educate and target community healthcare providers in community settings, as Defendant Scarlett admitted on the February 26, 2025 earnings call by stating, "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers;

d. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the possible root causes of flat revenue trends;

e. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[]***;"

f. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

g. According to CW1, it is typical for new drugs like Rytelo to have slow adoption because it takes time for prescribing physicians to become comfortable prescribing a new drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

102. During the question-and-answer portion of the call that followed, Defendant Kapur claimed the Company expected Rytelo to treat a "vast majority" of patients who are high transfusion burden:

**Craig for Corrine Johnson**, *Goldman Sachs Analyst*
So to start us off here, the label indicates that the drug is indicated for patients who require 4 or more transfusions in 8 weeks. So what portion of the patients does this apply to?

**Anil Kapur**, *Chief Commercial Officer*
So Craig, just to step back for a second. I just want to note again that low-risk MDS is a progressive disease and transfusion burden, as we have seen through all the clinical publications and real-world data, only continues to increase over time and continues to increase from one therapy to another.

> Our research and also data that was published by Dr. Rami at ASH 2023 showed from the real-world data set, approximately 50% of the patients are high transfusion burdens, which are 4 or more. In addition, our research also indicates that transfusion burden, in the eyes of a physician, is a sliding scale, with many physicians, approximately 80% plus of the physicians we have gone to research with indicating even one or higher on a regular basis is not satisfactory to them. <u>**So we expect a vast majority of the patients who are transfusion burden to be provided access to RYTELO**</u>....

103. The statement in the preceding paragraph was materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because it gave the false impression that physicians would easily prescribe Rytelo for high transfusion burden patients, when in reality, physicians were reluctant and/or unwilling to adopt Rytelo due to a lack of education and the fact it was more burdensome to monitor and adjust dosages, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers, and in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch. CW2 corroborated that there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management, aside from the prescribing information;

c. Defendants had failed to properly educate and target community healthcare providers in community settings, as Defendant Scarlett admitted on the February 26, 2025 earnings call by stating, "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers;

d. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the possible root causes of flat revenue trends;

e. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[]***;"

f. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it.

This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

g. According to CW1, it is typical for new drugs like Rytelo to have slow adoption because it takes time for prescribing physicians to become comfortable prescribing a new drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

104. In direct response to an analyst question pointedly asking whether the weekly monitoring would impact community doctors, Defendants Feller and Kapur assured that the weekly monitoring was "standard" and would not be viewed as a burden by community doctors:

**Kalpit R. Patel**, *B. Riley Securities, Inc., Research Division*
Any thoughts on the weekly monitoring requirements for the first 2 cycles and every cycle thereafter? How similar or dissimilar is that from your clinical trial protocol? ***And does that weekly monitoring impact a particular group of physicians, maybe community doctors***? All I'm trying to ask is how reasonable is it to do this for those types of doctors?

**Faye Feller**, *Chief Medical Officer*
So it is consistent with what was done on the Phase III IMerge study weekly for the first 2 cycles and then monthly prior to dosing in order to manage any potential dose modifications. **<u>This is pretty standard across 4 hematologists, I would say, as closer monitoring, especially in this patient population, it's often merited regardless of what drug you're starting in the beginning of treatment as a patient adjusts to the new treatment and the side effect profile, while monthly before the infusions is pretty standard</u>.**

**Anil Kapur**, *Chief Commercial Officer*
The only other thing I'll add is, Kalpit, to your question. We also obviously shared our profile and the weekly monitoring is also consistent. Many of these patients, as you know, are highly transfusion burden and they are coming to the clinics once a week or at least more than once a month many, many times to get red blood cell transfusion. **<u>So this has not been something that has been highlighted as a burden by both community and the academic facilities.</u>**

105. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo's treatment and monitoring regimen would not be viewed as burdensome by community doctors, when in reality, community doctors were hesitant and/or unwilling to try Rytelo because of the monitoring that was required, as evidenced by:

a. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

b. According to CW1, it is typical for new drugs like Rytelo to have slow adoption because it takes time for prescribing physicians to become comfortable prescribing a new drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

d. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;" and

e. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

**F. <u>August 8, 2024 – Q2 2024 Form 10-Q</u>**

106. On August 8, 2024, after the market closed, Defendants filed Geron's Q2 2024 Quarterly Report on Form 10-Q with the SEC for the period ended June 30, 2024, signed by Defendant Robertson (the "Q2 2024 Form 10-Q"). Notably, this quarter was the first reported following Rytelo's FDA approval and Rytelo's initial launch. Accordingly, Geron updated its risk factors to include new disclosures regarding the risks related to commercialization.

107. The Q2 2024 Form 10-Q contained false and misleading risk disclosures presented as mere hypotheticals, instead of risks that were actually occurring. For instance, under the section

entitled "Risks Related to the Commercialization of Rytelo," Defendants added a new risk disclosure not contained in any prior filings at a time when the Company was experiencing disruption and chaos in its commercial launch of Rytelo which had already forced it to terminate and replace Defendant Kapur, purporting to warn that ***if*** Geron is unable to successfully commercialize Rytelo, then its ability to generate revenue will be adversely affected, when in fact, Geron was ***already*** struggling with generating meaningful revenue from its sales of Rytelo, thus, the risk had already materialized:

> ***Our near-term prospects are wholly dependent on RYTELO. If we are unable to successfully commercialize RYTELO in the U.S. for lower-risk MDS, or to expand its indication of use, our ability to generate meaningful revenue or achieve profitability will be materially and adversely affected***.
>
> ***
>
> ***If we are unable to continue to execute on our sales, marketing and distribution plans to commercialize RYTELO, we may be unable to generate meaningful product revenue.***
>
> ***
>
> **If we are unable to recruit as needed, and to retain and effectively train marketing and sales personnel and equip them with compliant and effective materials, our efforts to successfully commercialize RYTELO could be adversely affected**.

108. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because the risks warned of had already materialized—Geron's commercial launch was already a disaster as the Company suffered from internal turmoil from conflicting directives from executive management leaving medical and sales staff "paralyzed" in the field, the Company had not prepared any marketing materials to be used in selling Rytelo, had insufficient and inexperienced medical and sales staff and, failed to educate community physicians on Rytelo and, thus, Rytelo sales consisted of only early adopter academics, which sales had flattened by September, as evidenced by:

a. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

d. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

e. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

f. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025;

g. During CW2's tenure from April 2023 to April 2024, the lack of community physician awareness negatively affected Rytelo's adoption;

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was ***"some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

109. Geron also purported to warn as mere hypotheticals that it may not be able to achieve market acceptance because the medical community ***may*** decide not to accept and utilize Rytelo, or Geron ***may be*** unable to successfully identify patients in Rytelo's approved indication and as a result might not achieve its revenue goals. In fact, Geron was ***already*** struggling with market acceptance, particularly with community healthcare providers, and with achieving market share within Rytelo's approved indication, thus, these risks had already materialized:

> ***To be commercially successful, RYTELO must be accepted by the healthcare community, which can be slow to adopt or unreceptive to new technologies and products.***
>
> **RYTELO may not achieve market acceptance in the U.S. for lower-risk MDS or any other indication that might be approved in the future, or achieve the potential U.S. or international revenue we believe may be possible, since hospitals, physicians, patients or the medical community in general may decide not to accept and utilize RYTELO**.
>
> ***
>
> ***If the market opportunities for RYTELO are smaller than we believe, our revenue may be adversely affected, and our business may suffer.***
>
> We are commercializing RYTELO in lower-risk MDS, and the addressable patient population in lower-risk MDS is based on our estimates. These estimates, which have been derived from a variety of sources, including scientific literature, surveys of clinics, patient foundations and market research, may prove to be incorrect. Further, new information from us or others may change the estimated incidence or prevalence of patients with lower-risk MDS in the U.S. Additionally, **the potentially addressable patient population for RYTELO may not ultimately be amenable to treatment with RYTELO, or we may be unable to successfully identify patients and achieve a significant market share in RYTELO's approved indication, or initial sales of RYTELO may deplete the prevalence pool of patients in the RYTELO's approved indication more quickly than expected, which would have a negative impact on sales of RYTELO in the future**.

110. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron was already struggling with market acceptance because community healthcare providers were reluctant and/or unwilling to prescribe Rytelo and those that were willing were early academic prescribers who were only willing to use it as a third-

line therapy due to better, less invasive options. As a result, the Q2 2024 Form 10-Q did not accurately portray Geron's then-current financial situation or business prospects because the warned about risks had materialized, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, CW2 witnessed a lot of internal turmoil and disagreements between the medical and commercial teams on how Rytelo should be launched;

b. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

c. During CW2's tenure from April 2023 to April 2024, CW2 witnessed tension between Denise Meyer, the Vice President of Medical Affairs, and Defendant Kapur, because "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]";

d. During CW2's tenure from April 2023 to April 2024, CW2 said that Denise Meyer and Defendant Kapur gave "conflicting directives to the medical and commercial teams" leading up to the Rytelo launch. There were also disagreements within the medical team, between Denise Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs;

e. CW2 reported that during CW2's tenure, Steidle would tell CW2's team one thing only to then have to backpedal after Denise Meyer or Defendant Kapur caught wind of it and changed the directive. "They weren't on the same page[;]"

f. During CW2's tenure from April 2023 to April 2024, communication from leadership "was always unclear" which "definitely impacted the commercial launch of the drug[;]"

g. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers, and in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

h. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch;

i. CW2 said that throughout CW2's tenure, there were no marketing materials covering information such as mechanism of action, clinical trials, administration, or side effect management aside from the prescribing information;

j. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase***

***awareness with a much broader group of physicians across the country[]*** and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

k. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

l. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

m. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025

n. During CW2's tenure from April 2023 to April 2024, the lack of community physician awareness negatively affected Rytelo's adoption;

o. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

p. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

q. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

### G. <u>August 8, 2024 – Q2 2024 Earnings Call</u>

111. On August 8, 2024, Geron hosted a conference call with analysts and investors, in order to present and discuss the Company's financial and operational results for its second quarter 2024 (the "Q2 2024 Earnings Call"). During the Q2 2024 Earnings Call, Defendant Scarlett falsely claimed Geron was seeing a significant uptake in prescriptions and enthusiasm from the "community" physicians that would support Rytelo becoming the "standard of care" for first and second-line patients:

