**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Co-Lead Plaintiffs Robbie
Dickson and Joseph M. Stacy, Jr.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE GERON CORPORATION SECURITIES LITIGATION | Master File No. 3:25-cv-02507-VC <br><br> CLASS ACTION <br><br> **OPPOSITION TO MOTION TO DISMISS** <br><br> Hearing Date: March 5, 2026 <br> Hearing Time: 10:00 a.m. <br> Judge: Hon. Vince Chhabria <br> Courtroom: 4, 17th Floor |

# **TABLE OF CONTENTS**

Table of Authorities ...................................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................... 2

I.    Rytelo Was Geron's "Bet-The-Company" Product ............................................................ 2

II.   Defendants Assured Investors They Were Fully Prepared for a Blockbuster Launch ....... 2

III.  The Rytelo Launch Was Plagued by Internal Chaos and Failed Execution ...................... 3

IV.  Defendants Misrepresented the Launch and Shuffled Executives While Cashing Out ...... 4

V.   The Truth Emerges, Causing a Massive Stock Price Decline ............................................ 4

ARGUMENT .................................................................................................................................... 5

I.    Legal Standard ................................................................................................................... 5

II.   The Complaint Adequately Alleges Defendants' Statements Were False When Made ..... 5

    A.    False Statements Regarding Rytelo Sales and Demand .................................................... 5

    B.    False Statements Regarding the Market for Rytelo .......................................................... 9

    C.    False Statements Concerning Rytelo's Launch Preparedness ...................................... 13

    D.    Defendants' Puffery and Safe Harbor Arguments Lack Merit ..................................... 15

III.  The Complaint Alleges a Strong Inference of Scienter ...................................................... 17

    A.    Defendants' Admit They Knew Sales Were Flat at the Time of Their Misstatements  18

    B.    That Rytelo Was Geron's Only Product Creates a Strong Inference of Scienter ......... 19

    C.    Defendants Knew of Flattening Sales from Internal Sales Data and Meetings ............ 20

    D.    Executive Terminations Support Scienter .................................................................... 21

    E.    Analysts Reactions Support Scienter: ............................................................................ 21

    F.    Defendants' Motive to Issue False Statements Contributes to the Scienter Analysis .. 22

    G.    A Holistic Review Demonstrates Plaintiffs' Scienter Theory is at Least as Compelling as Defendants' Opposing Inference ................................................................................. 24

IV.  The Complaint Adequately Alleges Loss Causation ......................................................... 24

V.   Plaintiffs' Section 20(A) Claim ........................................................................................ 25

CONCLUSION .............................................................................................................................. 25

OPPOSITION TO MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*Baron v. Hyrecar Inc.*,
  2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) ............................................................................. 23

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...................................................................................................... 15

*Black v. Snap, Inc.*,
  2023 WL 6812762 (C.D. Cal. Sep. 26, 2023) ....................................................................... 21, 22

*Constr. Workers Pension Tr. Fund – Lake Cnty., v. Genoptix, Inc.*,
  2013 WL 12123841  (S.D. Cal. Mar. 22, 2013) ......................................................................... 16

*Doller v. Hertz Glob. Hldgs, Inc.*,
  2025 WL 2896919 (M.D. Fla. Oct. 10, 2025) ............................................................................ 16

*Dolly v. GitLab Inc.*,
  2025 WL 2372965 (N.D. Cal.  Aug. 14, 2025) .......................................................................... 15

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ...................................................................................................... 11

*Eminence Cap., LLC, v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) .................................................................................................... 25

*Espy v. J2 Glob., Inc.*,
  99 F.4th 527 (9th Cir. 2024) ...................................................................................................... 15

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ............................................................................. 8

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ...................................................................................................... 22

*Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*,
  2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ........................................................................... 19

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ................................................................................................... 9, 16

ii

*Hammer v. Frontier Fin. Corp.*,

    2011 WL 13229260 (W.D. Wash. Sep. 7, 2011) ......................................................................... 16

*Hatamian v. Advanced Micro Devices, Inc.*,

    87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................................................. 18

*Hayden v. Portola Pharms., Inc.*,

    2021 WL 3506614 (N.D. Cal. Aug. 10, 2021) ................................................................. 19, 20

*Homyk v. ChemoCentryx, Inc.*,

    2023 WL 3579440 (N.D. Cal. 2023) ...................................................................................... 17

*In re Alphabet, Inc. Sec. Litig.*,

    1 F.4th 687 (9th Cir. 2021) ..................................................................................................... 5

*In re Apple Inc. Secs. Litig.*,

    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ....................................................................... 6, 18

*In re Atossa Genetics Inc. Sec. Litig.*,

    868 F.3d 784 (9th Cir. 2017) ................................................................................................... 5

*In re Countrywide Fin. Corp. Sec. Litig.*,

    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................. 25

*In re Cutera Sec. Litig.*,

    610 F.3d 1103 (9th Cir. 2010) ............................................................................................... 16

*In re Daou Sys., Inc.*,

    411 F. 3d 1006 (9th Cir. 2005) .............................................................................................. 20

*In re Extreme Networks, Inc. Sec. Litig.*,

    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ....................................................................... 20

*In re FibroGen, Inc., Sec. Litig.*,

    2022 WL 2793032 (N.D. Cal. July 15, 2022) ............................................................. 18, 20, 22

*In re Gilead Scis. Sec. Litig.*,

    536 F.3d 1049 (9th Cir. 2008) ............................................................................................ 5, 24

*In re JDS Uniphase Corp. Sec. Litig.*,

    2005 WL 43463 (N.D. Cal. Jan. 6, 2005) .............................................................................. 23

OPPOSITION TO MOTION TO DISMISS

*In re Nektar Therapeutics Sec. Litig.,*
   34 F.4th 828 (9th Cir. 2022) ................................................................................................ 15

*In re NVIDIA Corp. Sec. Litig.,*
   768 F.3d 1046 (9th Cir. 2014) ........................................................................................ 19, 20

*In re Omnicom Grp., Inc. Sec. Litig.,*
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) .................................................................................. 25

*In re Palo Alto Networks, Inc. Sec. Litig.,*
   2025 WL 1093247 (N.D. Cal 2025) ................................................................................ 15, 16

*In re Quality Sys.,*
   865 F.3d 1130 (9th Cir. 2017) ............................................................... 10, 15, 16, 20

*In re QuantumScape Sec. Class Action Litig.,*
   580 F. Supp. 3d 714 (N.D. Cal. 2022) .................................................................................. 14

*In re Questcor Sec. Litig.,*
   2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ......................................................................... 22

*In re Sanofi Sec. Litig.,*
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) .................................................................................... 17

*In re SeeBeyond Techs. Corp. Sec. Litig.,*
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................................ 23

*In re Semtech Corp. Sec. Litig.,*
   2025 WL 2884810 (C.D. Cal. Oct. 7, 2025) ................................................................... 10, 21

*In re Silicon Graphics Sec. Litig.,*
   183 F.3d 970 (9th Cir. 1999) ................................................................................................ 22

*In re Silver Lake Grp., LLC Sec. Litig.,*
   108 F.4th 1178 (9th Cir. 2024) ............................................................................................... 8

*In re Syntex Corp. Sec. Litig.,*
   95 F.3d 922 (9th Cir. 1996) ..................................................................................................... 5

*In re Vantive Corp. Sec. Litig.,*
   283 F.3d 1079 (9th Cir. 2002) .............................................................................................. 15

iv

*In re Vaxart, Inc. Sec. Litig.*,
    576 F. Supp. 3d 663 (N.D. Cal. 2021) (Chhabria, J) ................................................................. 25

*Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*,
    2025 WL 2426714 (C.D. Cal. Aug. 20, 2025).............................................................. 7, 21, 23

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................................................................ 5, 8

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ......................................................................................... 21, 23

*Luna v. Marvell Tech. Grp. Ltd*,
    2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) ........................................................................ 21

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)............................................................................................................... 5, 8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 104964 (9th Cir. 2008) .......................................................................................... 25

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................................... 16

*Murphy v. Precision Castparts Corp.*,
    2017 WL 3084274 (D. Or. June 27, 2017) ............................................................................ 16

*Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*,
    2021 WL 6101391 (9th Cir. Dec. 21, 2021)........................................................................... 13

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................................................. 24

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ................................................................................................. 21

*Nguyen v. Radiant Pharms. Corp.*,
    2011 WL 5041959 (C.D. Cal. Oct. 20, 2011).......................................................................... 24