> **As of July 31, 60% of the top decile 1 to 4 accounts have been reached by our team across both community and academic settings. This has led to gratifying uptake**. We estimate again as of July 31 that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch. **The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia**. **Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways and EMRs, including in the community setting.**
>
> In addition, the MDS NCCN guidelines were updated this July 25 to include RYTELO as a category 1 and 2A treatment for lower-risk MDS patients. That is, RYTELO is now designated for use in both RS positive and RS negative first-line ESA ineligible patients as well as in both RS positive and RS negative second-line patients regardless of prior first-line treatment. **We believe that these favorable NCCN guidelines have put RYTELO in a strong competitive position.**
>
> ***
>
> With the introduction of RYTELO as a new therapeutic option, we're seeing increasing dialogue among hematologists, rethinking treatment approaches for eligible low-risk MDS patients with transfusion dependent anemia. **Consequently, we believe that RYTELO can become part of the standard of care for both eligible first and second-line patients**.

112. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron was already struggling with market acceptance because community healthcare providers were not enthusiastic about Rytelo. Rather most had not even heard of it and those that had, were reluctant and/or unwilling to prescribe Rytelo, and, thus, Rytelo was unlikely to become the "standard of care" for first and second-line treatment when it was primarily used as a third-line treatment due to its side effects and administrative burden, as evidenced by:

a. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

d. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

e. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

f. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

g. During CW2's tenure from April 2023 to April 2024, the lack of community physician awareness negatively affected Rytelo's adoption;

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

113. Defendant Grethlein continued the prepared remarks, falsely portraying Rytelo's awareness among community physicians and success of the Company's execution on the drug's launch so far:

> On this next slide is a snapshot of our medical and commercial field teams that have been fully deployed to cover the entire U.S. market, supporting HCP and account education and uptake. This includes 50 key account managers, our oncology clinical educator liaisons, field reimbursement access directors and national

> account teams, along with our field medical affairs teams. **<u>We are pleased that since these commercial and medical field teams were deployed in June, there has been a strong level of in-person access to community and academic accounts and HCPs</u>**. We believe that the experience and relationships that our talented field teams bring to Geron have enabled them to quickly access these accounts.
>
> **<u>We believe that the strong RYTELO value proposition, commercial foundation and the execution of our entire organization is driving encouraging early results over these first 6 weeks of launch</u>**. As we commented earlier, we estimate that as of July 31, 2024, approximately 160 patients have received RYTELO. This demand was generated in part by reaching approximately 60% of top decile 1 through 4 accounts and includes orders from roughly 115 unique accounts.
>
> **<u>We are seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts with hospitals ranging from community, academic centers, teaching hospitals and large health systems</u>**…

114. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron's commercial launch was a disaster as the Company suffered from internal turmoil from conflicting directives from executive management leaving medical and sales staff "paralyzed" in the field, the Company had not prepared any marketing materials to be used in selling Rytelo, had insufficient and inexperienced medical and sales staff and, failed to educate community physicians on Rytelo. Thus, there was no "strong RYTELO value proposition" as Rytelo sales consisted of only early adopter academics, as evidenced by:

a. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[]***;"

d. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

e. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

f. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

g. During CW2's tenure from April 2023 to April 2024, the lack of community physician awareness negatively affected Rytelo's adoption;

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;" and

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS; and

k. The purported "strong" uptake was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers.

### H. November 7, 2024 – Q3 2024 Form 10-Q

115. On November 7, 2024, after the market closed, Defendants filed Geron's Q3 2024 Quarterly Report on Form 10-Q with the SEC for the period ended September 30, 2024, signed by Defendant Robertson (the "Q3 2024 Form 10-Q").

116. The Q3 2024 Form 10-Q contained false and misleading risk disclosures presented as mere hypotheticals, instead of risks that were actually occurring. For instance, under the section entitled "Risks Related to the Commercialization of Rytelo", Geron purported to warn that ***if*** Geron is unable to successfully commercialize Rytelo, then its ability to generate revenue will be

adversely affected, when in fact, Geron was ***already*** struggling with generating meaningful revenue from its sales of Rytelo, thus, the risk had already materialized:

> ***Our near-term prospects are wholly dependent on RYTELO. We have limited experience with the commercialization of RYTELO, and if we are unable to successfully commercialize RYTELO in the U.S. for lower-risk MDS, or to expand its indication of use, our ability to generate meaningful revenue or achieve profitability will be materially and adversely affected***.
>
> ***
>
> ***If we are unable to continue to execute on our sales, marketing and distribution plans to commercialize RYTELO, we may be unable to generate meaningful product revenue***.
>
> ***
>
> **If we are unable to recruit as needed, and to retain and effectively train marketing and sales personnel and equip them with compliant and effective materials, our efforts to successfully commercialize RYTELO could be adversely affected.**

117. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because the risks warned of had already materialized—Geron's commercial launch was already a disaster as the Company suffered from internal turmoil from conflicting directives from executive management leaving medical and sales staff "paralyzed" in the field, the Company had not prepared any marketing materials to be used in selling Rytelo, had insufficient and inexperienced medical and sales staff and, failed to educate community physicians on Rytelo. Thus, Rytelo sales consisted of only early adopter academics, which sales had flattened by September, as evidenced by:

a. CW2's title was changed in January 2024 from clinical education to Medical Science Liaison because there was a lot of misunderstanding about what the role was supposed to do, and expectations were not clear;

b. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country[]***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused[];***"

d. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

e. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

f. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025.

g. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

j. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the Fast Start meeting in January 2025;

k. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler, who told the sales team during that meeting that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas; and

l. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's

corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***."

118. Geron also purported to warn as mere hypotheticals that it may not be able to achieve market acceptance because the medical community ***may*** decide not to accept and utilize Rytelo, or Geron ***may be*** unable to successfully identify patients in Rytelo's approved indication and as a result might not achieve its revenue goals. In fact, Geron was ***already*** struggling with market acceptance, particularly with community healthcare providers, and with achieving market share within Rytelo's approved indication. Thus, these risks had already materialized.

> ***To be commercially successful, RYTELO must be accepted by the healthcare community, which can be slow to adopt or unreceptive to new technologies and products.***
>
> **RYTELO may not achieve market acceptance in the U.S. for lower-risk MDS or any other indication that might be approved in the future, or achieve the potential U.S. or international revenue we believe may be possible if approved outside the U.S., since hospitals, physicians, patients or the medical community in general may decide not to accept and utilize RYTELO**.

119. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because the risk being warned of had already materialized as community physicians that comprised 70% to 75% of the target prescribers were unaware of Rytelo and/or unwilling to prescribe it for anything other than a third-line, last resort therapy due to monitoring requirements, side effects, and the fact it is more invasive than proven competitor treatments already on the market, which had already caused Rytelo sales to flatline, as evidenced by:

a. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

b. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

c. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

j. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the Fast Start meeting in January 2025;

k. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler, who told the sales team during that meeting that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas; and

l. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***."

**I. <u>November 7, 2024 – Q3 2024 Earnings Call</u>**

120. On November 7, 2024, Defendants held an earnings call with analysts and investors to present and to discuss Geron's financial and operational results for its third quarter 2024 (the "Q3 2024 Earnings Call"). During the Q3 2024 Earnings Call, Defendant Scarlett touted the purported early success of Rytelo, stating in pertinent part:

> In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue which exceeded our expectations. **<u>The initial quarter of product revenue speaks to our execution as a commercial company</u>** as well as the high unmet need in lower risk MDS **<u>and the compelling value proposition of RYTELO for hematologists and patients. This gives us confidence in future continued demand and momentum for RYTELO</u>**.

121. Defendant Ziegler falsely claimed Rytelo would be broadly utilized across all patient subgroups by both community and academic providers:

> As Chip highlighted, we achieved $28.2 million in RYTELO net product revenues in our first full quarter of U.S. sales. In the first few months of launch, **<u>demand increased month-over-month with Q3 performance exceeding our expectations</u>**. Demand from launch through Q3 has come from 388 ordering centers which represents approximately 45% of our key targeted accounts. **<u>This strong start reinforces the high unmet need in RYTELO's clinical profile in first-line ESA ineligible and second line plus lower-risk MDS.</u>**
>
> Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and 1 year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. **<u>We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient subgroups in both community and academic settings.</u>**
>
> ***
>
> **<u>From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.</u>**
>
> ***
>
> In summary, I want to acknowledge the dedicated cross-functional teams at Geron for all their hard work to ensure that eligible U.S. patients have broad and timely access to RYTELO. I am inspired by how we have remained focused during this time of transition and I am optimistic in the future. **<u>We are very pleased with the strong demand for RYTELO across community and academic settings,</u>** favorable payer coverage policies **<u>and broad utilization across patient segments.</u>**

**<u>These early launch dynamics reinforce our expectations for continued demand and promising growth</u>.**

122. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo's lead indications for first and second-line patient segments had already, and would continue to generate significant revenue when, in reality, Rytelo's revenues came primarily from early adopter academics who were only willing to use Rytelo as a third-line therapy. Thus, demand and the potential market for Rytelo was significantly less than what Defendants represented and, as a result, Rytelo sales had already flattened, as evidenced by:

a. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

b. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

c. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

j. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the Fast Start meeting in January 2025;

k. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler, who told the sales team during that meeting that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas;

l. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***;"

m. The purported "strong" demand was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers; and

n. Thus, the estimated potential market and demand for Rytelo was much smaller than represented.