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*,
    320 F.3d, (9th Cir. 2003) ...................................................................................................... 22

OPPOSITION TO MOTION TO DISMISS

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,

380 F.3d 1226 (9th Cir. 2004) ................................................................................. 6, 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,

759 F.3d 1051 (9th Cir. 2014) ..................................................................................... 19

*Provenz v. Miller*,

102 F.3d 1478 (9th Cir. 1996) ..................................................................................... 22

*Roberti v. OSI Sys., Inc.*,

No. CV 13–9174, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ............................... 18

*Ronconi v. Larkin*,

253 F.3d 423 (9th Cir. 2001) ....................................................................................... 24

*Sakkal v. Anaplan Inc.*,

557 F. Supp. 3d 988 (N.D. Cal. 2021) .................................................................... 15, 21

*Schueneman v. Arena Pharms., Inc.*,

840 F.3d 698, (9th Cir. 2016) ................................................................................... 8, 17

*Smith v. NetApp, Inc.*,

2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) ............................................................... 15

*Sundaram v. Freshworks Inc.*,

2023 WL 6390622 (N.D. Cal. Sep. 28, 2023) ............................................................... 8

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,

551 U.S. 308, (2007)..................................................................................................... 24

*Turocy v. El Pollo Loco Holdings, Inc.*,

2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)............................................................... 23

*U.S. v. Smith*,

155 F.3d 1051 (9th Cir. 1998) ....................................................................................... 8

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,

2025 WL 39936 (N.D. Cal. Jan. 6, 2025)..................................................................... 25

*W. Pa. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*,

2018 WL 4524107 (D. Or. May 29, 2018), *aff'd sub nom*. 788 F. App'x 421 (9th Cir. 2019) 17

OPPOSITION TO MOTION TO DISMISS

*Westley v. Oclaro*, Inc.,

　897 F. Supp. 2d 902 (N.D. Cal. 2012) ............................................................................ 8

*Weston Family P'ship LLLP v. Twitter, Inc.*,

　29 F.4th 611 (9th Cir. 2022) ................................................................................... 8, 20

*Weston v. Docusign, Inc.*,

　669 F. Supp. 3d 849 (N.D. Cal. 2023) ............................................................................ 7

*Wochos v. Tesla, Inc.*,

　985 F.3d 1180 (9th Cir. 2021) ..................................................................................... 17

*Xiaojiao Lu v. Align Tech Inc.*,

　417 F. Supp. 3d 1266 (N.D. Cal. 2019) .......................................................................... 8

*Zucco Partners, LLC v. Digimarc Corp.*,

　552 F.3d 981 (9th Cir. 2009) ................................................................................... 7, 21

**Statutes**

15 U.S.C. §78u-4(b)(1) ...................................................................................................... 5

15 U.S.C. §78u-5(c)(1)(A)(i) .......................................................................................... 17

**PRELIMINARY STATEMENT**

This case arises from Defendants' scheme to deceive investors regarding the disastrous launch of Geron Corporation's ("Geron" or the "Company") sole product, Rytelo, accounting for 99.4% of its revenue. For years, Geron's survival hinged on Rytelo's success. But the clock on Geron's patent for imetelstat (Rytelo's active ingredient) ticked away as Geron sought FDA approval. Thus, a successful Rytelo launch was not a mere opportunity, it was a necessity.

Knowing these stakes, Defendants touted that Geron was "exceptionally well-prepared" for a blockbuster launch due to "highly experienced" and "fully integrated" commercial and medical affairs teams that were trained and ready to be deployed. Defendants also claimed having "extensive discussions" with the key "community physician" market they identified as critical for the drug's adoption because they were estimated to treat 70% of patients.

In reality, the launch was a disaster. Former Geron employees ("confidential witnesses" or "CWs") confirm chaos reigned within the Company with conflicting directives from senior leadership and a lack of even basic marketing materials. Critically, Defendants failed to educate their primary target market—community physicians. CWs confirm that, at the time of the launch, the "majority of community physicians... had never even heard of Rytelo[.]"

Faced with this operational disaster and resulting sales that "flattened" shortly after launch—a trend Defendants admittedly tracked weekly—they chose to hide the truth. For more than five months, Defendants issued false statements portraying a successful launch claiming "demand increased month-over-month" with "strong demand for Rytelo across community and academic settings" and "broad utilization across patient segments." These statements were fiction.

The Complaint pleads overwhelming contemporaneous evidence through Defendants' "I knew it all along" admissions and witness accounts showing Rytelo sales had flattened, not "increased," and Rytelo was mainly prescribed by a small population of academics as a third-line treatment. Indeed, CW1 attended a "Fast Start" meeting with defendant Ziegler in January 2025 wherein Ziegler stated that Geron's sales had flattened in September and November 2024. Corroborating CW1's account, on February 26, 2025, Defendants admitted: Rytelo's revenue had

OPPOSITION TO MOTION TO DISMISS

been "flat... over the last few months" and the "majority of new patient starts" came from Rytelo's use as a "third-line" treatment, not the promised first and second-line segments. Defendants also admitted that, far from capturing the community market, sales came "largely at many of the academic medical centers" from "early adopters[,]" while community physician adoption was "a little bit more diffused." Upon these admissions, Geron's stock price plummeted over 32%, erasing hundreds of millions in market value.

Meanwhile, key insiders had unloaded over $6 million in Geron stock at artificially inflated prices and terminated Defendant Kapur on July 23, 2024, just one month into Rytelo's launch.

Defendants' motion to dismiss fails on every stated ground and should be denied.

## STATEMENT OF FACTS[1]

### I.    <u>Rytelo Was Geron's "Bet-The-Company" Product</u>

Geron's "near-term prospects are wholly dependent on Rytelo," its only commercial drug product, accounting for 99.4% of annual revenue. ¶¶41-43. Defendants publicly claimed a total addressable market for Rytelo of $3.5 billion for lower-risk myelodysplastic syndromes ("lower-risk MDS"). ¶47. The success of Rytelo's launch depended heavily on adoption by "community physicians," who Defendants said would treat 70% of lower-risk MDS patients. ¶¶44, 66.

Rytelo, however, causes certain side effects, including cytopenias, which require close monitoring of patients weekly for the first two cycles and then monthly to manage potential dose modifications. ¶¶37-38. Rytelo is given as an intravenous infusion every four weeks, while Reblozyl, a competitor product approved as a first-line treatment for low-to intermediate-risk MDS, only requires a subcutaneous injection every three weeks. ¶39. Thus, physicians viewed Rytelo as more burdensome and not a compelling alternative to Reblozyl. *Id.*

### II.    <u>Defendants Assured Investors They Were Fully Prepared for a Blockbuster Launch</u>

Throughout the Class Period, Defendants told investors Geron was positioned for a successful commercial launch (¶57), having "onboarded and fully integrated a highly experienced

---

[1] All citations to "¶__" are to paragraphs in the Amended Complaint for Violations of the Federal Securities Laws ("AC" or "Complaint"). ECF 40. Capitalized terms have the same meaning as in the AC. Unless otherwise indicated, all internal citations are omitted.

OPPOSITION TO MOTION TO DISMISS

commercial and medical affairs team." ¶55. Defendants assured investors that Geron's sales team was "trained so that they will be prepared to be deployed" and having "extensive discussions with both community and academic providers" to ensure market acceptance. ¶¶55, 89. Defendants specifically touted their strategy to educate this key prescriber base of community physicians, who they claimed were the primary drivers of Rytelo's success. ¶¶65-66.

Defendants also downplayed competition—touting Rytelo's supposed "well-characterized safety profile with generally manageable and short-lived thrombocytopenia and neutropenia, which are familiar adverse events for hematologists who are experienced with managing cytopenias." ¶40. However, unbeknownst to investors, Geron had not educated community prescribers about Rytelo and, in reality, they preferred Reblozyl because it was less burdensome than Rytelo and were only willing to use Rytelo as a third-line treatment. *Id.*

### III.    The Rytelo Launch Was Plagued by Internal Chaos and Failed Execution

Contrary to Defendants' public statements, the Rytelo launch was an internal disaster. ¶4. According to confidential witnesses, Geron's medical and commercial teams were in a state of conflict. ¶¶59-60. Throughout CW2's tenure, CW2 witnessed tension between Denise Meyer, the VP of Medical Affairs, and Defendant Kapur, VP of Corporate Strategy and Chief Commercial Officer. For example, CW2 said, "Anil wanted us to transition over to commercial at launch, and Denise didn't want that." ¶60.