123. During the question-and-answer portion of the call that followed, in response to an analyst question, Defendant Ziegler assured investors that Rytelo was experiencing steady, consistent growth across *all* patient segments, and specifically in the first and second-line segments:

> **So what we're looking at is -- and expecting is steady, consistent growth across all of the patient segments. Specifically, second line in both RS negative and RS positive, first-line ESA-ineligible and then, of course, the relapsed/refractory third-line plus patients**. We're not giving guidance at this point, **but we are expecting steady and consistent growth going forward**.

124. Another analyst asked about patient growth rates, specifically across the first and second-line segments, and Defendant Ziegler, again, falsely assured that *all* patient segments across *both* the community and academic settings were growing:

> **Corinne Jenkins**, *Goldman Sachs Group, Inc., Research Division*
> You did mention that you expect to see kind of steady growth over the coming quarters, but could you clarify a little bit about what that means to you? Is that in terms of like absolute number of patient growth or the growth rate. Just a little clarification would be helpful there. And then in terms of the patients that you're seeing come on to therapy, are these primarily second-line or third-line patients? And what portion of them has previously been Reblozyl at this stage?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> Again, we're not providing guidance, but **in terms of our growth, what we expect is growth across all patient segments in both the academic and community setting**. And what we provided on this earnings call is that 388 of our targeted accounts have ordered. So that's the breadth. Over time, what we're expecting is obviously to increase the breadth and depth of prescriptions or are prescribing RYTELO for patients across these accounts.
>
> **So I'll just reinforce that we're seeing uptake in utilization across all patient segments, including first-line ESA ineligible, second-line and then third-line patients at this point**.

125. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo's lead indications for first and second-line patient segments had, and would continue to, generate significant revenue when in reality, Rytelo's revenues came primarily from early adopter academics who were only willing to use Rytelo as a third-line therapy. Thus, demand and the potential market for Rytelo was significantly less than what Defendants represented, as evidenced by:

a. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

b. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

c. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

j. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the Fast Start meeting in January 2025;

k. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team during that meeting that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas;

l. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***;"

m. The purported steady growth was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers; and

n. Thus, the estimated potential market and demand for Rytelo was much smaller than represented.

126. In response to an analyst question about the competition with luspatercept, Defendant Ziegler stated that notwithstanding the competition, Rytelo would still be the standard of care in the second-line:

> **Emily Claudia Bodnar**, *H.C. Wainwright & Co, LLC, Research Division*
> [C]urious how luspatercept is kind of transitioning more into the first-line setting has impacted the launch, if at all? And if you're seeing more patients previously treated with this luspatercept in the first line?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> [I]n terms of luspatercept in the first line, yes. Based upon their label and the commands**, I expect that trial that they will compete and compete for that first-line patient against ESA as you know**. **And regardless of whether that first-line patient is on ESA or luspatercept, we expect that our differentiated product profile will allow us to become standard of care in second line. And we still have that first-line ESA ineligible patient population, which is about 10% that we expect to compete for as well**.

127. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because in reality, Rytelo was not, and would not, be used as the "standard of care." Rather, it was primarily used as a third-line treatment after luspatercept. Moreover, it was not a "compelling option" due to its side effects and administrative burdensome, as evidenced by:

a. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

b. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

d. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

e. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS; and

f. Thus, the estimated potential market and demand for Rytelo was much smaller than represented.

128. Also during the Q3 2024 Earnings Call, an analyst specifically asked what the data shows in terms of the current utilization split between community and academic prescribers, according to current utilization trends, and Defendant Ziegler falsely stated the split was 65-35. Ziegler also stated there were not major concerns with cytopenia management:

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
>
> I was wondering if you could just maybe ***talk a little bit about the split that you're seeing. I know it's early in terms of data that you guys are getting. But just in terms of the utilization split between academics and community prescribers***. And then you mentioned your review of chart audits in terms of informing ***how current utilization trends are looking***. Can you talk about just how the dose management to address the cytopenias that occurred typically during the first few cycles is playing out in the real world data just relative to IMerge.
>
> **Jim Ziegler**, *Chief Commercial Officer*
> **<u>The split between community and academic is 65-35 or roughly 2/3, 1/3. And then right now, what we're hearing from our physicians in both field observations as well as our market research is that cytopenia management is well understood. There aren't major concerns, and I would expect that the real-world cytopenia management is at least as good as it is in the clinical trials</u>**. And we have a lot of personal, nonpersonal efforts to help support appropriate cytopenia management associated with RYTELO.

129. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because the ***utilization split*** among prescribers was mostly academic, not community, as Ziegler later admitted, in contradiction of this statement.

Furthermore, Geron failed to educate community prescribers on Rytelo and those physicians were, thus, reluctant and/or unwilling to prescribe Rytelo because of concerns about cytopenia management and other side effects, as evidenced by:

a. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

b. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

c. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;" and

i. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive

> treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS.

**J. November 18, 2024 – Stifel 2024 Healthcare Conference**

130. On November 7, 2024, Defendants Scarlett and Robinson were interviewed as part of the Stifel 2024 Healthcare Conference (the "Stifel 2024 Healthcare Conference"). At the Stifel 2024 Healthcare Conference, Defendant Scarlett falsely touted Rytelo's purported strong and broad remit across patient populations:

> [W]e are indicated to share about 10% of the frontline patients that are so-called ESA ineligible. **We also have a broad remit across all of the second line and a particularly strong remit in the second line RS negative population, which, heretofore hasn't had any real drugs indicated for that**.

131. In response to an analyst question about Geron's outreach to community physicians and consternation by community doctors to manage patients who develop cytopenias from using Rytelo, Defendant Scarlett falsely claimed that two-thirds of patients were coming from community physicians and affirmatively assured analyst that doctors were comfortable dealing with cytopenias so Defendants were not concerned that would impact Rytelo acceptance or sales:

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
> One of the segments that is really impactful, at least from a prescribing perspective in low risk MDS, is the group of community-based physicians. And so can you maybe just speak to how your outreach efforts are focused here? What [does] the early data you're seeing tell you about the return on those efforts? And then I think going into this launch there was a lot of, I don't know if you want to call it consternation, but, some concern about the willingness and the ability of these community docs to manage these patients kind of through these cytopenias that's typically caused by this drug during the first few cycles of therapy. Have you seen any of that hesitancy playing out in the commercial setting? Do you have to do more handholding with these guys than you would an academic doc?
>
> **John Scarlett**, *Chief Executive Officer*
> I think we've been very gratified by what we've seen so far. So first of all, if you look across the landscape in the United States about, about 65% of the prescribing physicians in low risk MDS are in the community setting. And about 35% are academic in one form or another. **That's exactly what we've seen so far. We've been seeing about two thirds of the patients appear to be coming from community settings and about a third come from academic settings**.

> **The question about the ability and willingness of, in particular the community, physicians to manage cytopenias, I have to say that's been more of an external point of view. We've always had confidence that the community physicians that we have interacted with pre-launch had tremendous reserves of insight and knowledge about how to deal with patients with cytopenias**.
>
> If you think about it, the class of drugs that these hematologists generally use, whether it's in lower risk MDS, or other myeloid, hematologic malignancies, they're often associated with significant cytopenia. Some even, well, I'll just say very significant. **We are very confident that they have the basic knowledge and insight on how to take care of these patients. I think that's what we've seen to date**.
>
> We also have a lot of support for them. We have oncology nurse support. We have our medical scientist support, the MSLs, and of course our sales reps and all of the apparatus that we can bring to bear on it. **So I think overall it's a little early in the launch to early declare victory, but I think we're feeling very good about management of cytopenias and really management of the safety profile of the product overall. And certainly feel very comfortable with the community docs taking care of that**.

132. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because Geron failed to educate community physicians who had either never heard of Rytelo and/or were reluctant and/or unwilling to prescribe Rytelo due to side effects and burdensome monitoring requirements. Moreover, the academic physicians that did prescribe Rytelo did so mainly as a third-line therapy and, thus, Rytelo would unlikely become the "standard of care" for first and second-line treatment. Thus, contrary to Defendants' statements, Rytelo did not have a "broad remit" across second-line, nor were the majority of physicians prescribing Rytelo from the community setting, as evidenced by:

a. CW1 stated that Geron did not provide any marketing materials, such as pamphlets, case studies, or any other resources to use in selling Rytelo prior to and at the time of its launch and for many months after launch, which negatively impacted community physician adoption of Rytelo;

b. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

c. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

j. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the January 2025 Fast Start meeting;

k. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team during that meeting that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas;

l. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***.";

m. The purported "strong" remit was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers; and

n. Thus, the estimated potential market for Rytelo was much smaller than represented.