CW2 confirmed that executives, including Kapur, gave "conflicting directives" and described disagreements between Ms. Meyer and CW2's boss, Michael Steidle, former Executive Director of Medical Affairs, such that the field teams were "paralyzed[.]" ¶61. CWs said leadership was not "on the same page," which "definitely" impacted Geron's commercial readiness. ¶¶61-62.

CWs 1 and 2 recalled that the sales force was sent into the market with no marketing materials beyond the basic FDA prescribing information on the label and no "detail piece[s]" or other materials about the drug's mechanism of action, side effects or administration. ¶¶70-71. CW1 was "shocked" at the lack of preparation. ¶58. Most critically, Defendants failed to educate their

3

primary target market—community physicians. ¶67. Indeed, the majority of community physicians CW2 spoke with had never even heard of Rytelo at the time of the launch. ¶¶4, 68.

IV.    **Defendants Misrepresented the Launch and Shuffled Executives While Cashing Out**

Faced with this internal disaster, Defendants actively concealed the operational failures from investors. ¶5. While the launch was failing, they touted "strong demand for Rytelo across community and academic settings" and "broad utilization across patient segments." ¶121. In reality, the initial sales figures were a short-lived "bolus" from a small number of early adopters at academic centers who had been involved in the clinical trials. ¶¶121-22.

By September 2024, just weeks after the launch, new patient starts and revenue had already flattened. ¶¶5, 81. Defendants knew this disastrous trend in real-time as they, admittedly, tracked sales using Geron's "own internal demand sales data" on a weekly basis, but concealed it for more than five months. ¶¶164-167. According to CWs, this sales data would have showed flattened sales by September 2024 and that prescriptions overwhelmingly came from a small group of academic "early adopters" as a third-line therapy, not the broad community setting as promised. ¶¶5, 162. The failure was so immediate and severe that on July 23, 2024, one month after launch, Geron terminated Defendant Kapur (¶169) and replaced him with Defendant Ziegler to "spearhead... commercial strategy" and "be responsible for driving growth of Rytelo." ¶170. Geron also hired Jim Hassard, SVP of Sales and Marketing, "to improve insights, strategy and execution." ¶172.

According to CW1, during a January 2025 "Fast Start" sales meeting, Defendant Ziegler explicitly told the national sales force that "Rytelo sales had flattened in September and November 2024 and they were not meeting expectations." Ziegler then mandated a new sales strategy with a "heavy focus on prescribing Rytelo as a second-line therapy" to boost sales. ¶81.

V.    **The Truth Emerges, Causing a Massive Stock Price Decline**

On February 26, 2025, Defendants finally admitted that Rytelo's revenue growth had been "flat… over the last few months" and that the "majority of new patient starts have come from the third-line plus patient segment" prescribed by academics because community physicians had not been educated on Rytelo and lacked general awareness of the drug. ¶¶141-142146. Geron's stock plummeted by over 32%. ¶¶7, 150.  Shortly after, Defendant Scarlett, Geron's CEO of 14 years,

4

was abruptly terminated in a "board-driven decision" that analysts tied to "flat Rytelo revenues" and the failed Rytelo launch. ¶¶175-177.

## ARGUMENT

### I.    Legal Standard

On a 12(b)(6) motion, the court "accepts the [P]laintiffs' allegations as true and construes them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017). When ruling on a motion to dismiss, any "skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

### II.    The Complaint Adequately Alleges Defendants' Statements Were False When Made

Falsity is alleged where the complaint "'specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . .with particularity all facts on which that belief is formed.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (quoting 15 U.S.C. §78u-4(b)(1)). A statement may also be misleading if it omits material information. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). An omission is material where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

In securities litigation, unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ[,]" the question of "[w]hether a statement is misleading and whether adverse facts were adequately disclosed . . . should be left to the trier of fact." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996).

### A.  False Statements Regarding Rytelo Sales and Demand

During the Class Period, Defendants told the market Rytelo's launch was an overwhelming success with "continued" and "increased" sales and demand. For example, during an 11/7/24 Q3 2024 earnings call, Defendants claimed "demand increased month-over-month with Q3 performance exceeding our expectations." ¶121. Relying on Geron's "own" "internal demand

5

sales data," Defendants assured investors there was "strong demand for Rytelo across community and academic settings," "broad utilization across patient segments" that "reinforce [Geron's] expectations for continued demand and promising growth" and, thus, "the Rytelo sales growth trajectory in the fourth quarter *continues* to be promising." *Id. See also* ¶120 ("future continued demand"); ¶123 ("steady, consistent growth"); ¶124 ("uptake in utilization across all patient segments"), ¶¶137 ("strong continued growth"). At the Evercore HealthConX Conference on 12/4/2024, Defendants assured analysts there was no "resistance" from community physicians to prescribe Rytelo despite its side effects and burdensome administration. ¶139.

Defendants admit these statements, and others like them (¶¶111, 113), were false when made. During the February 26, 2025 earnings call, Scarlett  revealed "we have observed flat revenue trends *over the last few months*" (¶141), which Ziegler confirmed, stating that "***based upon the rolling 4- and 8-week***" sales data (*e.g.*, from end of September through late November), Geron "started to see right, let's call it, around the holidays, Thanksgiving holiday" flattened sales, which continued into the "week leading up to this call." ¶145. Defendants further revealed sales flattened because a "majority" of new prescriptions came from "early adopters largely at many of the academic[s]" for treatment as a "third-line plus" treatment due to physician "hesitancy" from "monitoring" requirements and failure to inform/educate community physicians on Rytelo. ¶¶142-148. Defendants' admissions rendered their statements false when made. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232-33 (9th Cir. 2004) (it is "reasonably infer[red] from" admissions that "Oracle had known" it would not meet projections when making them); *In re Apple Inc. Secs. Litig.*, 2020 WL 6482014, at *6 (N.D. Cal. Nov. 4, 2020) (later admission rendered statement misleading).

Plaintiffs also allege corroborating facts demonstrating falsity, including that Defendants closely monitored Rytelo's weekly sales (¶145) and CW1's account that Rytelo sales flattened by September 2024 and November 2024 (¶81), which Defendant Ziegler confirmed during a Fast Start sales meeting in January 2025 he attended with CW1 (¶81). Thus, at the time of Defendants' November and December 2024 statements, there was no "strong demand for Rytelo across community and academic settings" or "broad utilization across patient segments," as Defendants

6

falsely claimed. ¶121. *See also* Appendix 1; *Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2025 WL 2426714, at *5 (C.D. Cal. Aug. 20, 2025) (customer demand statements misleading); *Weston v. Docusign, Inc.*, 669 F. Supp. 3d 849, 881 (N.D. Cal. 2023) (statements regarding customer demand false where demand declining).

Defendants argue their statements are not actionable because Geron had limited access to individual patient data and, thus, they could not have known community doctors were not prescribing Rytelo or that Rytelo was mainly being used as a third-line treatment. DB13, 15-16.[2] Defendants' access to individual patient data is an irrelevant red herring. Defendants need not know specific patient data to see that overall sales trends showed flattening.

Defendants' next argument—that CW1's account is "unreliable, uncorroborated, and lacks any detail" and their admissions are "insufficient" to establish falsity (DB16-17) is meritless. *First*, even though Plaintiffs need not allege facts corroborating CW1 where, as here, CW1 is in a position to know the facts asserted, Plaintiffs do allege corroborating facts. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). CW1 was a Key Account Manager responsible for educating physicians on Rytelo and *personally* attended the January 2025 Fast Start sales meeting with Ziegler. ¶¶26, 81. CW1's allegations are further corroborated by Defendants' admissions of flattening sales (¶¶141-42, 145) and Geron's decision to replace Kapur in September—when sales started flattening. CW1's allegations also particularly quantify the sales impact as "flat" (*e.g.*, no increase or decrease) and state when—September and November 2024.

*Second*, Defendants' admission of flattening sales by November 2024 does not undercut CW1's account of flat sales in September as Defendants' statements do not even discuss September sales.[3] In fact, Defendants' observation of flat sales by November based on the "4- and 8-week average[]" trend corroborates CW1—a flattening eight-week trend by November means it started in September continuing into November. Moreover, there are four weeks in September.

---

[2] "DB" refers to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, ECF 50.