133. Next, the analyst interviewing Scarlett asked about the types of patients who were being prescribed Rytelo, to which Defendant Scarlett responded that they were receiving patients across all key segments:

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
> I know a lot of the data that you're seeing post-launch is still very early, but are you seeing anything that kind of provides some information on the types of patients who are being prescribed therapy? And is there anything that you can say about the split between RS negative, RS positive, ESA, ineligibles, and just what these patients have been previously treated with?
>
> **John Scarlett**, *Chief Executive Officer*
> [W]e don't see the same level of information that we would of course love to see, which would identify patients by segment, by demographics, and so forth. So what you have to do, if you want to understand this better, is you have to do essentially market research.
>
> ***
>
> Here's what we can say to date from what we've been able to glean from that kind of work, although it's still in its infancy. It looks like **<u>we're getting patients across all of the key segments that we would've expected, frontline ESA ineligible patients, in second line RS positive patients and RS negative patients. In particular, I'd say the RS negative, just because they make up more of the second line and because other products are not necessarily approved. We're certainly seeing our, our fair share, and then we do get third line patients as well.</u>**
>
> ***
>
> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
> How is your ability to penetrate each of those segments impacted, if at all, by the use of luspatercept in the frontline center?
>
> **John Scarlett**, *Chief Executive Officer*
> Well, frontline is frontline, and aside from that 10% that we can compete effectively I think that it is a competition between luspatercept and ESAs. I'll not speak for our colleagues at BMS. **<u>I'll just simply say that when patients come down to the second line after frontline usage, I think we expect to be very, very, very</u>**

> **<u>strongly competitive in all elements of that</u>**. **<u>And in particular, I think we would expect to have very strong representation in the second line RS negative patient population.</u>** As you know other products are not necessarily indicated there and can't promote there. And I think that we've seen a real scarcity of product opportunity just because there hasn't been very much activity except for luspatercept in the last 10 years. **<u>So now that we're on the marketplace, I think we expect to see very strong uptake in across all of the second line, but in particular in the RS negative.</u>**

134. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo was generating significant revenue from first and second-line patient segments and, thus, was "strongly competitive" against luspatercept when, in reality, Rytelo's revenues came primarily from the third-line patient segment, and physicians were more likely to use luspatercept because it was less burdensome and invasive. Thus, Defendants' purported expectation that there would be a "strong uptake in across all of the second line" lacked any reasonable basis as sales had already flattened by September because it was primarily academic physicians who were prescribing Rytelo but only as a third-line treatment, as evidenced by:

a. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and many patients can continue with transfusions for years;

b. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first.";

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

d. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

e. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

f. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the January 2025 Fast Start meeting;

g. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler told the sales team that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas;

h. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***;"

i. The purported "strong" uptake was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers; and

j. Thus, the estimated potential market for Rytelo was much smaller than represented.

135. The analyst interviewing Scarlett specifically compared the luspatercept launch with Rytelo's launch, and asked if Rytelo would see the same type of bolus patient demand, which Defendant Scarlett assured that Rytelo would not have a bolus demand, but strong, steady consistent growth:

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
> When I go back and I look at commentary from Bristol, specifically the comments that they made during the first three to four quarters of the initial luspatercept launch and low risk MDS, there was a lot said about how growth was being driven by this bolus of patient demand…What are you seeing out there and do you think that there's kind of a similar bolus phenomenon at play here?
>
> **John Scarlett**, *Chief Executive Officer*
> It's a great question. And of course, you only know bolus for real when you look at in retrospect. **<u>We've never modeled a bolus and really have never expected it. We've always expected strong strategy growth</u>**.
>
> ***
>
> **<u>In any event, I think we've seen demand coming from over 45% of our key targeted accounts. I think strong steady growth is what we expect and what we've modeled</u>**.

136. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make

the statements not misleading because they gave the false impression that Rytelo's early success was not a bolus, and instead would have strong steady growth, when in reality, Rytelo's sales since Rytelo's launch were attributable to early adopters in academic settings who mainly used Rytelo as a last resort, third-line treatment, as evidenced by:

a. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

b. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

d. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

e. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

f. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the January 2025 Fast Start meeting;

g. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas;

h. The purported "strong" growth was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers; and

i. Thus, the estimated potential market for Rytelo was much smaller than represented.

**K. December 4, 2024 – 7th Annual Evercore HealthCONx Conference**

137. On December 7, 2024, Defendant Scarlett was interviewed as part of the 7th Annual Evercore HealthCONx Conference (the "Evercore HealthCONx Conference"). At the Evercore HealthCONx Conference, Defendant Scarlett doubled down, claiming Rytelo will be the standard of care in frontline and in second-line for both RS negative and RS positive patients:

> **Unknown Analyst**, *Evercore Analyst*
> Let's talk about the launch. First quarter obviously went very well. The market and the label is a little split here, so I would love to start by diving into the different populations. You've got the first line, ESA ineligible. Second line is split between the bars, plus and minus… So first things first, I know it's early in the launch, but what are you observing on the ground in terms of the populations where you're getting the best traction, and what's the feedback from docs on which settings they're most enthusiastic about?
>
> **John Scarlett**, *Chief Executive Officer*
> [] We've had a lot of investor interest, it's to say the least. So we're excited to be able to be at this stage of the company's development. You're right, we had a bang up first quarter, John. We had a good solid beat on the initial consensus numbers. **<u>As we look ahead, we see strong continued growth</u>**.
>
> ***
>
> In terms of the types of patients in the market, we kind of think of them in the following buckets. There's a group of patients who are frontline patients, but who when they appear and they're ready to start treatment, they have very high endogenous, erythropoietin levels. Those patients historically have not responded, to the use of ESAs…Those patients we have had in our clinical trials and we've shown very nice results in that patient set. It's a small group for us. It's about 10% of the frontline, **<u>but we're able to get a toehold there for sure. We've always been very strong in across the entire second line setting</u>**. So Reblozyl, our major competitor luspatercept, was developed for a relatively modest part of the second line market. That's the so-called RS positive second line market. They never studied the RS negative second line patients, and that's not in their label.
>
> **Unknown Analyst**, *Evercore Analyst*
> Although it is on guidelines.
>
> **John Scarlett**, *Chief Executive Officer*
> It is on guidelines for sure. Yes. And, as a commercial company, you get into what can you promote and what do patients actually do, and you're quite, that's a correct way to look at it. So **<u>in any event, we feel very, very strongly that we should be able to make great inroads, particularly in the RS negative second line RS negative space. And we do very well in the RS positive space, although that is a fairly, that's where luspatercept has really gotten most of their sales.</u>** And then there's always the third plus line that any drug will get.

138. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo's lead indications for first and second-line patient segments had, and would continue to, generate significant revenue and that Geron was experiencing continuing sales growth for Rytelo when in reality, Rytelo's revenues came primarily from early adopter academic physicians who prescribed it as a third-line treatment and, thus, Rytelo's sales had already flattened by September, as evidenced by:

a. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

b. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

c. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

d. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

e. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

f. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the January 2025 First Start meeting;

g. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas;

h. Defendant Scarlett's admissions on the February 26, 2025 earnings call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***" and "based upon the rolling 4-

and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward;"

i. The purported "strong" growth was just a bolus of academic early adopter doctors, not community physicians that comprised approximately 70%-75% of target subscribers; and

j. Thus, the estimated potential market for Rytelo was much smaller than represented.

139. Next, the analyst asked Defendant Scarlett if there was any hesitancy among community doctors with respect to cytopenias, to which Defendant Scarlett assured there was no hesitancy or resistance from community doctors because they were used to seeing and treating cytopenias and, in any event, Geron provided proper educational support:

> **Unknown Analyst**, *Evercore Analyst*
> Have you observed any lingering hesitance in the commercial setting, maybe in the community groups of docs that haven't fully digested the positive label or the profile here and are still worried?
>
> **John Scarlett**, *Chief Executive Officer*
> [] **I don't think we're seeing hesitancy. If anything, we always engage providers with the commentary around the cytopenias**. We want to make sure that everybody understands the nature of them, that they are self-limiting to some degree. Certainly, there are ways to adjust the dosing, hold doses, et cetera. And that's to make sure that people can stay on the drug and get the benefit of it. And their usual response, whether it's an MSL or a sales rep or, a nurse that we employ as an educator, **all of those people are coming back with the same answer. These hematologists say, you don't understand, every drug that we use does this. We don't care. We manage it all day, every day. I think there's a certain amount of truth to that. So we're not seeing, I haven't really heard any resistance from that. I think that was so well described and talked through and the information out there is really quite extensive. So I don't think it's going to be the big limiting factor. At least it doesn't seem that way right now**.

140. The statements in the preceding paragraph were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that community healthcare providers were not "hesita[ting]" to prescribe Rytelo because they had no concerns about treating cytopenias, when in reality, the majority of Rytelo prescriptions were coming from academic physicians because Geron had failed to educate community healthcare providers who were

reluctant and/or unwilling to prescribe Rytelo due to its side effects and monitoring requirements, as evidenced by:

a. During CW2's tenure from April 2023 to April 2024, awareness of Rytelo was low among community healthcare providers and, in fact, most community healthcare providers outside of the academic space had never even heard of Rytelo. The majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it;

b. According to CW2, Defendants' claim that Rytelo would be used as a first-line treatment was not realistic given nature of MDS and how physicians typically treat it. This is because, as CW2 explained, as long as patients are responding to transfusions, doctors will stick with that option as it is less invasive with fewer side effects and patients can continue with transfusions for years;

c. According to CW1, prescribing physicians are typically slow to adopt a new drug until they are fully educated on the drug. CW1 stated, "[t]hey need to see the evidence and get experience first";

d. Defendant Ziegler admitted on the February 26, 2025 earnings call that Geron had failed to properly educate community physicians that comprised 75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 earnings call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 earnings call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Geron overhauled the management team responsible for the commercial launch, by first abruptly replacing Anil Kapur effective August 31, 2024, with Defendant Ziegler, hiring Jim Hassard as Senior Vice President of Sales and Marketing and Joseph Eid, M.D. as Executive Vice President of Research and Development in November 2024 and firing Defendant Scarlett, Geron's CEO of nearly fourteen years, on March 11, 2025;

h. Defendant Ziegler admitted on the February 26, 2025 earnings call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

i. Defendant Ziegler admitted during the February 26, 2025 earnings call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

j. Reblozyl (luspatercept) approved in 2023 as a first-line treatment option for patients with MDS who are RS negative was less burdensome to manage and a less invasive treatment option, making it unlikely that Rytelo would be immediately adopted as a first or second-line treatment for RS negative MDS;

k. During CW1's tenure from the second quarter 2024 until the second quarter 2025, CW1 confirmed that sales had flattened in September 2024 and November 2024, which was later confirmed by Defendant Ziegler during the January 2025 Fast Start meeting; and

l. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy, which was included in the 2025 sales quotas.