[3] Defendants erroneously claim that CW1's omission of October 2024 sales must mean sales were increasing in October. DB16 n. 14. But Defendants' own admissions prove this false—four and eight week sales data showing a flattened sales trend by November means October sales could not have been increasing. Further, CW1's silence cannot be construed in Defendants' favor.

7

Thus, Defendants had sufficient data to establish a "trend" under their own definition. DB17. Regardless, Defendants stated during the 2/26/2025 call they also look at "week over week" data. ¶145 ("the past couple of months have been relatively flat **week-over-week**[,]" which "continued into the prior week leading up to this call."). That Defendants claimed "some variability" in the "revenues week-over-week" is still contrary to their prior statements of "steady, consistent growth" and continued "uptake in utilization across all patient segments." ¶¶123-24, 145. While Plaintiffs need not allege Defendants "knew" these facts to allege falsity (DB13, 17), they have here.[4]

Defendants contend they had "no duty to disclose… weekly snapshots" of flattening sales. DB17 n.15. But the Ninth Circuit has made clear, "[w]e have never held – nor even hinted – that …intra-quarter data cannot, as a matter of law, be material." *U.S. v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998). Quite the opposite. "A company must disclose a negative internal development…if its omission would make other statements materially misleading." *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 615, 620 (9th Cir. 2022) (citing *Matrixx*, 563 U.S. 27 at 45). Thus, where, as here, Defendants "'chose to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). That is especially true here where Defendants put Q4 sales at issue during the 11/7/24 call stating "Rytelo sales growth trajectory **in the fourth quarter continues**…." ¶121. *Khoja*, 899 F.3d at 1010 (9th Cir. 2018) ("once Orexigen chose to tout… interim results, Orexigen had the obligation also to disclose that they were likely unreliable").[5]

---

[4] Defendants' cases (DB16) are distinguishable. Unlike here, the CWs were not at the meeting and/or failed to describe the contradictory information conveyed. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) (failure to explain contradictory information CW knew); *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178 (9th Cir. 2024) (declining to credit statements from CWs not at meeting); *Westley v. Oclaro*, Inc., 897 F. Supp. 2d 902 (N.D. Cal. 2012) (CW failed to specify contradictory information in reports); *In re Cutera, Inc. Sec. Litig.*, 2025 WL 2782916, at *9 (N.D. Cal. Sept. 30, 2025) (CW did not specify when delays and cancellations occurred); *Xiaojiao Lu v. Align Tech Inc.*, 417 F. Supp. 3d 1266, 1278 (N.D. Cal. 2019) (failure to connect how post-patent-expiration competition caused disappointing results).

[5] Defendants' case (DB17, n.15) supports Plaintiffs. *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *5 (N.D. Cal. Sep. 28, 2023) (duty to disclose intra-quarter results where "'extreme

8

OPPOSITION TO MOTION TO DISMISS

Although Defendants purported to warn that "[i]f we are unable to continue to execute on our sales, marketing and distribution plans to commercialize RYTELO, we may be unable to generate meaningful product revenue" or that if Geron failed to "equip [sales personnel] with compliant and effective materials," Geron's "efforts to successfully commercialize RYTELO could be adversely affected" (¶¶107, 116), those statements are actionable because the risks had materialized—Geron had no marketing materials and, admittedly, failed to educate community physicians on Rytelo, resulting in sales falling off shortly after launch. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023). *See also* Appendices A and B.

## B. False Statements Regarding the Market for Rytelo

In response to analyst questions about how Rytelo sales were split among academics versus community providers, Defendants falsely stated the split was in-line with what investors were told to expect prior to launch—coming predominantly from community doctors. ¶128 (11/7/24 earnings call: "The split between community and academic is 65-35"); ¶131 (11/18/24 Stifel conference: "two thirds of the patients" were "from community settings" claiming "that's exactly what we've seen so far."); ¶100 ("70% of the patients are expected to be treated in the community setting with low-risk MDS"); ¶121 ("broad utilization" "across treatment eligible patient subgroups in both community and academic settings"). It is mathematically impossible for these statements to be true because, as Defendants now admit, the "*majority*" (*e.g.*, >50%) of Rytelo prescriptions were from academics. ¶¶142, 145, 148.

Defendants also falsely claimed Rytelo would have "broad use" as a first- and second-line treatment and become the "standard of care across the relapsed/refractory RS-negative patient population." ¶95, ¶111 (similar); ¶126 (similar); ¶93 ("Our market leaders suggest a broad use of imetelstat across the second line"); ¶100 ("RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes"); ¶102 (similar); ¶123 (Rytelo would have "consistent growth across all of the patient segments"); ¶¶133-34 ("I think we expect to see very strong uptake in across all of the second line, but in particular in the RS negative").

departure from the range of results which could be anticipated,'" but finding no duty where figures "in line with [Defendants'] financial metrics from the preceding five quarters").

9

In touting Rytelo's purported "broad" market, Defendants downplayed the treatment and monitoring burdens, falsely claiming Rytelo "has not been something that has been highlighted as a burden by both community and the academic facilities." ¶104; ¶128 ("what we're hearing from our physicians" "is that cytopenia management is well understood. There aren't major concerns"); ¶139 (hematologists say "every drug that we use does this. We don't care. We manage it all day, every day…So we're not seeing, I haven't really heard any resistance").

The above statements were false and misleading when made because Rytelo was never going to be broadly used as a first- or second-line therapy or become the "standard of care" among community doctors due its side effects and administrative and monitoring burden and Geron's failure to educate community prescribers. Indeed: (i) CW2, one of four MSLs tasked with educating doctors, reported low awareness of Rytelo among community physicians prior to launch where "the majority" never heard of Rytelo and/or did not know much about it due, in part, to a lack of marketing materials to educate them, negatively impacting Geron's ability to gain support from Key Opinion Leaders ("KOLs") (¶¶68, 71-72); (ii) CW1 confirmed the lack of marketing materials during the Class Period (¶70); (iii) Defendants admitted during the February 2025 earnings call that the majority of prescribers were early adopter academics while "[i]n the community, it's a little bit more diffused[]" and Geron needed to "increase the reach and frequency, [of] education and awareness" and "improv[e] our promotional and sales force effectiveness" for community providers (¶¶143, 145-48); (iv) CW2 reported that Rytelo as a first-line treatment was unrealistic because doctors will stick with the less invasive option with fewer side effects (¶48); and (v) Defendant Ziegler admitted during the February 26, 2025 earnings call that "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]" and there was "some hesitancy in the market to start some of these products that require, in our case, some monitoring." ¶¶142, 145. Defendants' statements claiming a broader product market than existed are actionable. *In re Quality Sys.,* 865 F.3d 1130, 1143 (9th Cir. 2017) (statements that "more than 75% of the midsize practice market is still fair game" false when market was saturated); *In re Semtech Corp. Sec. Litig.,* 2025 WL 2884810, at *9 (C.D. Cal. Oct. 7, 2025) (statement touting product viability when

development was halted, false). Analysts confirm falsity. Seeking Alpha's post-Class Period report stated "what I perceived to be as clinical adoption…was, really, 'early adopters who believed in the product[,]'" ¶185; *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937, 942-43 (9th Cir. 2023) (post disclosure reports citing misstatements supported falsity).

While Defendants purported to warn "RYTELO may not achieve market acceptance in the U.S. for lower-risk MDS or any other indication" "or we may be unable to successfully identify patients and achieve a significant market share in RYTELO" (¶¶109, 118), those statements were false because the warned of risks had already materialized as the "majority" of Rytelo prescriptions were from early adopter academics as a third-line, last resort treatment. *See also* Appendices A, B.

Defendants do not, because they cannot, dispute that their statements were false when made in light of Defendants' own admissions and CW accounts that Geron failed to adequately identify and educate community physicians. Instead, they peculiarly argue the Court should disregard their admissions and find Plaintiffs failed to provide enough granular details about how many physicians Defendants should have educated or what specific type of "education" Geron needed to provide. DB 10-11. This is another red herring. Plaintiffs' claim is that Geron had *no* marketing materials to educate physicians, regardless of how many physicians were contacted. Moreover, while Defendants' admissions, alone, are sufficient, Plaintiffs provide particular allegations of the types of materials needed to educate physicians. For example, CW1 reported Geron needed to provide pamphlets and case studies. ¶70. CW2 similarly stated Geron should have a "detail piece" and "materials covering [the] mechanism of action, clinical trials, administration, and side effect management" to provide to physicians. ¶71.