## VII. THE TRUTH EMERGES

141. On February 26, 2025, Defendants held an earnings call to discuss the Company's fourth quarter and full year 2024 financial results (the "Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendants shocked the market when they revealed that Rytelo's sales growth had ***flattened*** "over the last few months" and the flatness had continued up to the Q4 2024 Earnings Call. In pertinent part, Defendant Scarlett stated:

> However, ***despite achieving this revenue in the first 2 quarters of launch, we have observed flat revenue trends over the last few months***. As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call.

(Emphasis added).

142. Defendant Ziegler reiterated the flatness observed in Rytelo's growth over the past few months and elaborated that, contrary to Defendants' prior statements, "the majority" of Rytelo sales came from the third-line patients segment:

> As described previously by Chip, we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024…New patient starts and duration of treatment are the key primary drivers of revenue. For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately 8 months observed in the Phase III IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed

> in IMerge. ***However, with respect to new patient starts, we have observed flatness over the past few months***. Specifically, even though we see RYTELO being utilized across RS-negative and RS-positive first-line ESA ineligible, second-line ESA relapse refractory and third-line plus patients***, the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations***.

(Emphasis added).

143. Defendant Ziegler further explained factors that Geron would be addressing, in order to correct the flatness in new patient starts and revenue:

> ***Our priority is to drive new patient starts across the breadth of population in our FDA label so that we are not niche to a third-line treatment***…
>
> There are other factors we are also addressing, which we believe will help accelerate uptakes in earlier line patients. First, below the national level trends, we see variability in regional territory and account level performance. Some territories and accounts are performing very well and competing and winning at the local level. ***Other territories and accounts have opportunity for improvement where we are refocusing our support and sales training efforts***.
>
> ***Second, we believe the lower-risk MDS market is promotionally sensitive with time in front of the health care providers, or HCPs, being a key factor to changing their prescribing behaviors. We are taking steps to optimize our engagement with target HCPs.*** Joe will also highlight educational efforts by our medical affairs team to increase HCP awareness and education.
>
> We expect that as HCP's gain successful clinical experience with RYTELO in later lines and often difficult-to treat patients, and as we work to raise awareness and increase engagement, they will choose RYTELO in earlier lines of treatment.
>
> Third, as Chip mentioned earlier, ***our organization changed commercial and medical affairs leadership a few months into launch***.
>
> ***
>
> We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, ***refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO*** in lower-risk MDS, which I will speak to on the next slide.

(Emphasis added).

144. Joseph Eid, the Executive Vice President of Research & Development, further identified "areas for improvement":

> Similar to Jim's approach in the commercial organization, we are continuing to build and enhance our medical organization. As a first-in-class drug with a unique mechanism of action, RYTELO requires a steady flow of data to raise awareness and manage knowledge and data gaps at launch. To that end, ***we have actively prioritized our publication strategy and are targeting key medical congresses to reach the medical community to help increase awareness***.
>
> Together with commercial, ***we are also investing in market development and KOL engagement, which is particularly important in this launch***, given that 70% of the Phase III IMerge investigators were ex U.S.

(Emphasis added).

145. During the question-and-answer portion of the call that followed, Defendants responded to multiple inquiries regarding the declining growth trajectory for Rytelo during the following pertinent exchanges:

> **Peter Richard Lawson**, *Barclays Bank PLC, Research Analyst*
> Maybe first question would just be around how we think about revenues, your commentary around flat revenues over the last few months. Whether you're seeing any week-over-week growth. And I've seen that comment kind of captures January and February. And then the other component would just be around how we think about 1Q revenues themselves, whether that's flat or growing versus 4Q, and then anything you can tell us around revenues and costs as we think about 2025?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> Peter, so our ***revenues week-over-week have had some variability. But what I would say is our 4- and 8-week rolling averages underscore the flatness that I characterized on the call. And that flatness continued into the prior week leading up to this call***. So it may be a little bit too early to make a full call on Q1 revenues, but I would characterize and reinforce what we said on the earnings call that ***the past couple of months have been relatively flat week-over-week in the 4- and 8-week averages***.
>
> ***
>
> **Tara A. Bancroft**, *TD Cowen, VP & Senior Equity Research Analyst*
> So I was hoping you could give us maybe some more detail on the seasonality or patterns in general, not only that you're seeing with RYTELO, but it appears to be impacting MDS as a whole with luspatercept too. So I'm curious to get your thoughts on what's happening at a higher level in this indication? And then separately, maybe, Jim, if you could tell us more about the expected cadence of growth this year that we could see with your implemented changes that you suggested?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> [W]e saw some seasonality beginning around the holidays, Thanksgiving more specifically. And ***there is some hesitancy in the market to start some of these***

***products that require, in our case, some monitoring***. So there was a little bit of a delay.

…In terms of the expected cadence, it's really driven off of our business driver, right? We characterize the most important business driver for us is new patient starts. ***As you know, with launch products, often start in later line, third line plus, which we characterized on this call as seeing that's where the majority of our use was, even though we saw earlier line, second line, first-line use.***

So it really depends on our effectiveness in driving market share, not just in third-line plus, but in earlier line, second line and first-line opportunities. ***And our expectation is that as we increase our share of voice, our reach and frequency and together with medical affairs, increase education and awareness, we hope to see greater impact and use across all lines of therapy. But it's not going to happen overnight. Share of voice and increasing the prescribing behaviors will take some time***.

***

**Faisal Ali Khurshid**, *Leerink Partners LLC, Research Analyst*
On the trends that you've been seeing, could you comment on like how much of that was an impact on new patient starts as opposed to like discontinuations or dose modifications and holidays? I guess, the reason for the question is ***even if you're starting mostly in third-line patient, like shouldn't you be kind of like adding patients at a consistent rate***? And I guess like people are also wondering like the duration of therapy should still be longer than like the time you've been in the market in third line as well? Or is that not the way to think about it?

**Jim Ziegler**, *Chief Commercial Officer*
Faisal, no, I think the way you're thinking about it is exactly right. ***The primary drivers are new patient starts and duration of treatment***. What I said on the call is that duration of treatment at this point, while still early in that, we're only approaching the median duration of treatment in IMerge about right now. That does not appear to be issue based upon our own market research and KOL.

As you know, there isn't perfect data that we can cite only data that we triangulate around. But right now, at this point, we don't believe that duration of treatment is inconsistent with that seen in IMerge. ***And so we have seen some softness and it's related to new patient starts.***

I think the way to characterize it is we saw uptake and unmet need and ***the treatment was really with some of these early adopters*** who believe -- who understood and believed in the product and ***it's our obligation to really increase the reach and frequency, the share of voice amongst the majority of physicians who have yet to treat patients with RYTELO***.

**Faisal Ali Khurshid**, *Leerink Partners LLC, Research Analyst*
Got it. And then in terms of like the inflection or potential inflection this year, like do you guys have visibility that you should be kind of like at a bottom on new

> patient growth now? And then like how confident are you like the new sales strategy will cause an inflection? And what kind of timing would -- should we expect on that?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> That's a great question. ***I wouldn't characterize it as an inflection. I think others characterized it in the past as a bolus. What we're looking for is steady growth -*** - a steady growth in third line leading to earlier lines, second line and first line. So what we anticipate is that with great execution, great targeting, great messaging that as we increase our share of voice and awareness with these physicians that we would see uptake across the board.
>
> ***
>
> **Kalpit R. Patel**, B. *Riley Securities, Inc., Senior Biotech Analyst*
> Maybe first on the flattening over the past few months. Can you comment on exactly which month you started to see flattening? Was it the beginning of this year? Or was it the beginning of fourth quarter last year?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> ***[] I would say based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward***. We do see, as you know, in the weekly data, a lot of variability, which is why we incur more to the 4- and the 8-week rolling averages.

(Emphasis added).

146. In response to an analyst question about differences between the academic and community settings, Defendant Scarlett admitted that the biggest opportunity for Geron was to increase the reach in the community setting, thereby admitting that Geron's community awareness was not in line with academic setting, as previously told to investors:

> **Gregory Allen Harrison**, *Scotiabank Global Banking and Markets, Analyst*
> What feedback are you getting from KOLs and other providers around why they're not using RYTELO as much in earlier lines of therapy? And are there any differences based on setting as far as academic versus community? It sounds like from your comments just now that the bulk may be in academic?
>
> **John Scarlett**, *Chief Executive Officer*
> Thanks, Greg. I think the first message that I would share with you is that our MD and our KOL feedback that have used RYTELO, very simply can be summarized as RYTELO works. ***And we see that in our market research and our one-on-one engagements with the KOLs. I think the biggest opportunity for us is to really increase the reach and frequency, our education and awareness and share of voice especially as you point out with the community.***

> I'll just give you a very simple mathematic equation. So if you think about the 15,400 patients that we characterize as treatment eligible and you divide that by the number of MDS treating physicians in the U.S. It only leads to a couple of patients on average that each one of these physicians have. ***So it's really important for us to make sure that we get out to as many of these physicians in a cost-effective way through our sales team, our medical affairs team, and our nonpersonal efforts to really increase the share of voice***.

(Emphasis added).