CW2 quantified a lack of Rytelo awareness among the "majority" of community doctors CW2 spoke with prior to launch where they "had not heard of Rytelo" and/or "did not know much about it". ¶68.[6] CW2 reported that not all of the KOLs Geron targeted to gain support among

---

[6] Defendants' claim that CW2's account of "low" awareness is consistent with a new launch (DB12, n.9) contradicts their argument that Geron's survey purportedly reported *broad* awareness and utilization and "gratifying uptake" and fails to acknowledge CW2's full statement—that low awareness occurred from *lack of education*. ¶68. A physician can be aware of a new drug but still not be educated about it.

OPPOSITION TO MOTION TO DISMISS

hematologists viewed Rytelo favorably and chose other treatments. ¶72. As CW2 was one of four MSL's whose job it was to educate physicians on Rytelo, CW2 was positioned to know the extent of physician outreach and responses. ¶27. Moreover, according to CW2, the "chaos" and "conflicting directives" from management (including Defendant Kapur) leading up to the launch "paralyzed" MSL's from doing their job to educate community doctors. ¶¶27, 61. These facts, particularly when taken collectively with Defendants' admissions, adequately allege falsity.

Moreover, as discussed above, Plaintiffs' claim is not a forward-looking failure to predict revenues. Rather, Plaintiffs allege Defendants affirmatively misstated currently existing facts—"increasing" sales, the composition of sales (community versus academic physicians) and the market for Rytelo (third line treatment). Geron's purported market research (DB11-13, Ex. 12 at 13, Ex. 20 at 6) is not inconsistent with Plaintiffs' theory—the pre-launch research referenced during Geron's 8/8/24 call that Defendants rely on fails to state how many physicians Geron purportedly "surveyed" were oncologists versus hematologists and of the hematologists, how many were academics versus community, refers only to a general awareness of imetelstat (Rytelo's generic name) and says nothing about the physicians' willingness to use Rytelo over other treatments. Likewise, the study referred to on 6/7/24 does not state what percentage of academic versus community physicians used "imetelstat" and there is no discussion of Rytelo as a first-line treatment or standard of care. Such factual disputes over interpretation are not properly decided on a motion to dismiss. Further, contrary to Defendants' contention (DB12, 14), CW2 **does** dispute Geron's purported survey to the extent Defendants claim it educated and informed community doctors on Rytelo. ¶¶63-72.

Assuming, arguendo, Defendants' pre-launch research indicated Rytelo would have "broad utilization" among all subtypes (despite Geron's failure to educate community providers), Defendants knew by September and November 2024 from Geron's "own internal demand sales data" that they analyzed "week-over-week" and on a "4- and 8- week rolling average" basis, this was untrue. It strains credulity to claim Defendants monitored weekly sales data, saw flattening sales by September, yet had no idea until February why their only drug product had flat sales for months on end. Nor do Defendants explain how they magically learned in February 2025 the

12

treatment subtypes that comprised sales, despite disclaimers they had limited access to patient data. Both cannot be true. The far more plausible explanation is that Defendants knew by July 2024 there was a problem, replaced Kapur with Ziegler in hopes of fixing it, investors none the wiser, and failed due to a lack of community education and Rytelo's side effects and strict drug monitoring requirements.[7]

Finally, Defendants' claim that Plaintiffs only allege Geron did not have marketing materials "***prior to*** …launch" (DB11) is belied by CW accounts that Geron lacked marketing materials "at the time of Rytelo's launch." ¶¶56, 63; ¶¶4, 70 (same). Defendants omit from their citation (DB11) what the allegation actually says: "prior to ***and at the time of its launch***." ¶132.

### C.  False Statements Concerning Rytelo's Launch Preparedness

Prior to FDA approval, Defendants falsely stated Geron had completed all the steps for a successful launch, including that "we have onboarded and fully integrated a highly experienced commercial and medical affairs team" (¶87, *see also* ¶98), "had extensive discussions with ***both community*** and academic providers" (¶89), "completed the build-out of our full commercial organization with the hiring of our sales force, which has been now integrated and trained…." (¶97, *see also* ¶85) and "worked to identify the concentrated low-risk MDS prescriber base" (*id.*). As Geron's future depended on a successful launch, investors were focused on its preparation.

The above statements, and others like them (*e.g.*, ¶¶98, 113, 120) were false and misleading when made because Geron was ill-prepared for the launch. CWs confirmed that before and for the first few months after Rytelo's launch, internal chaos and disagreements about roles and strategy plagued Geron so that teams were "paralyzed" and Geron lacked marketing materials to educate community physicians, so salespeople were not "trained." In fact: (i) CW2 witnessed conflicting directives on launch strategy between Meyer and Kapur and/or Michael Steidle such as timing of launch initiatives and personnel roles; (ii) CW2 reported low awareness of Rytelo among

---

[7] Unlike in *Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *1 (9th Cir. Dec. 21, 2021) where the unexpected problems and delays did not foreclose the company having some successes on the project (DB11), here, Plaintiffs allege Geron had "no" marketing materials, such as pamphlets and studies, and most community physicians did not know about Rytelo, making it impossible for Defendants' statements to be true.

13

OPPOSITION TO MOTION TO DISMISS

community physicians, most of whom never heard of Rytelo; (iii) CWs 1 and 2 reported a lack of marketing materials to promote Rytelo; and (iv) Defendants admitted during the February 2025 earnings call that "[i]n the community, it's a little bit more diffused[]" where Geron needed to "increase the reach and frequency, [of] education and awareness" and "improv[e] our promotional and sales force effectiveness" for community physicians. Thus, there were no "extensive" discussions with community providers and Geron's teams were not integrated nor ready to be deployed. Courts have found similar misstatements about the state of preparedness, actionable. *In re QuantumScape Sec. Class Action Litig*., 580 F. Supp. 3d 714, 734 (N.D. Cal. 2022) (statements that batteries were ready for commercialization false when, in reality, batteries were compromised).

Defendants argue CW2's account should be discredited because CW2 left in April 2024, before the end of the Class Period. DB10. But CW2's account speaks to Geron's preparatory activities prior to launch, which occurred squarely during CW2's employment. ¶27. CW2 details who was involved in the disagreements (Kapur, Denise Meyer and Michael Steidle), what the disagreements were about (*e.g.*, employee roles, timing of transition to commercial launch and failure to prepare marketing materials), when these activities occurred (during CW2's tenure in 2024) and how they impacted the launch (low sales mainly among early adopters). ¶¶59-63, 68, 71-72. Thus, CW2 had first-hand knowledge of the pre-launch chaos that "paralyzed" employees.

Moreover, Defendants' purported qualification of their 2/28/24 pre-launch statement that Geron was "engaging in marketing" as "preparatory" (DB12) makes this statement no less false when CWs 1 and 2 both reported that Geron had *no* marketing materials at the time of launch. ¶85. *See also* ¶87. Defendants admitted as much in February 2025. ¶¶143-44. Likewise, CW1 confirmed Geron failed to adequately educate community providers whose awareness of Rytelo at launch was either "low" or non-existent, and Defendants admit Geron needed to focus on "improving our promotional and sales force effectiveness" and "increase the reach and frequency, our education and awareness…with [] community" doctors (¶¶143, 145-46). These facts directly contradict Kapur's 2/28/24 statement that Geron "had extensive discussions with both community and academic providers" and educated them on "management of heme toxicities" (¶89) and 5/2/24

14

statement that Geron's salesforce was "integrated and trained" (despite no marketing materials). ¶97. The alleged misstatements do not need be worded identically to the underlying supporting facts (DB12, 14) since they create an "impression of a state of affairs that differs in a material way" from reality. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).[8]

Further, contrary to Defendants' argument, Defendants knew the launch was a "disaster" and Rytelo was "struggling with market acceptance" (DB15), as evidenced by Geron replacing Kapur the month after launch. ¶78. In fact, Defendants referenced the management change during the February 2025 earnings call as one of the actions Geron took to get sales on track. ¶143 ("our organization changed commercial and medical affairs leadership a few months into launch"). Further, early sales would not have reflected chaos (DB15) because initial sales were, admittedly, from early adopter academics who were already familiar with Rytelo from the clinical trials.