147. In response to an analyst question about patient mix, Defendant Ziegler admitted that Geron was seeing "***higher use in later lines***" and that Geron's messaging to physicians was poor, stating, "***I don't know that our messaging has been as specific as it could be. And that's one of the things that we're refining with our segmentation targeting and messaging going forward***." (Emphasis added).

148. Later, in response to an analyst question about the source of most new patients, Defendant Ziegler admitted that, contrary to Defendants' prior statements, new patient starts had actually come from early adopters at academic medical centers, and not the community setting:

> **Emily Claudia Bodnar**, *H.C. Wainwright & Co., LLC, Vice President & Senior Healthcare Analyst*
> I guess on the first one, in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re-prescribe it to new patients? Or is it mostly coming from new prescribers, new centers?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> ***[] On new patient starts, we're seeing repeat prescriptions amongst the early adopters largely at many of the academic medical centers. In the community, it's a little bit more diffused.*** So there, we're seeing more breadth than depth. But over time, as with other product launches, I expect that both breadth and depth will continue to grow, especially as physicians gain clinical experience and success with RYTELO.

(Emphasis added).

149. An analyst asked Defendant Scarlett whether Geron needed to reassess expansion plans outside the U.S. until new patient starts were back on track, and Defendant Scarlett admitted that ninety percent of Geron's focus was getting new patient starts in the U.S. on track, as well as appropriate utilization of unmet need:

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*

> [] Do you need to get the U.S. on track and kind of growing in a new patient start direction before you embark on anything outside the United States?
>
> **John Scarlett**, *Chief Executive Officer*
> Yes, Steve, it's Chip. I think that it would be very easy for us to put our hands on our hearts and say ***our #1, #2 and #3 focus is on the U.S., the U.S. -- getting the U.S. on track, new patient starts on track, appropriate utilization throughout the areas of high unmet need***. And we are absolutely taking care to look at a variety of different options and to start some of the prework for Europe. But I think it would be very, very easy to say that our ***90-plus percent of our focus is on the U.S. right now.***

(Emphasis added).

150. Investors and analysts reacted immediately to Geron's revelation. The price of Geron's common stock declined dramatically from a closing market price of $2.37 per share on February 25, 2025 to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day on heavy trading volume.

151. A number of well-known analysts who had been following Geron lowered their stock ratings in response to Geron's disclosures. For example, H.C. Wainwright & Co., while downgrading the stock to a neutral rating due in part to the 8-week and 4-week trend showing flat revenues, noted "the company has observed prescribers represcribing Rytelo to patients, ***though mostly in the academic setting***" and that the "***community setting prescriptions have been more diffused***…" (emphasis added).

152. The H.C. Wainwright & Co. analyst also pointed to Geron's seemingly incongruent commercial plans to target first and second-line patient segments while the majority of new patient starts have been in the third-line segment, and pointed to competition as one likely factor, stating, in pertinent part:

> The company noted that majority of new patient starts have been in 3L low risk myelodysplastic syndrome (LR-MDS) patients, while ***the company's commercial plan is to target 1L ESA ineligible and 2L ESA refractory patients, as per the label***.
>
> ***
>
> We remind ***that luspatercept was approved for 1L patients in 2023***, which may be causing a shift in prescriber patterns and treatment paradigm. ***We believe some HCPs who are still using ESAs in 1L are likely then using luspatercept in 2L and then Rytelo in 3L.***

(Emphasis added).

153. As a result, the analyst concluded that while the Company "announced a plan to shift its strategy aimed at educating HCPs on Rytelo and expanding awareness of the therapy," they did not provide any specific plans "to address awareness aside from increased HCP education and use of KOLs and medical conferences."

154. Similarly, Barclays, lowered its price target nearly 56%, and similarly highlighted "***Rytelo new patient start flatness*** over the past few months (specifically 4- and 8-week rolling averages), with ***seasonality impact*** that started around the Thanksgiving holidays in 2024, ***and some hesitancy around starting products that require monitoring.***" The Company further noted that "[c]ompetitive dynamics also appear to be a headwind, and the majority of new starts are coming from the 3L+LR-MDS setting, ***while second line starts have been lower than expectations***." (emphasis added).

155. Needham also lowered its price target as a result of the softness to new patient adds, indicating that "[e]merging trends suggest ***Rytelo has captured low-hanging patients in academic centers*** (primarily in the 3rd line) but is experiencing challenges penetrating earlier lines, specifically, RS negative ESA failures. Geron chalked this dynamic up to ***insufficient education and outreach outside Rytelo experienced centers***." As a result, Needham noted that the Company intended "to invest in education and outreach to re-accelerate the launch." Due to a "slower than previously expected launch" Needham decreased its price target from $7.00 to $5.00 per share (emphasis added).

156. Wedbush analysts also noted that "***academic center use appears to be more dominant***, relative to the community setting (where additional effort is required for engagement)" along with "hesitancy to start new patients in holiday weeks, in light of a requirement for monitoring." (Emphasis added).

157. Scotiabank analysts also submitted a negative report, finding "Geron shares are weaker after management cited that momentum of the Rytelo launch in lower-risk myelodysplastic syndromes (LR-MDS) has slowed, noting flat revenue trends over the last few months." Scotiabank believed the "slowdown is a cause for concern at this early stage of the launch." Scotiabank analysts "caught up with management after the call which pointed to 3L patients

accounting for the majority of Rytelo scripts, with uptake among 2L falling below expectations at this point in the launch." As a result, Scotiabank lowered its "penetration assumptions for Rytelo in LR-MDS".

## VIII. POST-CLASS PERIOD EVENTS

158. On May 7, 2025, before the market opened for trading that day, Defendants issued a press release announcing Geron's first quarter financial results (the "May 7, 2025 Press Release"). The May 7, 2025 Press Release reported that revenues for Rytelo were $39.4 million for Q1 2025, down more than $8 million from Q4 2025, and Q1 "demand [was] relatively flat."

159. The same day, Defendants held a conference call to discuss Geron's results (the "May 7, 2025 Earnings Call"). During the May 7, 2025 Earnings Call, Dawn Carter Bir, Geron's Interim President & Chief Executive Officer and Director, shared several key factors that influenced the recent "soft performance" as well as specific enhancements Geron made to support commercial success:

> Since our last earnings call, we've performed an in-depth analysis of our commercial efforts with the current market, and we're focused on 3 key strategies to invigorate sales growth. First, we are investing additional resources to increase brand awareness among the highest decile U.S. hematologists treating the greatest number of lower-risk MDS patients today.
>
> Second, we're refining our marketing and medical efforts to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label with the goal of supporting positive HCP and patient experiences and continued use. And third, we're implementing programs to expand U.S. KOL support and advocacy through aligned messaging, education and through both commercial and medical affairs engagement efforts.

160. Defendant Ziegler further confirmed that "to date, most usage has been in the third-line plus setting." Defendant Ziegler went on to state that Geron was expanding its team by adding key account managers, oncology clinical educators, and a field-based regional marketing team. Additionally, Defendant Ziegler stated that Geron was "pursuing community-based educational and outreach initiatives". The commercial and medical affairs teams were also addressing and educating healthcare providers on appropriate cytopenia management to increase healthcare provider prescribing confidence.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

161. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding Geron, and their control over and/or receipt and/or modification of Geron's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants' scienter and that of other senior executives is properly imputed to Geron.

### A. Defendants' Actual Knowledge and/or Recklessness

#### 1. Defendants' End of Class Period Admission That They Knew Sales Had Flattened by at Least November 2024 Because Rytelo Failed to Educate Community Physicians and the Academics that Were Prescribing Rytelo Did So Only as a Third-Line Treatment

162. During the Q4 2024 Earnings Call, Defendant Scarlett admitted that Geron had "observed flat revenue trends over the last few months." Defendant Ziegler confirmed Scarlett's admission and elaborated that the "flatness continued into the prior week leading up to this call." Ziegler further admitted that "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations." In other words, contrary to Defendants' prior statements, Rytelo was being primarily used as a third-line, last resort treatment by "academic medical centers," not the community physicians investors were led to believe.

163. Accordingly, Defendants Ziegler stated, Geron would have to "***refin[e] our segmentation and targeting and improving our promotional and sales force effectiveness[.]***" To do this, Geron replaced its commercial and medical affairs leadership and EVP of R&D, as described below.

**2. Defendants Admittedly Track Rytelo Sales Data On A Weekly Basis**

164. During the Q4 2023 Earnings Call leading up to Rytelo's commercial launch, Defendant Kapur touted Geron's adoption and integration of systems and processes to report revenue: "[w]e continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues[.]"

165. Then, during the Q3 2024 Earnings Call, Defendant Ziegler likewise confirmed that Defendants used those systems to closely monitor Geron's "own internal demand sales data" to project Rytelo sales growth:

> From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.

166. During the February 26, 2025 Q4 2024 Earnings Call, Defendant Ziegler, again, confirmed Geron tracked revenue on a four and eight week rolling basis and saw sales flattening by November, as revealed "in the weekly data" that Defendants reviewed.

167. Accordingly, Defendants, admittedly, would have been immediately aware upon Rytelo's commercial launch at the end of June 2024 from their weekly, "own internal sales data" and reports that community physicians were reluctant and most unwilling to prescribe Rytelo because most prescriptions were coming from early adopting academic physicians prescribing Rytelo as a third-line therapy. Defendants would have also known from their sales data that by September 2024, Rytelo sales were flattening and remained flat throughout the remainder of the Class Period from their close monitoring and review of Geron's weekly sales data from Geron's internal "systems and processes."

**3. Executive Departures Strongly Supports Scienter**

168. Shortly after Rytelo's commercial launch, Geron was forced to overhaul its commercial team and sales strategy as Rytelo sales quickly flatlined. Defendants openly attributed the change in leadership to poor Rytelo sales.