The warning that "[o]ur inability to successfully establish and maintain effective commercialization capabilities for imetelstat…would severely and adversely affect our financial results" (¶¶83, 91) was false because it fails to warn of the specific risks—that Geron may fail to educate community doctors or prepare marketing materials—and such risk had already materialized for the reasons stated above. *See* also Appendix 2; *Quality Sys.*, 865 F.3d at 1141.[9]

### D. Defendants' Puffery and Safe Harbor Arguments Lack Merit

**Corporate Optimism**: While Defendants appear to argue parts of the alleged misstatements are inactionable corporate optimism (DB18), they do not identify the statements they challenge. Instead, they excise a single word from the statement, take it out of context and argue puffing.

---

[8] Defendants' reference on 6/7/24 to belated appointments with an undisclosed type of physician at some undisclosed future time (DB14) is *after* their false pre-launch statements.

[9] Defendants' cases (DB10, 12, 14-15) are inapposite. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022) (chart "lacking scientific integrity" insufficient); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086 (9th Cir. 2002) ("lengthening" "sales cycles" lacked specificity); *Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 993 (N.D. Cal. 2021) ("hire fast and fire faster" mantra insufficient to show salesforce not growing); *Dolly v. GitLab Inc.*, 2025 WL 2372965, at *11 (N.D. Cal. Aug. 14, 2025) (account addressing "*frequency*" insufficient); *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 537 (9th Cir. 2024) (CW's opinions of business practices); *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *7 (N.D. Cal. Feb. 1, 2021) (reduced customer spending insufficient to show forecasts unachievable); *In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, at *6 (N.D. Cal 2025) (programs to "accelerate" did not mean strategy failing).

15
OPPOSITION TO MOTION TO DISMISS

Puffing statements are optimistic statements generally not capable of objective verification. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). However, even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly. *Quality Sys.,* 865 F.3d at 1143-44.

The alleged misstatements, in context, are not puffery. They falsely describe Rytelo's sales and launch as an overwhelming success when sales quickly stalled after the early adopter academic bolus. *See* ¶111 ("gratifying uptake" describing early sales from purported successful outreach to physicians); ¶113 ("early [sales] results over these first 6 weeks of launch" and "strong level of in-person access to community and academic accounts" purportedly drove sales); *id.* ("seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts"); ¶121 ("Demand from launch through Q3 has come from 388 ordering centers…This strong start reinforces the high unmet need in RYTELO's clinical profile"); *id.* ("very pleased with the strong demand for RYTELO across community and academic settings" that "reinforce our expectations for continued demand and promising growth"). *Constr. Workers Pension Tr. Fund – Lake Cnty., v. Genoptix, Inc.*, 2013 WL 12123841, at *4  (S.D. Cal. Mar. 22, 2013) (touting revenue reflecting "**continued strong demand**" actionable); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *8-12 (D. Or. June 27, 2017) (customer demand statements actionable); *Doller v. Hertz Glob. Hldgs, Inc.*, 2025 WL 2896919, at *4 (M.D. Fla. Oct. 10, 2025) ("EV rental demand is very strong… across all aspects of our business").[10]

**Defendants Cannot Escape Liability by Invoking the Safe Harbor**: A forward-looking statement is protected under the safe harbor if it is: (a) identified as such; and (b) accompanied by meaningful cautionary language. 15 U.S.C. §78u-5(c)(1)(A)(i); *see also Glazer*, 63 F.4th at 767.

---

[10] Defendant's cases (DB18) are inapposite because there, unlike here, they concern unverifiable facts (*e.g.*, "strong" in-person access to community doctors drove early sales). *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111–12 (9th Cir. 2010) ("employee relations are good" inactionable puffery); *Palo Alto Networks*, 2025 WL 1093247, at *4 (same); *Hammer v. Frontier Fin. Corp.*, 2011 WL 13229260, at *9 (W.D. Wash. Sep. 7, 2011) (same).

16

OPPOSITION TO MOTION TO DISMISS

Even if forward-looking, statements are actionable where, as here, defendants "concealed adverse facts that gave investors a misleading impression of . . . the prospective market for" Defendants' product when the risks had materialized. *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *18 (N.D. Cal. 2023). The misrepresentations Defendants challenge are not protected by purported cautionary language (DB15, n. 11, 18-19) because they did not warn of the specific risk and/or the risk had materialized. While Defendants refer to ¶93 and ¶111 as protected by cautionary language, they do not identify the protecting language. Rather, they point to certain broad topics Geron warned about, such as "competitive factors" and "the commercialization of Rytelo." DB18-19. As discussed above and in Appendix 2, these risk factors are generic and do not warn about Geron's failure to prepare marketing materials or educate community physicians. Moreover, the warned of risks had materialized as Geron's sales flattened due to its failed efforts to prepare for Rytelo's launch, including failure to educate community physicians who were unwilling to prescribe Rytelo and certainly not as a first or second line treatment where less invasive treatments were available.[11]

Finally, Defendants' argument that Plaintiffs need to allege "Defendants knew Rytelo's sales would inevitably flatten" (DB19) is incorrect. Plaintiffs do not allege any forecasts or sales figures were false. Thus, Plaintiffs need only (and do) allege Defendants knew Rytelo sales ***had*** flattened—Defendants knew Rytelo would not become "the standard of care" or have "uptake" as a frontline therapy because of its side effects and burdensome administration and monitoring requirements (born out in the weekly sales data Defendants monitored), less invasive treatment options and Geron's failure to education community physicians. *See* Section II.A-B, *infra*.

## III.     The Complaint Alleges a Strong Inference of Scienter

Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'" *Schueneman* 840 F.3d at 705.  A defendant is deliberately

---

[11] Unlike Defendants' cases (DB19), Geron's risk disclosures did not warn of the specific risk, which had materialized. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 536 (S.D.N.Y. 2015) (warning that "a regulatory authority… may deny or delay approval" tailored to statement of anticipated product approval); *W. Pa. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2018 WL 4524107, at *16 (D. Or. May 29, 2018), *aff'd sub nom*. 788 F. App'x 421 (9th Cir. 2019) (obstacles did not render forecasts impossible to meet); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1186, 1192–94 (9th Cir. 2021) (same).

reckless if they "had reasonable grounds to believe material facts existed that were misstated or omitted but nonetheless failed to obtain and disclose such facts although [they] could have done so without extraordinary effort." *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). The relevant inquiry is "'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re FibroGen, Inc., Sec. Litig.*, 2022 WL 2793032, at *18 (N.D. Cal. July 15, 2022). Plaintiffs' allegations, taken holistically, support a strong inference of scienter.

**A.  Defendants' Admit They Knew Sales Were Flat at the Time of Their Misstatements**

Defendants' own admissions support a strong inference scienter. On the Q4 2024 Earnings Call, Scarlett admitted that Geron had "observed flat revenue trends over the last few months[,]" ¶162. In response to an analyst question of "which month you *started to see* flattening[,]" Defendant Ziegler stated that, "based upon the rolling 4- and 8-week, we *started to see* right, let's call it, around the holidays, Thanksgiving holiday going forward." ¶145 (emphasis added). In other words, sales started to flatten eight weeks prior to when Geron "started to see" the trend, or late September 2024, as Defendants concede in their brief. DB21 (the rolling average is "backward-looking"). Such executive admissions support scienter. *Apple*, 2020 WL 6482014, at *9-10 (post-Class Period admission supported scienter); *Roberti v. OSI Sys., Inc.*, No. CV 13–9174, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) (scienter where statements suggest actual knowledge).

In arguing Geron "could not have learned" about flattening sales until December 2024, Defendants disingenuously contend Zieger said sales flattened "*starting*" around Thanksgiving. DB21. But that's not what Ziegler said. He said November was when Geron "started *to see*" a sales flattening *trend* "based upon the rolling 4- and 8-week" averages. ¶145. Defendants also admittedly reviewed "the weekly data." ¶145. Moreover, while Defendants seek shelter behind the fact that Ziegler's February 2025 admission does not state "when" Geron "received patient start data" or learned about the trend (DB22), the more plausible inference is that Defendants knew this at the same time sales were flattening based on their weekly review. Indeed, it would be absurd to suggest Defendants did not know the composition of Geron's sales data or reasons for sales

18

OPPOSITION TO MOTION TO DISMISS

flattening over an eight-week period, particularly given Rytelo was Geron's only commercial product and its "own internal demand sales data" allowed Defendants to forecast demand. ¶121.