169. First, on July 23, 2024, Geron abruptly announced the unexpected departure of Chief Commercial Officer Kapur, less than one month after Rytelo's commercial launch. As the

CWs reported, Kapur repeatedly gave conflicting directives and lacked any clear strategy for Rytelo's commercial launch.

170. On September 9, 2024, Geron announced Defendant Ziegler would replace Kapur to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of Rytelo."

171. Thus, Kapur's termination was the direct result of slowing sales growth for Rytelo at this time, which Defendants concealed from the market in hopes that Ziegler could turn things around before investors noticed.

172. Shortly after, Geron reported that Jim Hassard had joined the Company in November 2024 as Senior Vice President, Sales and Marketing "to improve insights, strategy and execution." Also in November 2024, Geron announced the appointment of Joseph Eid, M.D. as EVP, Research and Development, "responsible for driving innovative medical and scientific strategies that support Rytelo commercially and sustain important research and development opportunities for Geron" confirming Geron was nowhere near ready for Rytelo's commercial launch, contrary to Defendants' prior statements.

173. Defendants openly attributed Rytelo's failed commercial launch to the executives who had been terminated. During the February 26, 2025 earnings call discussing Rytelo's flat sales, Defendant Scarlett stated "As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call."

174. Moreover, the timing of the executive changes at the same time Geron admitted sales were flattening which further supports scienter.

175. Finally, Defendant Scarlett, Geron's CEO of nearly fourteen years, abruptly departed mere weeks after Geron's flat sales growth for Rytelo was revealed to the market on February 26, 2025, further contributing to the strong inference of scienter. Indeed, On March 11, 2025, Geron issued a press release announcing that Scarlett would be departing the Company, and that the search for a replacement CEO "with significant commercial experience" was underway—

the latter indicating that Scarlett's departure was both: a) not preplanned; and b) tied directly to the Company's flat revenue growth. A Form 8-K filed with the SEC on March 11, 2025 further disclosed that on March 10, 2025, Defendant Scarlett resigned from Geron's board of directors in connection with his departure as CEO.

176. Analysts covering Geron were quick to hone in on the suspicious nature of Scarlett's sudden departure, confirming that Scarlett appeared to have been terminated, rather than resigned. Writing in a March 11, 2025 report, Barclays analysts explained that they had spoken privately with Geron management, writing that "[m]anagement indicated this was a board-driven decision that was executed relatively quickly." Barclays also notably added that "Geron had recently canceled from our Barclays Global Health Conference." Previously, Geron had announced members of the management team would be presenting at Barclays 27th Annual Global Healthcare Conference, but instead canceled at the last minute. There was no official public statement released by Geron or by the conference organizers giving a direct reason for the last-minute cancellation. There are no other reports of external factors that may have caused the withdrawal. Thus the timing strongly suggests the decision was a direct consequence of Scarlett's abrupt departure.

177. Corroborating Barclays' report that Scarlett's termination was driven by Geron's board, analysts from H.C. Wainwright issued a report on March 12, 2025, tying Scarlett's termination to the Company's lack of revenue growth:

> The [C]ompany did not share many additional details regarding the departure aside from it being a board-mediated decision. Given the recent announcement of the flat Rytelo revenues following 4Q24, we are not particularly surprised by this news.

178. Analysts from Scotiabank reported much of the same, writing in a report issued March 11, 2025 that Geron has announced Scarlett's departure "effective immediately, which coincides with recent adjustments to the commercial strategy after a weak fourth quarter of Rytelo sales[]" and that the Scotiabank analysts viewed the CEO change-up as a "[n]egative" for the Company.

**4. That Rytelo Was Geron's Only FDA-Approved Drug Product Creates A Strong Inference of Scienter**

179. Throughout the Class Period, Geron had one drug product approved for commercial sale—Rytelo. Rytelo was Geron's only source of product revenue during the Class Period, representing the Company's core operations.

180. In the Company's 2024 Form 10-K, Geron stated that "***our future success depends solely on imetelstat***" and that Rytelo was "our only product approved for marketing by the FDA, and our ability to generate revenue from product sales and achieve profitability is ***wholly dependent on our ability to successfully commercialize RYTELO in the U.S.*** []" Defendants further acknowledged that Rytelo was critical to the Company's future growth, stating "our near-term prospects ***are wholly dependent on RYTELO***".

181. Similarly, in a press release issued on November 7, 2024, Defendants acknowledged that they were only able to complete important financing transactions due to the "significant commercial potential of Rytelo" which provided them with "critical flexibility to fuel continued growth and invest in our future."

182. Analysts also acknowledged Geron's dependence on Rytelo as being vital to the Company. In an October 15, 2024 report, a Scotiabank analyst determined, "[g]iven Geron's early commercial stage, the company is burning cash and the ***ability to achieve profitability will depend on successful commercialization of Rytelo*** and development in new indications."

183. Given that Rytelo comprised 99.4% of Geron's revenue, it would be absurd to suggest that Defendants were unaware of Rytelo's flattening revenues.

**5. Analysts Negative Reactions Support Scienter**

184. An inference of scienter is further bolstered by the fact that analysts criticized Geron's admissions because they did not align with Defendants' prior misstatements about patient segment distribution.

185. For example, Stephen Ayers of Seeking Alpha wrote on February 26, 2025 that Geron revealed that what Ayers originally perceived as rapid clinical uptake for Rytelo was, in

reality, only just early adopters, and then scaled back Rytelo's supposed $7 billion total addressable market by half:

> During the earnings call, management revealed that what I perceived to be as clinical adoption in my last update was, really, "early adopters who believed in the product." If Rytelo *is* a 3rd-line or later product, its TAM is probably less than 50% of what I projected in my DCF, suggesting peak annual revenue of no more than $350 million. The company has acknowledged their shortcomings and is working on getting Rytelo into earlier lines. However, it appears that my previous concerns are coming to fruition.

186. Prior to this revelation, Mr. Ayers was "positive on the drug following its first full quarter on the market, which indicated clinical adoption" and was "encouraged by the treatment recommendations that supported Rytelo's utilization in MDS, particularly in 2nd-line patients." But after the "unusually somber and discorded Q4 earnings call" Geron revealed that not only were new patients starts flat over the past few months, but the majority of new patients starts came from the 3-line-plus patient segment with the 2-line new patient starts lower than expected.

187. Scotiabank analysts likewise felt that the slowdown was a "cause for concern at this early stage of the launch." Needham analysts similarly stated they were "taking down our longer term estimates, assuming a slower than previously expected launch."

188. These reports, when taken together with Plaintiffs' other allegations, add to the overall strong inference of scienter.

## B. <u>Defendants/ Motive and Opportunity to Commit Fraud</u>

### 1. Suspicious Stock Sales Strongly Support Scienter

189. Defendants Grethlein, Feller, and Kapur each engaged in insider trading at times when Geron's common stock was trading at artificially high prices as a result of Defendants' false and misleading statements during the Class Period.

190. Defendant Grethlein was, at all relevant times, the Executive Vice President and Chief Operating Officer of Geron. As the Chief Operating Officer of Geron, Defendant Grethlein had access to relevant inside information about Geron's operations, including information about Geron's commercial launch and sales of Rytelo.

191. Defendant Grethlein sold his shares just a month before falsely assuring investors that Geron's medical and commercial field teams had been fully deployed when, in reality, the medical and commercial teams were already struggling due to internal misunderstandings and turmoil and Geron had insufficient personnel.

192. Defendant Grethlein knew at the time that despite receiving FDA approval, the commercial launch of Rytelo would struggle to be successful. Armed with the truth about Geron's operational issues, Defendant Grethlein looked to cash out. On July 8, 2024, shortly after FDA approval when Geron's common stock was trading high, Grethlein converted 674,348 of his options into common stock and sold all 674,348 of them at $4.557 per share for total proceeds of $3,073,003.84. This transaction represented 100% of Defendant Grethlein's common stock holdings and was not sold pursuant to a trading plan. The average price of Defendant Grethlein's sales in 2024 was nearly $2.95 per share higher than the closing price of Geron common stock after the fraud was revealed on February 26, 2025.

193. In the prior year, 2023, Defendant Grethlein only sold $1,165,698.57 in common stock—significantly less than his sales in 2024, and unlike in 2024, most of his sales in 2023 were sold pursuant to trading plans.

194. Defendant Feller was, at all relevant times, the Executive Vice President and Chief Medical Officer of Geron. As the Chief Medical Officer of Geron, Defendant Feller had access to relevant inside information about Geron's operations, including information about Geron's commercial launch and sales of Rytelo.

195. Defendants Feller and Kapur assured investors and analysts on the June 7, 2024 call announcing FDA approval of Rytelo that community doctors would not view weekly monitoring as a burden, when in reality adoption of Rytelo was slow because Rytelo had specific side effects that required careful management.

196. Armed with the truth about Rytelo's side effects and concerns among community doctors, on June 10, 2024 Feller exercised all of her fully vested options and performance-based stock options which were granted on July 9, 2022 and vested in full on June 6, 2024 upon approval by the US FDA for imetelstat. Feller converted her options into 287,900 common stock shares and

sold them all at $4.634 per share for proceeds of $1,334,128.60 when Geron's common stock was trading high. This transaction accounted for 100% of her holdings and was not sold pursuant to a trading plan. The average price of Defendant Feller's sales in 2024 was nearly $3.02 per share higher than the closing price of Geron common stock after the fraud was revealed on February 26, 2025. Despite being awarded options in the year prior, Feller sold no shares in 2023.

197. Defendant Kapur was the Executive Vice President of Corporate Strategy and Chief Commercial Officer of Geron, at all relevant times until his departure from the Company on August 31, 2024. As the Chief Commercial Officer of Geron, Defendant Kapur had access to relevant inside information about Geron's operations, including information about Geron's commercial launch and sales of Rytelo.