Finally, Defendants' contention that the January 2025 Fast Start meeting "cut[s] against" scienter because it occurred after the alleged misstatements (DB21) falls flat in light of Defendants' admissions, replacement of Kapur with Ziegler to "driv[e] growth of Rytelo" in September (¶79), the same time sales started flattening, Defendants' monitoring of Geron's sales data and Rytelo's import to Geron's financial viability. Indeed, as CW1 stated, the January Fast Start meeting was reflective to discuss how to increase sales.

**B.  That Rytelo Was Geron's Only Product Creates a Strong Inference of Scienter**

Rytelo accounted for 99.4% of Geron's revenue, meaning the Company's "ability to generate revenue from product sales and achieve profitability [was] wholly dependent on [Geron's] ability to successfully commercialize RYTELO[.]" ¶¶180, 183. The core operations doctrine, alone, supports a strong inference of scienter where, as here, a product accounts for nearly all revenue and, thus, "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest management was without knowledge of the matter." *Ferraro Family Found., Inc. v. Corcept Therapeutics Inc*., 2021 WL 3748325, at *23 (N.D. Cal. Aug. 24, 2021) (drug accounted for 100% of revenue); *see also Hayden v. Portola Pharms., Inc*., 2021 WL 3506614, at *5 (N.D. Cal. Aug. 10, 2021) (Chhabria, J.) (drug accounted for 99% of the company's revenues). Moreover, "[w]hen the challenged statements involve the company's core operations, that showing can be made without alleging any specific facts that an individual officer actually knew about the particular fact—knowledge is essentially assumed." *Hayden*, 2021 WL 3506614, at *5 (Chhabria, J.); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1062 (9th Cir. 2014) (inferring executives had "knowledge of the critical core operation of their companies"). Nevertheless, Plaintiffs allege specific facts of Defendants' knowledge through their admissions and analyzing and monitoring Geron's "own internal demand sales data." ¶¶121, 145.

Defendants erroneously relegate Rytelo to a "flagship" product and imply Rytelo was not Geron's core business, citing *In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046 (9th Cir. 2014). DB22. Unlike here where Rytelo comprised all of Geron's revenues, *Nvidia* involved defects in certain

19

OPPOSITION TO MOTION TO DISMISS

versions of two of its chips but only for a certain "notebook systems" supplied to two customers. *NVIDIA,* 768 F.3d 1046, 1050-51.

### C. Defendants Knew of Flattening Sales from Internal Sales Data and Meetings

Defendants admittedly analyzed and monitored Geron's weekly, "internal demand sales data" which showed "sales growth trajectory" and "launch progress to date." ¶¶121, 165. Ziegler admitted Defendants could see sales flattening "***in the weekly data***" Defendants reviewed. ¶¶145, 166 (emphasis added). Kapur also touted that, in advance of the launch, Geron had implemented "systems and processes to recognize and report revenues[.]" ¶¶87, 164. Thus, Defendants were updated weekly that community physicians were unwilling to prescribe Rytelo, it was prescribed mostly by academics as a third-line treatment, and by September 2024, Rytelo sales were flattening and remained flat throughout the remainder of the Class Period. ¶167; *In re Daou Sys., Inc.,* 411 F. 3d 1006, 1022-23 (9th Cir. 2005) (admissions of monitoring data support scienter); *Quality Sys.,* 865 F.3d at 1145 (scienter where "reports… and sales forecasts" showed trends "available to executives"); *Hayden*, 2021 WL 3506614, at *5 ("close track of data" supported scienter ).

CW's confirm Defendants' access to adverse sales data. ¶75, 81 (CW1 said senior leadership had access to all sales data); *Quality Sys*., 865 F.3d at 1145 (defendants' access to reports of declining sales established by CWs); *FibroGen,* 2022 WL 2793032, at *30 ( "[d]efendants' access to information" sufficient). Further, CW1 attended the Fast Start meeting with Ziegler and sales personnel from all the regions in January 2025 where Ziegler discussed that Geron's sales had flattened in September 2024 and November 2024. ¶81. Such meetings discussing flattening sales supports scienter. *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *28 (N.D. Cal. Mar. 21, 2018) (scienter from attendance at sales meeting discussing issue).[12]

Defendants fault Plaintiffs' for failing to quantify "what the sales data showed" when the challenged statements were made. DB22. Not so. As discussed above, Plaintiffs quantify that sales data showed— "week-over-week" "flattening" based on the 4- and 8-week rolling data—and

---

[12] Defendants' reliance on *Twitter,* 29 F.4th at 621 is misplaced. There, the plaintiffs merely "presume[d]" defendants had knowledge whereas here, CW1 witnessed it firsthand at the meeting.

20

"when"—starting in September 2024 and throughout the Class Period.[13]

### D.  Executive Terminations Support Scienter

Suspicious executive departures are indicative of scienter. *Zucco*, 552 F.3d at 1002. Kapur and Scarlett's departures suspiciously coincide with the timing of Rytelo's failed launch and flat sales during the Class Period. As CCO, Kapur's purview was sales. Kapur's July 2024 termination, ***not even one month*** after Rytelo's launch, coincided with the "bolus" from academics ending and sales flattening. ¶¶78, 135. Likewise, the Board of Directors abruptly terminated Scarlett, Geron's CEO of 14 years, in March 2025 with no succession plan, as a result of Geron's flat sales reported mere weeks before 2/26/25. ¶175. Indeed, analysts understood Scarlett's departure was tied to flat revenues. *E.g.*, ¶178 (Scotiabank—Scarlett's departure "coincides with recent adjustments to the commercial strategy after a weak fourth quarter of Rytelo sales[]"); ¶176 (management told Barclays "this was a board-driven decision that was executed relatively quickly"). Moreover, Defendants explicitly stated in the February 2025 Earnings Call that these management changes were in response to Geron's failed commercial launch. ¶143 ("our organization changed commercial and medical affairs leadership a few months into launch").[14] Courts have found similar executive departures at suspicious times supports scienter. *Rivian*, 2025 WL 2426714, at *7 (resignations by executives "familiar with production and demand" supports scienter."); *Semtech*, 2025 WL 2884810, at *10 ("uncharacteristic" executive resignation, after decades at company without notice suspicious). Thus, Defendants' attempt to cast Kapur and Scarlett's terminations as merely pursuing other interests or retirement (DB23), fails.

### E.  Analysts Reactions Support Scienter:

Scienter is further bolstered by "damning" analyst reactions once the truth is revealed. *Black v. Snap, Inc.*, 2023 WL 6812762, at *13 (C.D. Cal. Sep. 26, 2023).  Here, for example, analyst Steven Ayers from Seeking Alpha reversed his analysis upon the corrective disclosure,

---

[13] Defendants' cases are misplaced. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("merely assert[ing] in conclusory terms" access to internal reports, insufficient); *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) (no scienter where lacking description of report).

[14] Defendants' cases (DB23) are inapposite. *Luna v. Marvell Tech. Grp. Ltd*, 2016 WL 5930655, at *13 (N.D. Cal. Oct. 12, 2016) ("general timing of the departures" insufficient); *Sakkal*, 557 F. Supp. 3d 988 at 999 (executive departure was for "legitimate reasons"*)*.

OPPOSITION TO MOTION TO DISMISS

stating "what I perceived to be as clinical adoption in my last update was, really, 'early adopters who believed in the product[,]'" and "[i]f Rytelo *is* a 3rd-line or later product, its TAM is probably less than 50% of what I projected[.]" ¶185. *Black,* 2023 WL 6812762, at \*13 (analysts negative reaction supports scienter "precisely because Snap's admissions did not align with [d]efendants' prior statements"); *FibroGen*, 2022 WL 2793032, at \*22–23 (same). Contrary to Defendants' suggestion that analysts were merely recalibrating "financial models given flattening sales" (DB24), Steven Ayers of Seeking Alpha specifically called out the contradictory information—Rytelo's sales were a bolus of academics and was only used as a third line treatment.[15]

### F.   Defendants' Motive to Issue False Statements Contributes to the Scienter Analysis

Courts "consider the defendants' motive to commit fraud as one factor that may support a strong inference of scienter." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at \*19 (C.D. Cal. Oct. 1, 2013). Plaintiffs' motive allegations further support scienter.