198. For example, Defendant Kapur falsely assured investors on February 28, 2024 that Geron had already onboarded and fully integrated a highly experienced commercial and medical affairs team, when in reality Geron was experiencing internal turmoil between Geron's medical and commercial teams. At the time, Defendant Kapur was also having serious disagreements with Denise Meyer, the Vice President of Medical Affairs about the commercial launch. Thus, Defendant Kapur knew at the time that despite receiving FDA approval, the commercial launch of Rytelo would struggle to be successful. Armed with the truth about Geron's operational issues, Defendant Kapur also looked to cash out while he could.

199. On June 10, 2024, while Geron's stock price was trading high, Kapur converted 421,875 options into common stock. These options vested in a series of 48 consecutive equal monthly installments commencing February 16, 2022, as long as Kapur continued to provide service to the Company. Kapur sold all 421,875 shares at $4.645 per share for proceeds $1,959,609.38 on June 10, 2024, right before his termination. This was 100% of his holdings and was not sold pursuant to a trading plan. The average price of Defendant Kapur's sales in 2024 was nearly $3.04 per share higher than the closing price of Geron common stock after the fraud was revealed on February 26, 2025. Despite being awarded options in the year prior, Kapur made no similar transactions in 2023.

200. Defendants also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. Sufficient information concerning Geron's operational issues were known to the executives heavily involved in, or directly responsible for, the Company's commercial launch of Rytelo, such that they were able to make suspiciously timed decisions (*e.g.*, the unloading of hundreds of thousands of shares of stock while Geron's stock price was trading on news of FDA approval) creates a strong inference that Defendants, the Company's actual executives, acted with scienter throughout the Class Period.

**2. Defendants Were Motivated to Materially Overstate the Market for Rytelo to Raise Desperately Needed Cash to Fund Operations and Drug Development.**

201. Geron derives 99.4% of its revenue from sales of Rytelo. As the Company stated in its annual report, "our ability to generate revenue from product sales and achieve profitability is ***wholly dependent on our ability to successfully commercialize Rytelo in the U.S***."

202. Up until the commercialization of Rytelo, Geron never generated any revenue from product sales. In fact, Geron has incurred operating losses every year since its operations began in 1990, except for one. As of December 31, 2024, Geron's accumulated deficit was approximately $1.8 billion. Losses have resulted principally from costs incurred in connection with Geron's research and development activities and from general and administrative costs associated with operations.

203. The recent commercialization of Rytelo has added some revenues for Geron, however, it is not sufficient to fund Geron's operations, imetelstat clinical development activities and research programs, pay royalty payments, service debt obligations, and continue with the commercialization of Rytelo. Geron needs to generate significant revenues to achieve consistent future profitability.

204. The company's costs have been consistently increasing over the reporting periods, primarily due to commercial expansion and product launch activities:

| Period | Operating Expenses | Research and Development Expenses |
|---|---|---|
| FY 2020 | $77.2 million | $51.5 million |
| FY 2021 | $115.4 million | $85.7 million |
| FY 2022 | $139.1 million | $95.5 million |
| FY 2023 | $194.1 million | $125.0 million |
| FY 2024 | $250.7 million | $103.7 million |
| FY 2025 (Guidance) | $270–$285 million | $15.1 million (Q1 2025) |

205. The Defendants knew of the increasingly high operating expenses and research and development costs Geron was expected to (and did) incur in 2023 and 2024.

206. On November 7, 2024, Geron announced it had received up to $375 million in funding with Royalty Pharma and Pharmakon Advisors "of which $250 million in cash was provided at closing and another $125 million in debt is available." According to Defendant Robertson, Geron obtain the funding due to the purported "significant commercial potential of RYTELO."

207. Geron stated that he proceeds would be used "to support the commercial launch of RYTELO in the U.S. and potential launch in the EU, complete our Phase 3 IMpactMF trial in relapsed/refractory myelofibrosis, invest in supply chain redundancy for RYTELO, and our general working capital requirements."

208. Accordingly, Defendants were motivated to make the material misstatements alleged herein, at a time when Rytelo's sales had flatlined, to obtain desperately needed financing to continue business operations and invest in new products.

### 3. Defendants Were Motivated to Expand Quickly Due to Patent Expirations

209. Defendants have stated their intellectual property, such as patent protection, is very important to Geron's business.

210. Geron's composition of matter patent in the U.S. was filed in 2009 and only extends until December 2025. A composition of matter patent grants the Company a legal monopoly, allowing it to be the only maker and seller of the drug. This means it can set higher prices without competition from generics, leading to larger profits.

211. By the time Geron received FDA approval for Rytelo, it had already burned up the majority of its exclusivity rights for the drug imetelstat. Upon FDA approval, Geron applied for patent term extensions for an additional five years of patent exclusivity until December 2030. If Geron does not receive approval, the composition of matter patent expires in December 2025. Thus, Defendants were extremely motivated to commercialize Rytelo as fast as possible in order to maximize its profits while Geron holds exclusivity on the patent rights.

## X. LOSS CAUSATION AND ECONOMIC LOSS

212. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Geron's common stock and operated as a fraud or deceit on Class Period purchasers of Geron's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market and the price of Geron's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Geron's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

213. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of Geron and its well-being and prospects, thus causing the Company's common stock

to be overvalued and artificially inflated at all relevant times. By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of Geron's business and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Geron's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock as follows.

214. On February 26, 2025, Geron revealed (among other things) that Rytelo's growth had flattened over the past few months and had remained flat into the next quarter, that "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations[,]" and, thus, Geron would have to "refin[e] our segmentation and targeting and improving our promotional and sales force effectiveness[.]"

215. These disclosures corrected Defendants' prior statements that, for example, Rytelo "demand has increased month-over-month with Q3 performance" and "[f]rom our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising[,]" as Geron had "onboarded and fully integrated a highly experienced commercial and medical affairs team" and conducted reliable and adequate market research that purportedly showed Rytelo's "strong clinical data support broad utilization across treatment eligible patient subgroups in both community and academic settings."

216. Upon the news, the price of Geron's common stock declined from a closing market price of $2.37 per share on February 25, 2025 to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day on unusually heavy trading volume.

217. Analysts at Needham and Wedbush understood Defendants' disclosures to correct Defendants' prior statements such as "70% of the patients are expected to be treated in the community setting." Needham lowered its price target as a result of the softness to new patient adds, and understood that "[e]merging trends suggest Rytelo has captured low-hanging patients in academic centers (primarily in the 3rd line)" and Wedbush analysts also noted that "academic center use appears to be more dominant[.]"

218. Additionally, analysts at H.C. Wainwright & Co. and Barclays understood Defendants' disclosures to correct Defendants' prior statements that Rytelo would be the standard

of care in the second-line in both RS negative and RS positive, and in the frontline patients. H.C. Wainwright & Co. understood that "HCPs who are still using ESAs in 1L are likely then using luspatercept in 2L and then Rytelo in 3L[]" and Barclays understood that "the majority of new starts are coming from the 3L+LR-MDS setting[.]"

219. Also, H.C. Wainwright & Co. analysts understood the disclosures to correct Defendants' prior statements that there was strong demand for Rytelo across community and academic settings, and concluded that "2024 could have been impacted by upfront demand which may not be representative of realistic growth rate for future quarters."

220. The decline in the price of Geron's common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' misrepresentations and/or fraudulent conduct being revealed to investors and the market. The timing and magnitude of the price declines in Geron common stock negates any inference that the losses suffered by Plaintiffs and the other members of Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' material misrepresentations and/or fraudulent conduct.

221. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' false statements that artificially inflated, or maintained the artificial inflation in the price of Geron common stock and the subsequent significant declines in the value of Geron A common stock when Defendants' prior misrepresentations were disclosed.

222. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET

223. At all relevant times, the market for Geron's common stock was an efficient market for the following reasons, among others:

(a) Geron's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Geron communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Geron was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Geron was reflected in and incorporated into the Company's stock price during the Class Period.

224. As a result of the foregoing, the market for Geron's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Geron's stock price. Under these circumstances, all purchasers of Geron's common stock during the Class Period suffered similar injury through their purchase of Geron's common stock at artificially inflated prices, and a presumption of reliance applies.

225. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

226. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in

sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

227. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

228. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Geron who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIII. CLASS ACTION ALLEGATIONS

229. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Geron's common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

230. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Geron's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can

be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Geron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 21, 2025, there were 636.9 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

231. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

232. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

233. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Geron;

(c) whether the Individual Defendants caused Geron to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Geron's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

234. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. COUNT I

***Against All Defendants for Violations of***

***<u>Section 10(b) and Rule 10b-5 Promulgated Thereunder</u>***

235. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

236. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

237. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Geron common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Geron's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

238. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Geron's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

239. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

240. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Geron's internal affairs.

241. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Geron's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Geron's common stock was artificially inflated throughout the Class Period. In ignorance of the

adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Geron's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

242. During the Class Period, Geron's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Geron's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Geron's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Geron's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

243. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

244. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XV. COUNT II

***Against the Individual Defendants***

***<u>for Violations of Section 20(a) of the Exchange Act</u>***

245. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

246. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Geron's misstatements.

247. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Geron which had become materially false or misleading.

248. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Geron disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Geron to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Geron's common stock.

249. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Geron to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

250. By reason of the above conduct, the Individual Defendants and/or Geron are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XVI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XVII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 8, 2025

Respectfully submitted,

**LEVI & KORSINSKY LLP**

/s/ *Adam Apton*
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
Amanda D. Foley (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: afoley@zlk.com

*Attorneys for Plaintiffs*