**<u>Stock Sales</u>**: "To evaluate suspiciousness of stock sales, [courts] consider, inter alia, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Oracle*, 380 F.3d at 1232 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). Each of these factors weigh in favor of scienter. Combined, Defendants Grethlein, Feller, and Kapur sold over 1.3 million shares of Geron stock for proceeds of over $6 million during the Class Period. ¶192 (Grethlein sold 674,348 shares for $3,073,003.84); ¶196 (Feller sold 287,900 shares for $1,334,128.60); ¶199 (Kapur sold 421,875 shares for $1,959,609.38); *see Fecht v. Price Co.*, 70 F.3d 1078, 1084 (9th Cir. 1995) (sales of $1.6 million by two insiders found to be suspicious); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (sale of $1,340,000 of company stock was suspicious).[16] Each of these transactions represented 100% of Grethlein, Feller, and Kapur's stock holdings and none were sold pursuant to a 10b5-1

[15] Defendants' cases (DB24) are distinguishable because the analyst reports did not contain contradictory information and relied on *pre-class period* analyst statements).

[16] That Scarlett, Ziegler, or Robertson did not sell stock during the Class Period (DB23) demonstrates nothing. The Ninth Circuit has held that "[s]cienter can be established even if the officers who made the misleading statements did not sell stock…." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d, 944 (9th Cir. 2003).

22

trading plan. ¶¶192, 196, 199.[17] Nor were any in line with prior trading history. ¶¶196, 199 (Feller and Kapur sold no shares in 2023); ¶193 (in 2023, Grethlein sold $1,165,698.57 in stock—less than half that in 2024—and, unlike 2024, pursuant to trading plans). Defendants sold their shares while Geron's stock was trading at an all-time high and at the same time Kapur was terminated, and they quickly saw from Geron's own "own internal demand sales data" that sales were flattening (¶¶192-200). *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *18 (C.D. Cal. Aug. 4, 2017) (scienter pled where "[d]efendants sold at the earliest possible moment, while aware of negative information").

Defendants argue that it is not unusual for them to have sold after a pivotal event (FDA approval), and that they sold shares which vested on the "achievement of regulatory approval by the FDA." DB23 (citing Ex. 7 at 50). But Defendants' Form 4s indicate that the shares they converted and sold were vested options from awards "commencing February 16, 2022" and other "fully vested" options, not just those contingent on FDA approval. *See* Def. Exs. 2, 13, and 14.[18] *See In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 43463, at *8 (N.D. Cal. Jan. 6, 2005) (inference of scienter where stock sales dramatically increased at price peaks).

**<u>Geron's Desperate need for Cash</u>**: Contrary to Defendants' contention (DB24), Plaintiffs allege much *more* than the mere desire to raise capital. Rather, Plaintiffs allege Geron was in dire financial straits and in need of cash, having never generated any revenue and incurring operating losses every year from inception, resulting in an accumulated deficit of $1.8 billion. ¶¶201-02. *See Rivian*, 2025 WL 2426714, at *7 (motive where free cash flow "around negative $1.5 billion per quarter" and company "racing against time to…finally generate a profit"); *Nguyen v. Radiant*

---

[17] Defendants erroneously calculate the percentage of shares sold by including total options held, including unvested options, and awards years outside the Class Period. DB23. Nonetheless, Courts have found the percentages sold even under Defendants' incorrect calculation (DB23) sufficient. *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (sale of 7.6% of holdings supported scienter); *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) (selling 17%-45% of shares supports scienter).

[18] Defendants' reliance on *Lipton*, 284 F.3d at 1037 is inapt. There, the court found the timing of insider sales was not suspicious when only one defendant sold an "extremely small portion of his total holdings" while all other "officers fully retained their holdings".

OPPOSITION TO MOTION TO DISMISS

*Pharms. Corp.*, 2011 WL 5041959, at *8 (C.D. Cal. Oct. 20, 2011) (company "desperate for operating cash" supportive of motive).

**Patent Expiration**: That Geron's key patent and only source of revenue was nearing expiration supports Defendants' motive. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (motive where patent protection for the company's only drug "was obviously important").[19]

### G. A Holistic Review Demonstrates Plaintiffs' Scienter Theory is at Least as Compelling as Defendants' Opposing Inference

Plaintiffs assert that Defendants were completely unprepared for Geron's first commercial launch and concealed the resulting flattening sales after the "bolus" from early academics prescribing Rytelo as mainly a third-line treatment had stalled, while Defendants quickly replaced management and belatedly reached out to community physicians in hopes of catching up, investors none the wiser, while Defendants unloaded their stock. This inference is far more compelling than Defendants' competing inference that Geron somehow had "limited visibility" into the early sales of Geron's *only* drug product and did not become aware that sales were flattening until six months later, claiming to have suddenly obtained visibility into sales data and "promptly disclosed that" a quarter later, DB24.[20] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007) (court must find for plaintiff if "the inference of scienter at least as strong as any opposing inference[.]").

### IV.    The Complaint Adequately Alleges Loss Causation

Pleading loss causation merely requires allegations that the misrepresentation was a "substantial cause" of the stock price decline. *Gilead,,* 536 F.3d 1049 at 1055. It does not have to be the sole reason. *Id.* at 1057. Plaintiffs allege that on February 26, 2025, the truth was revealed when Defendants disclosed Rytelo's sales growth had flattened because "the majority" of Rytelo

---

[19] Defendants argue that Geron's orphan drug and market exclusivity protect Rytelo from generic competition into the 2030s. DB24. However, Geron's expiring 20-year composition of matter patent that can block anyone from selling a drug is much more critical and, thus, supports scienter. *See Nathenson*, 267 F.3d at 425. In fact, Geron warns in its 2024 10-K that orphan drug designations may not be maintained, limiting the period of exclusivity for commercialization of RYTELO, which would likely harm Geron's business—pages Defendants conveniently omitted from their Exhibit 33. *See* 0000950170-25-027982 at 38 (last visited on 12/8/2025).

[20] Defendants' cherry-picked quote from *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) (DB24-25) is inapt. Unlike here, the *Ronconi* court found no specific contemporaneous facts showing the defendants knew their optimistic predictions were false *when made*.

OPPOSITION TO MOTION TO DISMISS

sales came from "early adopters at many of the academic medical centers" as a third-line treatment and "[i]n the community, it's a little bit more diffused." ¶¶141-42 148,157. Upon the news, Geron's common stock price declined approximately 32.07%. ¶150. These disclosures corrected Defendants' prior misstatements that, for example, Rytelo demand showed "steady, consistent growth" (¶123); with "uptake in utilization across all patient segments" (¶124) and that "70% of the patients" were being treated in the community (¶100) as "the standard of care for both eligible first and second-line patients." ¶111.

Defendants erroneously contend these disclosures were not corrective and were merely "a balanced assessment of Rytelo's successful progress to date and its proactive efforts to refine its business strategy."  DB25.[21] But, several analysts lowered their price targets because of "new patient start flatness over the past few months" and "insufficient education and outreach outside Rytelo experienced centers[]". ¶¶154-55. One even noted that "that momentum of the Rytelo launch… has slowed, noting flat revenue trends" which is a "cause for concern at this early stage of the launch." ¶157; S*ee Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc*., 2025 WL 39936, at *6 (N.D. Cal. Jan. 6, 2025) (Chhabria, J.) (analyst discussing the disclosure and stock downgrade suggested "the market was taking the [disclosure] seriously.").

## V.    <u>Plaintiffs' Section 20(A) Claim</u>

By adequately alleging a Section 10(b) claim, Plaintiffs have alleged a Section 20(a) claim. *In re Vaxart, Inc. Sec. Litig*., 576 F. Supp. 3d 663, 675 (N.D. Cal. 2021) (Chhabria, J).

<b>CONCLUSION</b>

Wherefore, Defendants' motion should be denied. If the Court grants any part of the motion, Plaintiffs respectfully request leave to amend. *Eminence Cap., LLC, v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to amend liberally granted in PSLRA cases).

---

[21] Defendants' cases are distinguishable. *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1063-64 (9th Cir. 2008) (news article about DOE investigation at one campus and guidance shortfall did not connect to company-wide manipulation of enrollment figures); *In re Omnicom Grp., Inc. Sec. Litig*., 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (summary judgment where disclosures recharacterized **known** facts); *In re Countrywide Fin. Corp. Sec. Litig*., 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) (announcement of new practices).

Dated: December 8, 2025

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ *Adam M. Apton*
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
Amanda D. Foley (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: afoley@zlk.com

*Attorneys for Plaintiffs*

26

OPPOSITION TO MOTION TO DISMISS