**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Co-Lead Plaintiffs Robbie Dickson and Joseph M. Stacy, Jr.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE GERON CORPORATION SECURITIES LITIGATION | Master File No. 3:25-cv-02507-VC<br><br>CLASS ACTION<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 5

III. THE PARTIES .......... 5

IV. ADDITIONAL RELEVANT NON-PARTIES .......... 7

V. ADDITIONAL SUBSTANTIVE ALLEGATIONS .......... 8

A. Geron Develops Treatments for Hematologic Malignancies .......... 8

B. Geron's Future Financial Viability and Growth Depended on the Successful Commercial Launch of Rytelo as a Second-Line Treatment .......... 10

C. Geron Launches Rytelo With No Marketing Materials, Insufficient Medical and Sales Staff, and No Clear Messaging or Positioning for Rytelo's Use .......... 11

1. Internal Turmoil and Conflicting Directives from Executives Cause Sales Personnel to Feel "Paralyzed" at Rytelo's Launch .......... 12

2. Geron Lacked Any Marketing Materials or Clear Messaging to Educate Community Physicians Who Would Be the Primary Rytelo Subscribers .......... 13

D. Geron's Failed Launch Causes Sales and Sales Growth to Flatten by September 2024 and Remain Flat Throughout the Class Period .......... 15

E. Defendants Were Aware of the Flattened Sales Through Their Review of Weekly Sales Data and Attendance at Weekly Sales Meetings .......... 19

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .......... 20

A. November 7, 2024 – Q3 2024 Earnings Call .......... 20

B. November 18, 2024 – Stifel 2024 Healthcare Conference .......... 26

C. December 4, 2024 – 7th Annual Evercore HealthCONx Conference .......... 30

VII. THE TRUTH EMERGES .......... 35

VIII. POST-CLASS PERIOD EVENTS .......... 42

A. Geron Overhauls Executive Management and Lays Off One-Third of its Workforce .......... 42

B. Geron Reports *Declining* Q1 2025 Sales .......... 44

C. Geron's New CEO Admits Lack of Physician Education and Awareness Caused Sales to Flatten .......... 45

IX. ADDITIONAL SCIENTER ALLEGATIONS ........ 46

A. Defendants' Actual Knowledge and/or Recklessness ........ 46

1. Defendants Personally Tracked Rytelo Sales Data on a Weekly Basis ........ 46

2. Defendants Admit They Knew Sales Had Flattened by at Least November 2024 Because They Failed to Educate Community Physicians and Rytelo Was Mainly Prescribed by Academics as a Third-Line Treatment ........ 47

3. Executive Personnel Changes Strongly Support Scienter ........ 48

4. That Rytelo Was Geron's Only FDA-Approved Drug Product Creates a Strong Inference of Scienter ........ 49

5. Analysts' Negative Reactions Support Scienter ........ 50

B. Defendants Were Motivated to Misrepresent Material Facts Regarding Geron's Failed Launch So Geron Would Be Acquired ........ 51

X. LOSS CAUSATION AND ECONOMIC LOSS ........ 51

XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET ........ 54

XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE ........ 55

XIII. CLASS ACTION ALLEGATIONS ........ 55

XIV. COUNT I ........ 57

XV. COUNT II ........ 60

XVI. PRAYER FOR RELIEF ........ 61

XVII. DEMAND FOR TRIAL BY JURY ........ 61

Court-appointed Lead Plaintiffs Robbie Dickson and Joseph M. Stacy, Jr. ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Geron Corporation ("Geron" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Geron's public documents, conference calls transcripts, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews with former Geron employees; and (e) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within the defendants' control.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Geron common stock between November 7, 2024 and February 25, 2025, inclusive (the "Class Period") and were damaged thereby (the "Class"), seeking to recover damages caused by Defendants' violations of the federal securities laws.

2. Geron Corporation ("Geron" or the "Company") is a commercial-stage biopharmaceutical company that develops treatments for blood cancer. For Geron, the commercial launch of Rytelo, its only FDA-approved drug, was a critical milestone: Geron claimed the Company's "ability to achieve profitability will depend on successful commercialization of Rytelo," which accounted for 99.4% of its annual revenue. With Geron's near-term prospects tethered exclusively to this single drug, Defendants systematically assured investors that Geron was fully prepared for a successful commercial launch. They touted an already onboarded, "fully integrated" and "highly experienced commercial and medical affairs team." Defendants also

promised investors they were targeting and educating community physicians—who they claimed would treat 70% to 80% of patients—to drive Rytelo's success as a highly lucrative first and second-line treatment.

3. These assurances stood in stark contrast to reality. Internally, the Rytelo launch was a disaster, hindered by conflicting executive directives, inadequate preparation and a lack of clear messaging and positioning for Rytelo's use. A former Medical Science Liaison reported that Geron's executives gave "conflicting directives to the medical and commercial teams," leaving the field personnel feeling "paralyzed." The Company deployed its commercial teams into the field without basic marketing materials; a former Key Account Manager confirmed that the only marketing material available to sell the drug at launch was the bare FDA-approved prescribing information. Despite that "[n]ew patient starts and duration of treatment are the key primary drivers of revenue," Defendants failed to educate their primary target demographic—community physicians. Witnesses confirm that most community physicians they spoke with had not heard of Rytelo or, if they had, they did not know much about it, and Geron's market research showed these physicians were confused about how to use Rytelo.

4. A former senior executive in sales and marketing confirmed that, as a result of the above launch failures, Geron's internal weekly sales data showed that by September 2024, Geron stopped getting new patients and sales and sales growth flattened. A former Geron Director who reviewed daily demand data and sales trends for Rytelo similarly reported sales were flattening by October 2024. These witnesses both confirmed that Geron's sales and sales growth remained flat throughout the Class Period.

5. Yet, Defendants maintained a false public narrative that directly contradicted the weekly sales metrics Defendants admit they were actively monitoring. While Defendants possessed weekly sales data showing sales and sales growth had flattened, they told the market the opposite, that Geron was experiencing "steady, consistent growth across all of the patient segments[,]" and there was "strong demand for Rytelo across community and academic settings" with "broad utilization across patient segments."

6. Defendants also continuously misrepresented the prescriber demographics. Because Geron's survival depended on adoption by community healthcare providers, Defendants falsely touted success in the community setting, claiming the prescriber split was "65-35 or roughly 2/3, 1/3" in favor of community physicians. In reality, weekly sales data showed the majority of patients on Rytelo came from early adopter academics, while community physicians were not prescribing Rytelo due to confusion over how Rytelo should be used and concerns over cytopenias.

7. To sell the narrative of a broadly utilized drug, Defendants falsely touted that Rytelo was seeing "uptake in utilization across *all patient segments*, including first-line ESA ineligible, [and] *second-line*" when, in fact, Geron's weekly sales data showed prescriptions were almost entirely from third or later lines.

8. Defendants made these misstatements with actual knowledge of the truth. The evidence establishing Defendants' scienter is robust and multifaceted:

- **Defendants' Review and Analysis of Weekly Sales Data:** Rytelo was Geron's only commercial product accounting for 99.4% of its annual revenue. Defendants admit they closely monitored Rytelo's "weekly" sales data. Witnesses confirmed that Defendants Ziegler and Scarlett, and the executive management team received weekly emails detailing national, regional, territory, and account-level sales, showing exactly who was prescribing the drug and for what treatment line. Witnesses also confirm Ziegler had access to daily demand data in a dashboard that showed flattening sales.
- **Defendants' Own Admissions that Sales Had Been Flat for "Months" as a Result of Poor Messaging to the Target Market:** Defendants cannot plead ignorance when they ultimately confessed to the exact operational failures they spent months concealing. During a February 2025 earnings call, Defendant Scarlett admitted that Geron had failed to adequately educate community healthcare providers, identifying it as their "biggest opportunity" to fix. Defendant Ziegler similarly confessed that, as a result of this failure, the "majority of new patient starts have come from the third-line plus patient segment," resulting in "flat revenue trends over the last few months."

- **Executive Departures:** The timeline of executive terminations underscores the internal failures. Less than one month after launch, Geron announced the departure of Chief Commercial Officer Anil Kapur ("Kapur"). Following the truth's revelation in February 2025, the Board ousted Defendant Scarlett, ending his nearly 14-year tenure as CEO. Additionally, Defendant Ziegler abruptly departed in October 2025 along with the COO, Andrew Grethlein, followed by a massive layoff of one third of Geron's 260 employees in December 2025.
- **Motive**: Witnesses confirm that Defendants told them Geron's pre-launch strategy was focused on being acquired, not successfully executing Rytelo's launch, leading Defendants to purposefully underinvest in the necessary systems and personnel and misrepresent the demand and sales for Rytelo.

9. The misleading narrative finally unraveled on February 26, 2025, during the Company's fourth-quarter earnings call ("Q4 2024 Earnings Call") during which Defendants were forced to confess the reality of the Rytelo launch. Defendant Scarlett admitted that "*we have observed flat revenue trends over the last few months.*" Echoing Scarlett, Defendant Ziegler stated "*with respect to new patient starts, we have observed flatness over the past few months*" and Defendants saw sales flattening, "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward." Ziegler also dismantled Defendants' prior claims regarding prescriber demographics, admitting that "*the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]*" and that while Geron was "seeing repeat prescriptions at academic medical centers, "*[i]n the community, it's a little bit more diffused*."

10. The market's reaction was swift and damaging to shareholders. Wall Street analysts recognized that Defendants' disclosures fundamentally corrected their prior statements. For example, analysts at Needham and Wedbush noted that the emerging trends proved Rytelo was merely capturing a bolus of patients in academic centers as a third-line therapy, directly contradicting Defendants' prior assurances of widespread community penetration.

11. As the artificial inflation was stripped from the stock price, Geron's share price plummeted from $2.37 to $1.61—a 32.07% decline in a single day on unusually heavy trading volume.

12. This action seeks to hold Defendants accountable for the substantial economic damages their fraudulent scheme inflicted upon the Class.

## II. JURISDICTION AND VENUE

13. Plaintiffs bring this action on behalf of themselves and other similarly situated investors to recover losses sustained in connection with Defendants' fraud.

14. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

16. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Geron is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class took place within this District.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. THE PARTIES

18. Plaintiff Robbie Dickson purchased Geron common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff Dickson's certification evidencing his transaction(s) in Geron was submitted in connection with his lead plaintiff application (ECF No. 17-2), which is incorporated herein.

19. Plaintiff Joseph M. Stacy, Jr. purchased Geron common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud.

Plaintiff Stacy's certification evidencing his transaction(s) in Geron was submitted in connection with his lead plaintiff application (ECF No. 17-2), which is incorporated herein.

20. Geron Corporation is a California corporation with its principal executive offices located at 919 East Hillsdale Boulevard, Suite 250, Foster City, CA 94404. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GERN."

21. Defendant John A. Scarlett ("Scarlett") was, at all relevant times, the Chairman of the Board, President, and Chief Executive Officer ("CEO") of Geron. Scarlett served as the CEO and a director since September 2011 and was appointed to Chairman of the Board in December 2018. On March 11, 2025, Geron abruptly announced that Scarlett would be stepping down as CEO after nearly fourteen years at Geron. Scarlett also resigned from Geron's board of directors in connection with his departure as CEO.

22. Defendant James ("Jim") Ziegler ("Ziegler") served as Executive Vice President and Chief Commercial Officer ("CCO") from September 9, 2024 through October 15, 2025.

23. Defendants John A. Scarlett and James Ziegler are sometimes referred to herein as the "Individual Defendants." Geron together with the Individual Defendants are referred to herein as the "Defendants."

24. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Geron's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements

pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

25. Geron is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

26. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Geron under *respondeat superior* and agency principles.

## IV. ADDITIONAL RELEVANT NON-PARTIES

27. CW1 was a Key Account Manager at Geron from the second quarter 2024 until the second quarter 2025, responsible for sales and prescriber education focused on educating providers about Rytelo and selling Rytelo.

28. CW2 was a Medical Science Liaison at Geron from April 2023 until April 2024 reporting to former Executive Director of Medical Affairs, Michael Steidle. As a Medical Science Liaison ("MSL"), CW2 was responsible for speaking with hematology doctors about myelodysplastic syndromes prior to Rytelo's approval. While CW2 was initially hired as a Clinical Educator, CW2's title was changed to MSL in January 2024 focusing on pre-launch activities where the Clinical Educator role focused on commercial, post-launch activities.

29. CW3 was a senior executive in sales and marketing from before Thanksgiving 2024 until after the end of the Class Period. CW3 reported to Ziegler and was hired to assist Geron in determining how to address flattened sales and restart Rytelo sales growth.

30. CW4 was employed in a Director role at Geron prior to and throughout the entire Class Period and beyond. CW4 reported to a Vice President who reported to the Chief Commercial Officer. In CW4's role at Geron, CW4 tracked sales trends based on daily demand data that Geron obtained directly from its specialty distributors, which is the distribution network that physically sells Geron's product.

## V. ADDITIONAL SUBSTANTIVE ALLEGATIONS

### A. Geron Develops Treatments for Hematologic Malignancies

31. Geron is a late-stage biopharmaceutical company pursuing therapies to extend the lives of patients with hematologic malignancies. The Company's main product is a telomerase inhibitor called imetelstat, which Geron sells under the brand name, Rytelo. Rytelo is designed to reduce the proliferation of malignant cells to permit the production of new healthy cells.

32. The FDA approved Rytelo on June 6, 2024 for the treatment of adult patients with low to intermediate-1 risk myelodysplastic syndromes ("lower-risk MDS"), with transfusion-dependent anemia requiring four or more red blood cell units over eight weeks or who have not responded to or have lost response to or are otherwise ineligible for erythropoiesis-stimulating agents ("ESAs").

33. Myelodysplastic syndromes ("MDS") are blood disorders which originate in the bone marrow and are characterized by ineffective blood cell production. MDS is generally classified and treated as a type of blood cancer. MDS is primarily a disease of the elderly, with a median age at diagnosis of around 70 years. Higher-risk MDS is characterized by a higher percentage of abnormal blast cells in the bone marrow (between 10-20%), is more severe, and progresses rapidly. Lower-risk MDS is characterized by a lower percentage of abnormal blast cells (less than 5%), is less severe, and progresses more slowly.

34. Lower-risk MDS often presents with mild to moderate cytopenias. Cytopenias are conditions characterized by a reduction in the number of one or more types of blood cells in the body, such as red blood cells (anemia), white blood cells (leukopenia), and/or platelets (thrombocytopenia). Anemia, a reduction of red blood cells, is typically one of the most prominent cytopenias observed. Chronic anemia is the predominant clinical problem in patients who have both high and lower-risk MDS. Many patients with anemia become dependent on red blood cell transfusions, which can be associated with clinical consequences and decreased quality of life.

35. The current standard of care for the treatment of lower-risk MDS is the use of ESAs such as erythropoietin, or EPO, to address the patient's chronic anemia. Although ESAs provide

an improvement in anemia in approximately 50% of patients, the effect is transient with a median duration of response of approximately two years.

36. Once ESAs are no longer effective, serial blood transfusions are often administered that can cause damaging effects to other organs due to iron overload, resulting in poorer overall survival and a higher risk of developing acute myeloid leukemia. In addition, other best available therapies are used without durable effect for the patient. According to Geron, approximately 10% of lower-risk MDS patients are not eligible for ESAs, representing a very high "unmet need" subgroup.

37. Among lower-risk MDS patients, there are ringed sideroblast positive, or RS-positive patients, and ringed sideroblast negative, or RS-negative patients. RS-negative patients make up approximately 75% of lower-risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are limited options for the treatment of anemia in RS-negative patients once they are relapsed or refractory to ESAs. RS-positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high transfusion burden lack effective treatment options.

38. On July 26, 2024, Geron announced the MDS National Comprehensive Cancer Network ("NCCN") Guidelines® were updated to include imetelstat as a Category 1 treatment in second-line RS-positive and RS-negative patients regardless of prior treatment and as a Category 2A treatment for first-line ESA-ineligible RS positive and RS negative patients.

39. Geron claims that in lower-risk MDS, Rytelo produces "meaningful and durable transfusion independence, activity across MDS patient subtypes, and potential disease-modifying activity achievable with imetelstat treatment," which "are differentiators compared to currently approved products as well as investigational drugs currently in clinical development."

40. Rytelo, however, often causes certain side effects, including cytopenias and neutropenia, which is a condition associated with a low number of neutrophils, a specific type of white blood cell. In addition, MDS itself generally causes anemia.

41. Given these common side effects, physicians must closely monitor the patient weekly for the first two cycles of Rytelo and then monthly to manage any potential dose modifications where patients exhibit any of the various side effects.

42. Rytelo is given as an intravenous infusion directly into the vein, administered over a period of two hours once every four weeks. In contrast, Reblozyl (luspatercept), a competitor product approved in 2023 as a first-line treatment in patients with low-to intermediate-risk MDS, only requires a subcutaneous injection every three weeks. Thus, physicians viewed Rytelo's administration and monitoring as more burdensome and not a compelling alternative to Reblozyl.

**B. <u>Geron's Future Financial Viability and Growth Depended on the Successful Commercial Launch of Rytelo as a Second-Line Treatment</u>**

43. Rytelo is Geron's only commercial drug product, accounting for 99.4% of its annual revenue. Accordingly, Geron's financial viability and growth depended on its commercial sales of Rytelo.

44. Indeed, in the Company's 2024 Annual Report on Form 10-K for the period ended December 31, 2024 (the "2024 Form 10-K"), Geron stated that Rytelo is "our only product approved for marketing by the FDA, and our ability to generate revenue from product sales and achieve profitability is ***wholly dependent on our ability to successfully commercialize Rytelo in the U.S***."

45. Defendants further acknowledged in the 2024 Form 10-K that Rytelo was critical to the Company's future growth, stating "[o]ur near-term prospects ***are wholly dependent on Rytelo.***" Scotiabank analysts also acknowledged Geron's dependence on Rytelo as being vital to the Company, stating on October 15, 2024, that Geron's "***ability to achieve profitability will depend on successful commercialization of Rytelo…***"

46. According to Defendants, low-risk MDS for which Rytelo is indicated is predominantly treated within the community physician setting. Indeed, on June 7, 2024, when Defendants announced the FDA approval of Rytelo, Kapur stated that "70% of the patients are expected to be treated in the community setting with low-risk MDS." Accordingly, the market expected the majority of Rytelo sales would come from community healthcare providers.

47. Geron describes Rytelo to investors as a "transformational treatment option for [] underserved populations." Throughout the Class Period, Defendants touted Rytelo as the likely standard of care for the approved indications going forward, claiming Rytelo would be used for more than just a third-line treatment. Rather, Rytelo would also capture market share as a first and second-line treatment.

48. According to Defendants, "the favorable FDA label and National Comprehensive Cancer Network, or NCCN®, Clinical Practice Guidelines in Oncology, or NCCN Guidelines®, position RYTELO as a potential ***blockbuster treatment that can compete for significant market segments*** in lower-risk MDS, including ***first-line*** ESA ineligible patients ***and second-line patients regardless of prior treatment or RS status***."

49. Defendants, thus, publicly claimed a total addressable market ("TAM") for imetelstat of $7 billion consisting of $3.5 billion for relapsed/refractory MF and $3.5 billion for lower-risk MDS based on it being used as a first, second, and third-line therapy.

50. Defendants told the market that "[n]ew patient starts and duration of treatment are the ***key primary drivers of revenue***" that they used in evaluating Rytelo's performance and growth.

**C. <u>Geron Launches Rytelo With No Marketing Materials, Insufficient Medical and Sales Staff, and No Clear Messaging or Positioning for Rytelo's Use</u>**

51. According to Geron's SEC filings, Defendants recognized that "substantial preparations" were needed for a successful launch and commercialization of Geron's first-ever drug product, Rytelo. Such commercialization preparatory activities "include, among other things, the development of an in-house marketing and sales force, which will continue to require significant capital expenditures, management resources and time."

52. The Company also needed to "effectively train sales personnel and equip them with compliant and effective materials[.]" In fact, according to Geron's SEC filings, its "ability to generate revenues from sales of imetelstat in the U.S.…depends on [the Company] being able to establish sales and marketing capabilities and gain acceptance in the marketplace[.]"

53. Defendants also recognized during an earnings call held on May 2, 2024 (the "Q1 2024 Earnings Call"), that "[i]t's also critical that we provide education and support for physicians

on the imetelstat safety profile and help them to contextualize and manage cytopenias so they can offer an optimized patient experience and duration of [testing].”

54. Leading up to Rytelo’s FDA approval, Defendants repeatedly told the market that Geron was well-prepared and had everything in place for a successful Rytelo launch, including an already onboarded full commercial and medical affairs team, internal systems and processes in place, and a well-trained sales force.

55. As discussed below, contrary to Defendants’ representations, confidential witnesses confirm that Rytelo’s commercial launch was complete chaos and the Company had no cohesive launch plan. Rather, at the time of launch in June 2024, Geron lacked any marketing materials, did not have sufficient sales and medical staff to promote and educate prescribers, failed to adequately educate community physicians, Rytelo’s primary subscriber base, and lacked clear messaging or positioning for Rytelo’s use.

**1. Internal Turmoil and Conflicting Directives from Executives Cause Sales Personnel to Feel “Paralyzed” at Rytelo’s Launch**

56. According to CW2, at the time CW2 was hired in April 2023, Geron’s medical and commercial teams were having serious disagreements about how to launch Rytelo and how to utilize the different people’s roles. For instance, CW2 was initially hired as a Clinical Educator responsible for commercial, post-launch activities, but then CW2’s title was changed to Medical Science Liaison in January 2024. In this role, CW2 was told to focus on pre-launch activities.

57. Throughout CW2’s tenure, CW2 witnessed internal turmoil at Geron, including tension between Denise Meyer (“Meyer”), the Vice President of Medical Affairs, and Anil Kapur, the Vice President of Corporate Strategy and Chief Commercial Officer. For example, “Anil wanted us to transition over to commercial at launch, and Denise didn’t want that[.]”

58. CW2 recalled that Meyer and Kapur gave “conflicting directives to the medical and commercial teams” leading up to the Rytelo launch. There were also disagreements within the medical team between Meyer and CW2’s boss, Michael Steidle, former Executive Director of Medical Affairs. The communication problems between Meyer and Michael Steidle were obvious to CW2 where Steidle wanted to go in one direction with the medical team, and then Meyer came

in and changed everything up. CW2 reported that Steidle would tell CW2's team one thing, only to then have to backpedal after Meyer or Kapur caught wind of it and changed the directive. "They weren't on the same page." CW2 felt "paralyzed by Michael's direction versus Denise's direction."

59. As a result of the tension at the top, the communication from executive leadership "was always unclear." CW2 said the conflicting instructions caused confusion and problems in the field, which "definitely" impacted Geron's commercial readiness and the commercial launch of the Rytelo. "When leadership isn't on the same page, how can you expect the field to have clear direction?"

60. This confusion continued until well after CW2 left Geron in April of 2024. While CW2 was not at Geron at the time of Rytelo's launch, CW2 kept in touch with current employees who described the launch as a "cluster." As a result of the disorganization and confusion, Geron would be forced to quickly overhaul management within weeks of Rytelo's launch.

**2. Geron Lacked Any Marketing Materials or Clear Messaging to Educate Community Physicians Who Would Be the Primary Rytelo Subscribers**

61. The hematologists who treat MDS are generally considered either community or academic healthcare providers. Community healthcare providers are frontline public health professionals who work directly within the communities they serve. Academic healthcare providers usually practice within an academic medical center, or an academic hospital. These providers are often more focused on clinical research and are usually faculty members or affiliated clinicians linked to medical schools or teaching hospitals who frequently work on the clinical trials for the drugs.

62. In February 2024, Kapur stated that low-risk MDS is predominantly treated within the community setting and claimed that, in preparation for a commercial launch of Rytelo, Geron was having "extensive discussions with both community and academic providers…"

63. On June 7, 2024, when Defendants announced the FDA approval of Rytelo, Kapur stated that "70% of the patients are expected to be treated in the community setting with low-risk MDS." Accordingly, investors expected the majority of Rytelo sales would come from community healthcare providers.

64. However, because Geron was unprepared for commercial launch and failed to educate community physicians or provide them with clear messaging about Rytelo's use, revenues primarily originated from academics who were already familiar with Rytelo from working on clinical trials and very few community physicians were willing to prescribe Rytelo.

65. Indeed, according to CW1, Geron did not provide CW1 with any marketing materials, such as pamphlets, case studies or other resources to use in selling Rytelo at the time of its launch. CW1 recalled that it took a substantial amount of time to get marketing materials and the only materials CW1 had available was the "Prescribing Information," which is the FDA-Approved document regarding clinical information for Rytelo.

66. CW2, likewise, reported that in CW2's role as a Medical Science Liaison, CW2 spoke with doctors prior to Rytelo's commercial launch and awareness of Rytelo was low among community healthcare providers. Indeed, CW2 said that the majority of community physicians CW2 spoke with had not heard of Rytelo or, if they had, did not know much about it. In contrast, hematologists in academia were more likely to be aware of the drug.

67. Geron's failure to educate physicians adversely impacted Geron's strategy to win over key opinion leaders ("KOLs") to promote Rytelo. According to CW2, Geron's early strategy was to gain KOL support before launch. "That can influence the hematology community as a whole when you've got a key opinion leader who says, this is a great drug." However, not all KOLs spoke highly of Rytelo. According to CW2, there was at least one KOL in Houston who chose to use Reblozyl instead of Rytelo.

68. Similarly, CW4 stated that Geron's field teams observed a lack of KOLs supporting Rytelo.

69. CW3 corroborated CW2's and CW4's accounts, confirming that CW3 learned from Ziegler that as of September 2024, there was very little support for Rytelo from key opinion leaders (KOLs). Ziegler told CW3 that Ziegler learned this from, among other ways, Geron's market research and attending a Society of Hematologic Oncology ("SOHO") meeting in Houston, Texas

in September 2024[1] to assess Geron's marketing efforts and meet the sales team so Ziegler could make his own assessment of the reason(s) for flattening sales.

70. According to CW3, one of the main problems with the Rytelo launch and reason for sales flattening was that Geron did not have a clear message for Rytelo's use. Thus, sales personnel were confused because they were unsure of what to tell physicians about how to use Rytelo. This led to doctor confusion.

71. CW3 said Geron's market research, which CW3 reviewed, showed that when sales representatives asked doctors where they saw Rytelo fitting in, doctors were confused due to a lack of clear messaging. According to CW3, doctors understood they might use Rytelo when there was no other option but beyond that, there was no clarity as to when or how doctors should prescribe Rytelo. In fact, CW3 personally saw Geron's lack of clear messaging for Rytelo from the Company's website, visual aids the sales team used, and CW3's own conversations with physicians.

72. CW4, similarly stated that Geron's field teams found prescribers were reluctant to use Rytelo for anything other than a third line treatment.

73. Accordingly, as Defendants would admit during the February 26, 2025 Q4 2024 Earnings Call, Geron's lack of clear messaging and resulting lack of physician awareness negatively impacted Rytelo's adoption and sales, particularly as a first- or second-line treatment. This required Geron to "really increase the reach and frequency, our education and awareness and share of voice especially[,] as you point out[,] with the community [physicians]" and focus on "improving our promotional and sales force effectiveness" to restart sales growth.

**D. <u>Geron's Failed Launch Causes Sales and Sales Growth to Flatten by September 2024 and Remain Flat Throughout the Class Period</u>**

74. Defendant Ziegler stated during the Q4 2024 Earnings Call, "[n]ew patient starts and duration of treatment are the key primary drivers of revenue." Ziegler further explained during

[1] *See* https://sohoonline.org/SOHO2024/SOHO2024/Program.aspx, last visited on April 13, 2026. Speakers at the at the annual SOHO meeting are internationally recognized experts that represent the spectrum of hematologic malignancies. Attendees included physicians, sales personnel and other experts.

the call that Defendants track "weekly" and "week-over-week" sales for Rytelo to evaluate Rytelo performance and growth.

75. According to CW3, Geron purchased its weekly sales data from IQVIA. IQVIA data is part of the National Prescription Audit ("NPA") and reflects the prescribing history of physicians, as well as what formulations and in what dosages. IQVIA data is proprietary and can only be obtained by purchase.

76. CW3 stated that Geron analyzed the IQVIA weekly sales data by putting it into a visualization tool like Microsoft Excel that CW3, Ziegler and regional managers, among others, then used to analyze weekly Rytelo sales on a national, regional, territorial and account level (*e.g.*, prescribing physicians or medical center).

77. CW3 also recalled that Geron received on a monthly basis, a representative sample of sales data from IQVIA and Geron's proprietary market research, detailing the backgrounds of patients on Rytelo and what prior treatments they had received before being put on Rytelo. Thus, Defendants could see on a monthly basis, sales broken out by patient treatment lines.

78. CW3 said this weekly and monthly sales data (which CW3 reviewed) showed that as soon as Rytelo was launched, the majority of patients put on Rytelo were a bolus of later-line patients with no other treatment option. In addition, CW3 said that academics were typically the main prescribers for later-line patients because those are the patients who are seeing specialists because they have no other treatment option.

79. CW3 confirmed that Geron's weekly sales data showed sales starting to flatten in September 2024. Sales continued flattening into October 2024, prompting Ziegler to reach out to CW3 in October 2024 about joining Geron to help Ziegler figure out how to restart Rytelo sales growth.

80. At the time Ziegler reached out to CW3 in October 2024, Ziegler told CW3 that, based on Ziegler's own review of Geron's weekly sales data, as well as Ziegler's attendance at medical conferences and interviews of physicians and Geron's sales representatives, sales and sales growth had flattened because Rytelo was primarily being prescribed by academics as a last resort treatment and was not being used as a second-line treatment option due to a lack of clear

messaging or positioning for Rytelo's use. Thus, CW3's objective upon joining Geron was to try and move Rytelo into an earlier treatment paradigm within the label and change the perception and positioning among prescribers from the top (*e.g.*, KOLs). This was very difficult to do, CW3 said, because Rytelo had been positioned where it had initially been used mainly as a later-line treatment.

81. When CW3 joined Geron before Thanksgiving in 2024, CW3 reviewed Rytelo's weekly sales data from the launch forward to make CW3's own assessment of the problem. Based on CW3's review of Rytelo's weekly sales data, Geron's website and materials and conversations with regional sales managers and physicians upon joining Geron, CW3 concluded that from June through August 2024, Rytelo sales were comprised of a "bolus" of later-line patients, which CW3 referred to as latent demand patients who have a short life expectancy and were previously on Reblozyl or other therapies that were no longer working. These patients switched to Rytelo as a last resort. However, once this initial group of patients was exhausted towards the end of August or early September 2024, sales growth flattened because Geron was not getting new or second-line patients. CW3 said that once those latent demand patients pass away due to short life expectancy, negative growth can occur, which was what was happening with Geron.

82. CW3 confirmed that, based on CW3's review of the sales data, sales and sales growth remained flat throughout October, November and December 2024 and throughout the Class Period.

83. CW3 recalled that, while there may have been slight blips in the weekly sales data of plus or minus 5%, overall monthly sales trends from September 2024 onward showed flattening and Geron was not seeing the sales growth progress the Company had hoped for or that was expected from a successful new launch, which should be at least 10% or more month over month growth.

84. The reason sales had flattened, CW3 said was readily apparent from the sales data because doctors were not putting new patients on Rytelo and Rytelo was not moving into earlier lines of treatment.

85. After CW3 joined Geron, CW3 and Ziegler tried to refocus the message around second-line or at least as a post first-line treatment. While Scarlett was not directly involved in changing the message, CW3 said Scarlett was aware that Geron had to refocus its messaging towards post first-line treatment.

86. CW4 reported that in CW4's role at Geron, CW4 tracked sales trends based on daily demand data that Geron obtained directly from its specialty distributors, which is the distribution network that physically sells Geron's product. Based on this demand data, CW4, likewise, observed that sales of Rytelo began flattening around October 2024 and remained flat throughout Q4 2024 and Q1 2025.

87. CW4 attended a quarterly business review meeting with Ziegler in October 2024 in which Ziegler acknowledged the slowdown in sales growth that CW4 had previously observed.

88. CW4 stated that Geron's field teams surmised that the flattening sales growth could be attributed to several factors, which included a lack of KOLs supporting Rytelo, an initial bolus, and prescribers' reluctance to use Rytelo for anything other than a third line treatment.

89. CW1 corroborated CW3's and CW4's accounts. CW1 reported that this witness attended a Fast Start meeting in January 2025 with Defendant Ziegler, sales personnel from all the regions, and other executives during which Ziegler told the sales personnel that Rytelo sales had flattened in September and November 2024 and that sales personnel were not meeting expectations. Ziegler introduced new sales goals at the meeting, which included a heavy focus on prescribing Rytelo as a second-line therapy.

90. CW3 also attended the January 2025 Fast Start meeting and corroborated CW1's account that at that meeting, Ziegler gave the sales representatives a tough message that sales were relatively flat, Geron was not seeing growth, and Geron needed to change the way it marketed and sold Rytelo and the way Geron operated as a commercial organization.

91. As a result of the Company's poor commercial launch and flattening sales, Geron overhauled management. First, on July 23, 2024, approximately one month after Rytelo's commercial launch, Geron abruptly announced that Anil Kapur, the Chief Commercial Officer, would be departing effective August 31, 2024.

92. On September 9, 2024, Geron announced the appointment of Jim Ziegler as the new Chief Commercial Officer to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of Rytelo." CW3 learned from Ziegler that Scarlett brought Ziegler on board in September specifically to address the lack of growth in sales and Ziegler was able to make a quick diagnosis of the problem upon joining by, among other ways, reviewing weekly sales data and attending the SOHO meeting.

93. Shortly after, in November 2024, Jim Hassard joined the Company as Senior Vice President, Sales and Marketing "to improve insights, strategy and execution" and Joseph Eid, M.D. joined as Executive Vice President of Research and Development, "responsible for driving innovative medical and scientific strategies that support RYTELO™ commercially and sustain important research and development opportunities for Geron."

94. Defendants would later admit during the Q4 2024 Earnings Call on February 26, 2025 that, unbeknownst to investors, "we have observed flat revenue trends over the last few months[]" and "that flatness continued into the prior week leading up to this call."

### E. <u>Defendants Were Aware of the Flattened Sales Through Their Review of Weekly Sales Data and Attendance at Weekly Sales Meetings</u>

95. CW3 reported that Geron reviewed sales data every week. CW3's account is corroborated by the Individual Defendants' own admissions during the Q4 2024 Earnings Call that they reviewed Geron's "weekly" and "week-over-week" sales data, such that Defendants could report sales based on "our own internal demand sales data" using Geron's "systems and processes to recognize and report revenues" that Kapur touted prior to launch.

96. CW3 held a weekly sales meeting every Monday with Ziegler, the VP of Sales and regional managers to review the prior week's sales. According to CW3, Ziegler, Scarlett and the entire executive team received by email Rytelo's weekly sales data, broken down by national, regional, territory and account sales. Because this weekly data showed where Rytelo was being sold (*e.g.*, territory) and where it was being used (academic centers or community physicians), CW3 and Ziegler could then speak to specific regional or territory managers to understand which treatment line was using Rytelo (*e.g.*, first, second or third-line).

97. Similarly, CW4 stated that Ziegler had access to the daily demand data provided by distributors through a dashboard. CW4's knowledge of what data Ziegler had access to is based on CW4's many conversations with Ziegler.

98. According to Defendant Ziegler, Geron also had access to, and used "market sizing reports" and "patient chart audits" to analyze sales data and "estimate our number of new patient starts."

99. Thus, based on the weekly and monthly sales data and discussions with regional and territorial managers and the demand data accessible to the executives in a dashboard that was updated daily, executive leadership, including the Individual Defendants, were aware that sales started flattening in September 2024, after the initial bolus, and remained flat throughout the Class Period.

100. According to CW3, while there may have been some impact on sales around Thanksgiving and Christmas, seasonality was not the main cause of flattened sales because flattening had started in September 2024, well before Thanksgiving.

101. On February 26, 2025, the last day of the Class Period, Defendant Ziegler admitted that "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS[2]

### A. November 7, 2024 – Q3 2024 Earnings Call

102. On November 7, 2024, Defendants held an earnings call with analysts and investors to present and discuss Geron's financial and operational results for the third quarter 2024 (the "Q3 2024 Earnings Call"). During the Q3 2024 Earnings Call, Defendant Ziegler falsely claimed Rytelo was being broadly utilized across all patient subgroups by both community and academic providers, which was driving "promising" Q4 growth:

> From our own internal demand sales data, **so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising**. Overall, we remain

---

[2] Statements alleged to be false and misleading are bolded and underlined. The remaining statements are provided for context.

> confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.
>
> ***
>
> In summary, I want to acknowledge the dedicated cross-functional teams at Geron for all their hard work to ensure that eligible U.S. patients have broad and timely access to RYTELO. I am inspired by how we have remained focused during this time of transition and I am optimistic in the future. **We are very pleased with the strong demand for RYTELO across community and academic settings,** favorable payer coverage policies **and broad utilization across patient segments. These early launch dynamics reinforce our expectations for continued demand and promising growth.**

103. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that there was "strong" demand and sales growth for Rytelo across all treatment lines because Geron's lead indications for first and second-line patient segments had already, and would continue to generate significant revenue when, in reality, sales and sales growth had flattened by September 2024 and remained flat throughout the Class Period and revenues came primarily from early adopter academics who were only willing to use Rytelo as a third-line, last resort treatment. Thus, Geron was not getting new patients and seeing strong demand across community and academics or broad utilization across all treatment lines and the fourth quarter growth trajectory was not, and did not, continue to be, "promising," as evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. CW3 confirmed that Geron was not getting any new patients due to lack of clear messaging and positioning for Rytelo, as Geron's own sales representatives were confused and did not know what to tell physicians, resulting in physician confusion where they did not know how to use Rytelo;

c. CW3 reported that Geron's weekly sales data showed sales and sales growth began to flatten starting in September 2024 and remained flat throughout the Class Period because Rytelo was mainly prescribed by academics as a third-line or last resort treatment;

d. CW4 confirmed that daily sales data from distributors showed sales growth had flattened by at least October 2024 and continued throughout Q4 2024 and Q1 2025 and that Ziegler had acknowledged the slowdown in sales growth during a quarterly business review meeting in October 2024;

e. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler, who told the sales team during that meeting that sales flattened in September and November 2024 and mandated that sales personnel aggressively market Rytelo as a second-line therapy;

f. Defendant Scarlett admitted on the February 26, 2025 Q4 2024 Earnings Call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call stating that "***with respect to new patient starts, we have observed flatness over the past few months***" and "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday ***going forward***" flat sales;

g. Defendant Scarlett admitted during the February 26, 2025 Q4 2024 Earnings Call that because Geron had not adequately educated community healthcare providers, Geron's sales had flattened and remained flat where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

h. On the February 26, 2025 Q4 2024 Earnings Call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the root causes of flat revenue trends;

i. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that sales had flattened because "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

j. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

k. Defendants admitted during the May 7, 2025 Q1 earnings call that the *continued* lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was still "refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully*** as indicated in our approved label;" and

l. Thus, the demand for Rytelo was much less than represented.

104. During the question-and-answer portion of the call that followed, in response to an analyst question, Defendant Ziegler assured investors that Rytelo was experiencing "steady, consistent growth" across *all* patient segments, and specifically in the first and second-line segments:

> **<u>So what we're looking at is -- and expecting is steady, consistent growth across all of the patient segments. Specifically, second line in both RS negative and RS positive, first-line ESA-ineligible</u>** and then, of course, the relapsed/refractory

> third-line plus patients. We're not giving guidance at this point, **<u>but we are expecting steady and consistent growth going forward</u>**.

105. Another analyst asked about patient growth rates, specifically across the first and second-line segments, and Defendant Ziegler, again, falsely assured that there was "uptake" across *all* patient segments from *both* the community and academic settings:

> **Corinne Jenkins**, *Goldman Sachs Group, Inc., Research Division*
> You did mention that you expect to see kind of steady growth over the coming quarters, but could you clarify a little bit about what that means to you? Is that in terms of like absolute number of patient growth or the growth rate. Just a little clarification would be helpful there. And then in terms of the patients that you're seeing come on to therapy, are these primarily second-line or third-line patients? And what portion of them has previously been Reblozyl at this stage?
>
> ***
>
> **Jim Ziegler**, *Chief Commercial Officer*
> Again, we're not providing guidance, but **<u>in terms of our growth, what we expect is growth across all patient segments in both the academic and community setting</u>**. And what we provided on this earnings call is that 388 of our targeted accounts have ordered. So that's the breadth. Over time, what we're expecting is obviously to increase the breadth and depth of prescriptions or are prescribing RYTELO for patients across these accounts.
>
> **<u>So I'll just reinforce that we're seeing uptake in utilization across all patient segments, including first-line ESA ineligible, second-line</u>** and then third-line patients at this point.

106. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo sales were consistently growing and that lead indications for first and second-line patient segments had, and would continue to, generate significant revenue when in reality, Rytelo sales had flattened starting in September 2024, continuing throughout the rest of the Class Period, because Geron was not getting new patients. Rather, Rytelo's prescriptions had come primarily from early adopter academics as a last resort treatment. Thus, there was no "steady, consistent growth across all of the patient segments" or "uptake in utilization across all patient segments," as evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. CW3 confirmed that Geron was not getting any new patients due to lack of clear messaging and positioning for Rytelo as Geron's own sales representatives were confused and did not know what to tell physicians, resulting in physician confusion where they did not know how to use Rytelo;

c. CW3 confirmed that Geron's weekly sales data showed sales and sales growth began to flatten starting in September 2024 and remained flat throughout the Class Period because Rytelo was mainly prescribed by academics as a third-line or last resort treatment;

d. CW4 confirmed daily sales data from distributors showed that sales growth had flattened by at least October 2024 and continued throughout Q4 2024 and Q1 2025 and that Ziegler had acknowledged the slowdown in sales growth during a quarterly business review meeting in October 2024;

e. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team during that meeting that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy;

f. Defendant Scarlett admitted on the February 26, 2025 Q4 2024 Earnings Call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler admitted during the same call stating that "***with respect to new patient starts, we have observed flatness over the past few months***" and "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday ***going forward***" flat sales;

g. Defendant Scarlett admitted during the February 26, 2025 Q4 2024 Earnings Call that because Geron had not adequately educated community healthcare providers, Geron's sales had flattened and remained flat where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

h. On the February 26, 2025 Q4 2024 Earnings Call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the root causes of flat revenue trends;

i. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that sales had flattened because "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

j. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

k. Defendants admitted during the May 7, 2025 Q1 earnings call that the continued lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was "refining our marketing and medical efforts ***to enhance prescribing clarity and***

***confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label***;" and

l. Thus, the demand for Rytelo was much smaller than represented.

107. Also, during the Q3 2024 Earnings Call, an analyst asked what the data shows in terms of the current utilization split between community and academic prescribers, according to current utilization trends, and Defendant Ziegler falsely stated the split was "65-35":

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
>
> I was wondering if you could just maybe ***talk a little bit about the split that you're seeing. I know it's early in terms of data that you guys are getting. But just in terms of the utilization split between academics and community prescribers***. And then you mentioned your review of chart audits in terms of informing ***how current utilization trends are looking***. Can you talk about just how the dose management to address the cytopenias that occurred typically during the first few cycles is playing out in the real world data just relative to IMerge. []
>
> **Jim Ziegler**, *Chief Commercial Officer*
> [] **The split between community and academic is 65-35 or roughly 2/3, 1/3.** And then right now, **what we're hearing from our physicians in both field observations as well as our market research is that cytopenia management is well understood. There aren't major concerns, and I would expect that the real-world cytopenia management is at least as good as it is in the clinical trials. And we have a lot of personal, nonpersonal efforts to help support appropriate cytopenia management associated with RYTELO**.

108. The statement in the preceding paragraph was materially false and misleading when made because the majority (*e.g.*, over 50%) of doctors prescribing Rytelo were academics (not community doctors) who prescribed Rytelo as a last resort therapy. Community doctors were not prescribing Rytelo because Geron lacked clear messaging or positioning for Rytelo to explain to them how to use Rytelo. Thus, the utilization split was not 65% community doctors, as Ziegler later admitted, in contradiction of this statement, evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. According to CW3, Geron's weekly sales data showed that the majority of patients on Rytelo were third- or later-line patients put on Rytelo by academics who are often specialists treating such patients who have no other treatment option;

c. According to CW4, Geron's field teams surmised that the flattening sales growth could be attributed to several factors, which included a lack of KOLs supporting Rytelo, an

initial bolus, and prescribers' reluctance to use Rytelo for anything other than a third-line treatment;

d. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that Geron had failed to properly educate community physicians, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused;***"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 Q4 2024 Earnings Call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 Q4 2024 Earnings Call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

i. Defendants admitted during the May 7, 2025 Q1 earnings call that the continued lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was "refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label***;" and

j. Defendants admitted during the November 5, 2025 earnings call that, contrary to their Class Period misstatements, physicians were not prescribing Rytelo because they ***were*** concerned about cytopenias and, thus, Geron had to educate KOLs and community doctors on cytopenias such that, and as of November 2025, nearly nine months after the Class Period, "[t]hese efforts are ***starting*** to yield early results. Post-engagement surveys suggest that physicians who initially expressed ***reservations about cytopenia*** now report a better understanding of the mechanism of action, dose adjustment strategies, and monitoring protocols."

### B. <u>November 18, 2024 – Stifel 2024 Healthcare Conference</u>

109. On November 18, 2024, Defendant Scarlett was interviewed as part of the Stifel 2024 Healthcare Conference (the "Stifel 2024 Healthcare Conference"). At the Stifel 2024

Healthcare Conference, Defendant Scarlett falsely claimed that two-thirds of Rytelo patients were coming from community physicians:

> **Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*
> One of the segments that is really impactful, at least from a prescribing perspective in low risk MDS, is the group of community-based physicians. And so can you maybe just speak to how your outreach efforts are focused here? What [does] the early data you're seeing tell you about the return on those efforts? And then I think going into this launch there was a lot of, I don't know if you want to call it consternation, but, some concern about the willingness and the ability of these community docs to manage these patients kind of through these cytopenias that's typically caused by this drug during the first few cycles of therapy. Have you seen any of that hesitancy playing out in the commercial setting? Do you have to do more handholding with these guys than you would an academic doc?
>
> **John Scarlett**, *Chief Executive Officer*
> I think we've been very gratified by what we've seen so far. So first of all, if you look across the landscape in the United States about, **about 65% of the prescribing physicians in low risk MDS are in the community setting. And about 35% are academic in one form or another.** **That's exactly what we've seen so far. We've been seeing about two thirds of the patients appear to be coming from community settings and about a third come from academic settings**.

110. The statement in the preceding paragraph was materially false and misleading when made because the majority (*e.g.*, over 50%) of doctors prescribing Rytelo were academics (not community doctors) who prescribed Rytelo as a last resort therapy. Community doctors were not prescribing Rytelo because Geron lacked clear messaging or positioning for Rytelo to explain to them how to use Rytelo beyond a third-line treatment. Thus, the utilization split was not 65% community doctors, as Ziegler later admitted, in contradiction of this statement, as evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. According to CW3, Geron's weekly sales data showed that the majority of patients on Rytelo were third or later-line patients put on Rytelo by academics who are often specialists treating such patients who have no other treatment option;

c. According to CW4, Geron's field teams surmised that the flattening sales growth could be attributed to several factors, which included a lack of KOLs supporting Rytelo, an initial bolus, and prescribers' reluctance to use Rytelo for anything other than a third-line treatment;

d. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that Geron had failed to properly educate community physicians that comprised 70-75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused***[***;***]"

e. Defendants were not adequately educating community healthcare providers in community settings and, thus, as Defendant Scarlett ultimately admitted on the February 26, 2025 Q4 2024 Earnings Call, Geron's sales had, and were continuing to, flatten where "***the biggest opportunity for us is to really increase the reach and frequency, our education and awareness***" with community healthcare providers to increase sales;

f. On the February 26, 2025 Q4 2024 Earnings Call, Defendant Ziegler admitted that Geron was "***refining our segmentation and targeting and improving our promotional and sales force effectiveness***," which were the likely root causes of flat revenue trends;

g. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***";

h. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;" and

i. Defendants admitted during the May 7, 2025 Q1 earnings call that the continued lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was "refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label***;" and

j. Defendants admitted during the November 5, 2025 earnings call that, contrary to their Class Period misstatements, physicians were not prescribing Rytelo because they ***were*** concerned about cytopenias and, thus, Geron had to educate KOLs and community doctors on cytopenias such that, and as of November 2025, nearly nine months after the Class Period, "[t]hese efforts are ***starting*** to yield early results. Post-engagement surveys suggest that physicians who initially expressed ***reservations about cytopenia*** now report a better understanding of the mechanism of action, dose adjustment strategies, and monitoring protocols."

111. Next, the analyst interviewer asked Scarlett about the types of patients who were being prescribed Rytelo, to which Defendant Scarlett responded that they were receiving patients across *all* "key segments," particularly in the "second line:"

**Stephen Douglas Willey**, *Stifel, Nicolaus & Company, Incorporated, Research Division*

I know a lot of the data that you're seeing post-launch is still very early, but are you seeing anything that kind of provides some information on the types of patients who are being prescribed therapy? And is there anything that you can say about the split between RS negative, RS positive, ESA, ineligibles, and just what these patients have been previously treated with?

**John Scarlett**, *Chief Executive Officer*

***

Here's what we can say to date from what we've been able to glean from that kind of work, although it's still in its infancy. It looks like **we're getting patients across all of the key segments that we would've expected, frontline ESA ineligible patients, in second line RS positive patients and RS negative patients. In particular, I'd say the RS negative, just because they make up more of the second line and because other products are not necessarily approved. We're certainly seeing our, our fair share, and then we do get third line patients as well.**

112. The statements in the preceding paragraphs were materially false and misleading when made because, in reality, Rytelo's revenues came primarily from the third-line patient segment, as evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. CW3 confirmed that Geron was not getting any new patients due to lack of clear messaging and positioning for Rytelo as Geron's own sales representatives were confused and did not know what to tell physicians, resulting in physician confusion where they did not know how to use Rytelo;

c. According to CW3, Geron's weekly sales data showed that the majority of patients on Rytelo were from academics who prescribed Rytelo as a last resort treatment for those who had no other options, not for second or first line and, thus, CW3's main objective upon joining Geron was to change the messaging and positioning of Rytelo so physicians would be comfortable and willing to prescribe Rytelo as a post-first line treatment;

d. According to CW4, Geron's field teams surmised that the flattening sales growth that began at least by October 2024 could be attributed to several factors, which included a lack of KOLs supporting Rytelo, an initial bolus, and prescribers' reluctance to use Rytelo for anything other than a third-line treatment;

e. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler told the sales team that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy;

f. Defendant Scarlett admitted on the February 26, 2025 Q4 2024 Earnings Call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call stating that "***with respect to new patient starts, we have observed flatness over the past few months***" and "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward" flat sales;

g. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

h. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;" and

i. Defendants admitted during the May 7, 2025 Q1 earnings call that the continued lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was "refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label***."

### C. December 4, 2024 – 7th Annual Evercore HealthCONx Conference

113. On December 4, 2024, Defendant Scarlett was interviewed as part of the 7th Annual Evercore HealthCONx Conference (the "Evercore HealthCONx Conference"). At the Evercore HealthCONx Conference, Defendant Scarlett doubled down, claiming Geron had experienced and "continued" to expect "strong" growth largely from Rytelo used as a "second line" treatment:

> **Unknown Analyst**, *Evercore Analyst*
> Let's talk about the launch. First quarter obviously went very well. The market and the label is a little split here, so I would love to start by diving into the different populations. You've got the first line, ESA ineligible. Second line is split between the bars, plus and minus… So first things first, I know it's early in the launch, but what are you observing on the ground in terms of the populations where you're getting the best traction, and what's the feedback from docs on which settings they're most enthusiastic about?
>
> **John Scarlett**, *Chief Executive Officer*
> [] We've had a lot of investor interest, it's to say the least. So we're excited to be able to be at this stage of the company's development. You're right, we had a bang up first quarter, John. We had a good solid beat on the initial consensus numbers. **As we look ahead, we see strong continued growth**.
>
> ***
>
> In terms of the types of patients in the market, we kind of think of them in the following buckets. There's a group of patients who are frontline patients, but who

> when they appear and they're ready to start treatment, they have very high endogenous, erythropoietin levels. Those patients historically have not responded, to the use of ESAs…Those patients we have had in our clinical trials and we've shown very nice results in that patient set. It's a small group for us. It's about 10% of the frontline, **but we're able to get a toehold there for sure. We've always been very strong in across the entire second line setting**. So Reblozyl, our major competitor luspatercept, was developed for a relatively modest part of the second line market. That's the so-called RS positive second line market. They never studied the RS negative second line patients, and that's not in their label.

114. The statements in the preceding paragraphs were materially false and misleading when made, lacked any reasonable basis, and/or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Rytelo's lead indication for the second-line patient segment had, and would continue to, generate significant revenue and that Geron was experiencing continuing sales growth for Rytelo when in reality, Rytelo's revenues came primarily from early adopter academic physicians, who prescribed it as a third-line treatment due to Geron's lack of clear messaging and positioning for Rytelo. Thus, Rytelo's sales had already flattened by September 2024 when the last resort, latent demand patients had been exhausted and, because Geron was not getting any new patients, sales flattening remained flat throughout the Class Period, as evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. CW3 confirmed that Geron was not getting any new patients due to lack of clear messaging and positioning for Rytelo as Geron's own sales representatives were confused and did not know what to tell physicians, resulting in physician confusion where they did not know how to use Rytelo;

c. CW3 confirmed that Geron's weekly sales data showed sales and sales growth began to flatten starting in September 2024 and remained flat throughout the Class Period because Rytelo was mainly prescribed by academics as a third-line or last resort treatment;

d. According to CW3, Geron's weekly sales data showed that the majority of patients on Rytelo were from academics who prescribed Rytelo as a last resort treatment for those who had no other options, not for second or first-line and, thus, CW3's main objective upon joining Geron was to change the messaging and positioning of Rytelo so physicians would be comfortable and willing to prescribe Rytelo as a post-first line treatment;

e. CW4 confirmed that daily sales data from distributors showed sales growth had flattened by at least October 2024 and continued throughout Q4 2024 and Q1 2025 and that Ziegler had acknowledged the slowdown in sales growth during a quarterly business review meeting in October 2024;

f. According to CW4, Geron's field teams surmised that the flattening sales growth that began at least by October 2024 could be attributed to several factors, which included a lack of KOLs supporting Rytelo, an initial bolus, and prescribers' reluctance to use Rytelo for anything other than a third-line treatment;

g. In January 2025, CW1 attended a "Fast Start" sales meeting led by Defendant Ziegler who told the sales team that sales flattened in September and November and mandated that sales personnel aggressively market Rytelo as a second-line therapy;

h. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that Geron had failed to properly educate community physicians that comprised 70-75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused***[***;***]"

i. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

j. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

k. Defendant Scarlett admitted on the February 26, 2025 Q4 2024 Earnings Call that "***we have observed flat revenue trends over the last few months***" and Defendant Ziegler's corroborating admission during the same call that "***with respect to new patient starts, we have observed flatness over the past few months***" and "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward;"

l. Defendants admitted during the May 7, 2025 Q1 earnings call that the continued lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was "refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label***;"

m. The purported "strong" growth was just a bolus of academic early adopter doctors, not community physicians; and

n. Thus, demand for Rytelo was much smaller than represented.

115. Next, the analyst asked Defendant Scarlett if there was any hesitancy among community doctors with respect to cytopenias, to which Defendant Scarlett assured there was no

hesitancy or resistance from community doctors and, in any event, Geron provided proper educational support:

> **Unknown Analyst, Evercore Analyst**
> Have you observed any lingering hesitance in the commercial setting, maybe in the community groups of docs that haven't fully digested the positive label or the profile here and are still worried?
>
> **John Scarlett, Chief Executive Officer**
> [] **I don't think we're seeing hesitancy. If anything, we always engage providers with the commentary around the cytopenias**. We want to make sure that everybody understands the nature of them, that they are self-limiting to some degree. Certainly, there are ways to adjust the dosing, hold doses, et cetera. And that's to make sure that people can stay on the drug and get the benefit of it. And their usual response, whether it's an MSL or a sales rep or, a nurse that we employ as an educator, all of those people are coming back with the same answer. These hematologists say, you don't understand, every drug that we use does this. We don't care. We manage it all day, every day. I think there's a certain amount of truth to that. So **we're not seeing, I haven't really heard any resistance from that. I think that was so well described and talked through and the information out there is really quite extensive. So I don't think it's going to be the big limiting factor**. At least it doesn't seem that way right now.

116. The statements in the preceding paragraph were materially false and misleading when made because they gave the false impression that community healthcare providers were not "hesita[ting]" to prescribe Rytelo and had been well-educated on Rytelo's use and mechanism of action, when in reality, the majority of Rytelo prescriptions were coming from academic physicians because Geron had failed to educate community healthcare providers who were reluctant and/or unwilling to prescribe Rytelo, as evidenced by:

a. According to CW2, Geron failed to educate community physicians and most that CW2 spoke to either had not heard of Rytelo or did not know much about it;

b. CW3 confirmed that Geron was not getting any new patients due to lack of clear messaging and positioning for Rytelo as Geron's own sales representatives were confused and did not know what to tell physicians, resulting in physician confusion where they did not know how to use Rytelo;

c. CW3 confirmed that Geron's weekly sales data showed sales and sales growth began to flatten starting in September 2024 and remained flat throughout the Class Period because Rytelo was mainly prescribed by academics as a third-line or last resort treatment;

d. According to CW3, Geron's weekly sales data showed that the majority of patients on Rytelo were from academics who prescribed Rytelo as a last resort treatment for those who had no other options, not for second or first-line and, thus, CW3's main objective upon joining Geron was to change the messaging and positioning of Rytelo so physicians would be comfortable and willing to prescribe Rytelo as a post-first line treatment;

e. According to CW4, Geron's field teams surmised that the flattening sales growth that began at least by October 2024 could be attributed to several factors, which included a lack of KOLs supporting Rytelo, an initial bolus, and prescribers' reluctance to use Rytelo for anything other than a third-line treatment;

f. Defendant Ziegler admitted during the February 26, 2025 Q4 2024 Earnings Call that there was "***some hesitancy in the market to start some of these products that require, in our case, some monitoring***;"

g. Defendants admitted during the November 5, 2025 earnings call that, contrary to their Class Period misstatements, physicians were not prescribing Rytelo because they ***were*** concerned about cytopenias and, thus, Geron had to educate KOLs and community doctors on cytopenias such that, and as of November 2025, nearly nine months after the Class Period, "[t]hese efforts are ***starting*** to yield early results. Post-engagement surveys suggest that physicians who initially expressed ***reservations about cytopenia*** now report a better understanding of the mechanism of action, dose adjustment strategies, and monitoring protocols;"

h. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that Geron had failed to properly educate community physicians that comprised 70-75% of the prescriber base, stating its "***our obligation and opportunity to help educate and increase awareness with a much broader group of physicians across the country***" and while they were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused***[***;***]"

i. Defendant Ziegler admitted on the February 26, 2025 Q4 2024 Earnings Call that "***the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than [expected]***;"

j. Defendants admitted during the May 7, 2025 Q1 earnings call that the continued lack of clarity for Rytelo's messaging resulted in sales for Q1 2025 ***decreasing***; thus, Geron was "refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label***;" and

k. Defendants admitted during the November 5, 2025 earnings call that, contrary to their Class Period misstatements, physicians were not prescribing Rytelo because they ***were*** concerned about cytopenias and, thus, Geron had to educate KOLs and community doctors on cytopenias such that, and as of November 2025, nearly nine months after the Class Period, "[t]hese efforts are ***starting*** to yield early results. Post-engagement surveys suggest that physicians who initially expressed ***reservations about cytopenia***

> now report a better understanding of the mechanism of action, dose adjustment strategies, and monitoring protocols."

## VII. THE TRUTH EMERGES

117. On February 26, 2025, Defendants held the Q4 2024 Earnings Call to discuss the Company's fourth quarter and full year 2024 financial results. During the Q4 2024 Earnings Call, Defendants shocked the market when they revealed that Rytelo's sales had ***flattened*** "over the last few months" and the flatness had continued up to the Q4 2024 Earnings Call, tying Geron's prior management changes to flattened sales. In pertinent part, Defendant Scarlett stated:

> However, despite achieving this revenue in the first 2 quarters of launch, ***we have observed flat revenue trends over the last few months***. As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call.

(Emphasis added).

118. Defendant Ziegler reiterated the flatness observed in Rytelo's growth over the past few months and elaborated that, contrary to Defendants' prior statements, "the majority" of Rytelo sales came from the third-line patients segment:

> As described previously by Chip, we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024…***New patient starts and duration of treatment are the key primary drivers of revenue***. For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately 8 months observed in the Phase III IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge. ***However, with respect to new patient starts, we have observed flatness over the past few months***. Specifically, even though we see RYTELO being utilized across RS-negative and RS-positive first-line ESA ineligible, second-line ESA relapse refractory and third-line plus patients***, the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations***.

(Emphasis added).

119. Defendant Ziegler further explained factors that Geron would be addressing, in trying to restart Rytelo's sales growth including, among others, the previous leadership changes, sales training to address salesforce confusion, and increased physician education and awareness to

address physicians' confusion—things Defendants told investors they had done before Rytelo's launch:

> ***Our priority is to drive new patient starts across the breadth of population in our FDA label so that we are not niche to a third-line treatment***…
>
> There are other factors we are also addressing, which we believe will help accelerate uptakes in earlier line patients. First, below the national level trends, we see variability in regional territory and account level performance. Some territories and accounts are performing very well and competing and winning at the local level. ***Other territories and accounts have opportunity for improvement where we are refocusing our support and sales training efforts***.
>
> ***Second, we believe the lower-risk MDS market is promotionally sensitive with time in front of the health care providers, or HCPs, being a key factor to changing their prescribing behaviors. We are taking steps to optimize our engagement with target HCPs.*** Joe will also highlight educational efforts by our medical affairs team to increase HCP awareness and education.
>
> We expect that as HCP's gain successful clinical experience with RYTELO in later lines and often difficult-to-treat patients, and as we work to raise awareness and increase engagement, they will choose RYTELO in earlier lines of treatment.
>
> Third, as Chip mentioned earlier, ***our organization changed commercial and medical affairs leadership a few months into launch***.
>
> ***
>
> We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, ***refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO*** in lower-risk MDS, which I will speak to on the next slide.

(Emphasis added).

120. Joseph Eid, the Executive Vice President of Research & Development, further identified "areas for improvement," including KOL engagement:

> Similar to Jim's approach in the commercial organization, we are continuing to build and enhance our medical organization. As a first-in-class drug with a unique mechanism of action, RYTELO requires a steady flow of data to raise awareness and manage knowledge and data gaps at launch. To that end, ***we have actively prioritized our publication strategy and are targeting key medical congresses to reach the medical community to help increase awareness***.
>
> Together with commercial, ***we are also investing in market development and KOL***

> ***engagement, which is particularly important in this launch***, given that 70% of the Phase III IMerge investigators were ex U.S.

(Emphasis added).

121. During the question-and-answer portion of the call that followed, Defendants explained that while there was "some" variability in sales data "week-over-week[,]" the overall four and eight week rolling average sales trend "underscore the flatness":

> **Peter Richard Lawson**, *Barclays Bank PLC, Research Analyst*
> Maybe first question would just be around how we think about revenues, your commentary around flat revenues over the last few months. ***Whether you're seeing any week-over-week growth***. And I've seen that comment kind of captures January and February. And then the other component would just be around how we think about 1Q revenues themselves, whether that's flat or growing versus 4Q, and then anything you can tell us around revenues and costs as we think about 2025?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> Peter, so our ***revenues week-over-week have had some variability. But what I would say is our 4- and 8-week rolling averages underscore the flatness that I characterized on the call. And that flatness continued into the prior week leading up to this call***. So it may be a little bit too early to make a full call on Q1 revenues, but I would characterize and reinforce what we said on the earnings call that ***the past couple of months have been relatively flat week-over-week in the 4- and 8-week averages***.

(Emphasis added).

122. In response to the one question on the call about whether seasonality might be driving flatter sales, Ziegler responded that there may have been "some" seasonality but the bigger issue was the "hesitancy" of physicians to prescribe Rytelo due to lack of education and awareness and the monitoring requirements, resulting in most prescriptions being for third-line treatment:

> **Tara A. Bancroft**, *TD Cowen, VP & Senior Equity Research Analyst*
> So I was hoping you could give us maybe some more detail on the seasonality or patterns in general, not only that you're seeing with RYTELO, but it appears to be impacting MDS as a whole with luspatercept too. So I'm curious to get your thoughts on what's happening at a higher level in this indication? And then separately, maybe, Jim, if you could ***tell us more about the expected cadence of growth this year*** that we could see with your implemented changes that you suggested?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> [W]e saw some seasonality beginning around the holidays, Thanksgiving more specifically. And ***there is some hesitancy in the market to start some of these products that require, in our case, some monitoring***. So there was a little bit of a

> delay.
>
> …In terms of the expected cadence, it's really driven off of our business driver, right? We characterize the most important business driver for us is new patient starts. As you know, with launch products, often start in later line, ***third line plus, which we characterized on this call as seeing that's where the majority of our use was, even though we saw earlier line, second line, first-line use.***
>
> So it really depends on our effectiveness in driving market share, not just in third-line plus, but in earlier line, second line and first-line opportunities. ***And our expectation is that as we increase our share of voice, our reach and frequency and together with medical affairs, increase education and awareness, we hope to see greater impact and use across all lines of therapy. But it's not going to happen overnight. Share of voice and increasing the prescribing behaviors will take some time***.

123. Seeking more clarity, a Leerink Partners analyst asked why Geron was not seeing new patients added at a consistent rate, to which Ziegler responded that while Geron was looking for "steady growth" in new patients, that was not happening due to ineffective messaging to community physicians, resulting in early adopter academics being the primary Rytelo prescribers:

> **Faisal Ali Khurshid**, *Leerink Partners LLC, Research Analyst*
> On the trends that you've been seeing, could you comment on like how much of that was an impact on new patient starts as opposed to like discontinuations or dose modifications and holidays? I guess, the reason for the question is ***even if you're starting mostly in third-line patient, like shouldn't you be kind of like adding patients at a consistent rate***? And I guess like people are also wondering like the duration of therapy should still be longer than like the time you've been in the market in third line as well? Or is that not the way to think about it?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> Faisal, no, I think the way you're thinking about it is exactly right. ***The primary drivers are new patient starts and duration of treatment***. What I said on the call is that duration of treatment at this point, while still early in that, we're only approaching the median duration of treatment in IMerge about right now. That does not appear to be issue based upon our own market research and KOL.
>
> As you know, there isn't perfect data that we can cite only data that we triangulate around. But right now, at this point, we don't believe that duration of treatment is inconsistent with that seen in IMerge. ***And so we have seen some softness and it's related to new patient starts.***
>
> I think the way to characterize it is we saw uptake and unmet need and ***the treatment was really with some of these early adopters*** who believe -- who understood and believed in the product and ***it's our obligation to really increase the reach and***

> ***frequency, the share of voice amongst the majority of physicians who have yet to treat patients with RYTELO***.
>
> **Faisal Ali Khurshid**, *Leerink Partners LLC, Research Analyst*
> Got it. And then in terms of like the inflection or potential inflection this year, like do you guys have visibility that you should be kind of like at a bottom on new patient growth now? And then like how confident are you like the new sales strategy will cause an inflection? And what kind of timing would -- should we expect on that?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> That's a great question. ***I wouldn't characterize it as an inflection. I think others characterized it in the past as a bolus. What we're looking for is steady growth -*** - a steady growth in third line leading to earlier lines, second line and first line. So what we anticipate is that with great execution, great targeting, great messaging that as we increase our share of voice and awareness with these physicians that we would see uptake across the board.

124. One analyst from B. Riley Securities asked, point blank, which month Defendants "started to see" the sales flattening, to which Ziegler admitted, "based upon the rolling 4- and 8-week" sales trend data, that Geron first saw flat sales trends as far back as Thanksgiving:

> **Kalpit R. Patel**, B. *Riley Securities, Inc., Senior Biotech Analyst*
> Maybe first on the flattening over the past few months. Can you comment on exactly which month you started to see flattening? Was it the beginning of this year? Or was it the beginning of fourth quarter last year?
>
> **Jim Ziegler**, *Chief Commercial Officer*
> ***[] I would say based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward***. We do see, as you know, in the weekly data, a lot of variability, which is why we incur more to the 4- and the 8-week rolling averages.

(Emphasis added).

125. In other words, the four- and eight-week sales trend data leading up to Thanksgiving (*e.g.*, October and November) was not, as Defendants previously claimed, showing "steady, consistent growth."

126. In response to an analyst question about differences between the academic and community settings, Defendant Scarlett admitted that the biggest opportunity for Geron was to increase the reach in the community setting, thereby admitting a lack of awareness and

understanding by community doctors in direct contradiction to what Defendants previously told to investors:

> **Gregory Allen Harrison**, *Scotiabank Global Banking and Markets, Analyst*
> What feedback are you getting from KOLs and other providers around why they're not using RYTELO as much in earlier lines of therapy? And are there any differences based on setting as far as academic versus community? It sounds like from your comments just now that the bulk may be in academic?
>
> **John Scarlett**, *Chief Executive Officer*
> Thanks, Greg. I think the first message that I would share with you is that our MD and our KOL feedback that have used RYTELO, very simply can be summarized as RYTELO works. ***And we see that in our market research and our one-on-one engagements with the KOLs. I think the biggest opportunity for us is to really increase the reach and frequency, our education and awareness and share of voice especially as you point out with the community.***
>
> I'll just give you a very simple mathematic equation. So if you think about the 15,400 patients that we characterize as treatment eligible and you divide that by the number of MDS treating physicians in the U.S. It only leads to a couple of patients on average that each one of these physicians have. ***So it's really important for us to make sure that we get out to as many of these physicians in a cost-effective way through our sales team, our medical affairs team, and our nonpersonal efforts to really increase the share of voice***.

(Emphasis added).

127. In response to an analyst question about patient mix, Defendant Ziegler admitted that Geron was seeing "***higher use in later lines***" because Geron's messaging to physicians was poor, stating, "***I don't know that our messaging has been as specific as it could be. And that's one of the things that we're refining with our segmentation targeting and messaging going forward***." (Emphasis added).

128. Later, in response to an analyst question about the source of most new patients, Defendant Ziegler admitted that, contrary to Defendants' prior statements, new patient starts had actually come from early adopters at academic medical centers, and not the community setting:

> **Emily Claudia Bodnar**, *H.C. Wainwright & Co., LLC, Vice President & Senior Healthcare Analyst*
> I guess on the first one, in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re-prescribe it to new patients? Or is it mostly coming from new prescribers, new centers?

> **Jim Ziegler**, *Chief Commercial Officer*
> ***[] On new patient starts, we're seeing repeat prescriptions amongst the early adopters largely at many of the academic medical centers. In the community, it's a little bit more diffused.*** So there, we're seeing more breadth than depth. But over time, as with other product launches, I expect that both breadth and depth will continue to grow, especially as physicians gain clinical experience and success with RYTELO.

(Emphasis added).

129. Investors and analysts reacted immediately to Geron's revelation. The price of Geron's common stock declined dramatically from a closing market price of $2.37 per share on February 25, 2025 to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day on heavy trading volume.

130. A number of well-known analysts who had been following Geron lowered their stock ratings in response to Geron's disclosures. For example, H.C. Wainwright & Co., while downgrading the stock to a neutral rating due in part to the 8-week and 4-week trend showing flat revenues, noted "[t]he company has observed prescribers represcribing Rytelo to patients, ***though mostly in the academic setting***" and that the "***community setting prescriptions have been more diffused***…" (emphasis added).

131. The H.C. Wainwright & Co. analyst also highlighted Geron's seemingly incongruent commercial plans to target first and second-line patient segments while the majority of new patient starts have been in the third-line segment, and pointed to competition as one likely factor, stating, in pertinent part:

> The company noted that majority of new patient starts have been in 3L low risk myelodysplastic syndrome (LR-MDS) patients, while ***the company's commercial plan is to target 1L ESA ineligible and 2L ESA refractory patients, as per the label***.

(Emphasis added).

132. As a result, the analyst concluded that while the Company "announced a plan to shift its strategy, aimed at educating HCPs on Rytelo and expanding awareness of the therapy[,]" they did not provide any specific plans "to address awareness aside from increased HCP education and use of KOLs and medical conferences."

133. Needham also lowered its price target as a result of the softness to new patient adds, indicating that "[e]merging trends suggest ***Rytelo has captured low-hanging patients in academic centers*** (primarily in the 3rd line) but is experiencing challenges penetrating earlier lines, specifically, RS negative ESA failures. Geron chalked this dynamic up to ***insufficient education and outreach outside Rytelo experienced centers***." As a result, Needham noted that the Company intended "to invest in education and outreach to re-accelerate the launch[.]" Due to a "slower than previously expected launch" Needham decreased its price target from $7.00 to $5.00 per share. (Emphasis added).

134. Wedbush analysts also noted that "***academic center use appears to be more dominant***, relative to the community setting (where additional effort is required for engagement)" along with "hesitancy to start new patients in holiday weeks, in light of a requirement for monitoring." (Emphasis added).

135. Scotiabank analysts also submitted a negative report, finding "Geron shares are weaker after management cited that momentum of the Rytelo launch in lower-risk myelodysplastic syndromes (LR-MDS) has slowed, noting flat revenue trends over the last few months." Scotiabank believed the "slowdown is a cause for concern at this early stage of the launch." Scotiabank analysts "caught up with management after the call which pointed to 3L [third-line] patients accounting for the majority of Rytelo scripts, with uptake among 2L [second-line] falling below expectations at this point in the launch." As a result, Scotiabank lowered its "penetration assumptions for Rytelo in LR-MDS".

## VIII. POST-CLASS PERIOD EVENTS

### A. Geron Overhauls Executive Management and Lays Off One-Third of its Workforce

136. On March 11, 2025, Geron issued a press release announcing that Scarlett would be departing the Company, and that the search for a replacement CEO "with significant commercial experience" was underway—the latter indicating that Scarlett's departure was both: a) not preplanned; and b) tied directly to the Company's flat revenue growth. A Form 8-K filed with the SEC on March 11, 2025 further disclosed that on March 10, 2025, Defendant Scarlett resigned from Geron's board of directors in connection with his departure as CEO.

137. In a March 11, 2025 report, Barclays analysts explained that they had spoken privately with Geron management, writing that "[m]anagement indicated this was a board-driven decision that was executed relatively quickly."

138. On August 6, 2025, Geron announced the appointment of Harout Semerjian as its new President and CEO, effective August 7, 2025. Geron stated that Semerjian's appointment "comes at a pivotal moment for Geron, as the company continues to work to expand awareness of, and access to, Rytelo…" Semerjian, who has over 30 years of commercial experience across hematology and oncology, receives an $800,000 salary and stock options to purchase 11,000,000 shares of common stock.

139. Next, in a press release dated October 13, 2025, Geron announced that Andrew Grethlein, "who joined Geron in September 2012 and has served as Executive Vice President, Chief Operating Officer since January 2019, will depart the company on October 15, 2025, transitioning to a consulting role, while pursuing other interests." Geron further announced that Jim Ziegler was departing the Company, also on October 15, 2025, "to pursue other interests" but without any consulting roles with the Company.

140. Then, Geron announced that Ahmed ElNawawi would replace Jim Ziegler as Chief Commercial Officer, effective October 20, 2025. In addition to ElNawawi's appointment, Geron also announced the appointment of three other seasoned executives to its leadership team: Shanthakumar Tyavanagimatt as Senior Vice President, Chief Technical Officer, Dawn Schottlandt as Senior Vice President, Investor Relations and Corporate Affairs, and Bryan Ridgell as Senior Vice President, Portfolio and Project Management and Chief of Staff.

141. Finally, on December 16, 2025, with little notice, Geron laid off approximately one-third of its 260 employees. Dubbed a "restructuring plan" Geron expected the reduction in workforce to be substantially complete by the first quarter of 2026 and further expected that restructuring charges would impact the results of operations for both the fourth quarter of 2025 and first quarter of 2026.

**B. Geron Reports *Declining* Q1 2025 Sales**

142. On May 7, 2025, before the market opened for trading that day, Defendants issued a press release announcing Geron's first quarter financial results (the "May 7, 2025 Press Release"). The May 7, 2025 Press Release reported that revenues for Rytelo were $39.4 million for Q1 2025, down more than $8 million from Q4 2024, and Q1 "demand [was] relatively flat."

143. The same day, on May 7, 2025 Defendants held a conference call to discuss Geron's results (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Dawn Carter Bir, Geron's Interim President & Chief Executive Officer and Director, shared several key factors that influenced the recent "soft performance" as well as specific enhancements Geron made to support commercial success:

> Since our last earnings call, we've performed an in-depth analysis of our commercial efforts with the current market, and we're focused on 3 key strategies to invigorate sales growth. First, we are investing additional resources to increase brand awareness among the highest decile U.S. hematologists treating the greatest number of lower-risk MDS patients today.
>
> Second, we're refining our marketing and medical efforts ***to enhance prescribing clarity and confidence with the use of RYTELO, articulating how and where to use it successfully as indicated in our approved label*** with the goal of supporting positive HCP and patient experiences and continued use. And third, we're ***implementing programs to expand U.S. KOL support and advocacy through aligned messaging, education and through both commercial and medical affairs engagement efforts***.

144. Defendant Ziegler further confirmed that "to date, most usage has been in the third-line plus setting." Defendant Ziegler went on to state that Geron was expanding its team by adding key account managers, oncology clinical educators, and a field-based regional marketing team. Additionally, Defendant Ziegler stated that Geron was "pursuing community-based educational and outreach initiatives[.]" The commercial and medical affairs teams were also addressing and educating healthcare providers on appropriate cytopenia management to increase healthcare provider prescribing confidence.

### C. Geron's New CEO Admits Lack of Physician Education and Awareness Caused Sales to Flatten

145. On November 5, 2025, Geron held an earnings call to discuss its third quarter 2025 results (the "Q3 2025 Earnings Call"). Geron's new CEO Harout Semerjian admitted that Geron had been off track and detailed action steps to "step up our execution[.]" Semerjian further stated on the Q3 2025 Earnings Call that Geron needed to "substantially increase awareness for Rytelo among U.S. HCPs through a comprehensive, well-coordinated account plan" and "significantly and consistently increase our in-person and digital presence in hematology forums." Semerjian explained that "***new patient starts did not offset the discontinuations we saw from patients using Rytelo in later lines[,]***" which made clear that Geron had "work to do on establishing Rytelo as a second-line therapy…and educating HCPs on treatment management."

146. Also on the Q3 2025 Earnings Call, analyst Tara Bancroft of TD Cowen inquired about the cause of flat demand, asking if it could be attributed to seasonality, reluctance to reorder, or discontinuities:

> I know you stated that discontinuities in later lines are a big factor, but I'm curious to hear if there were other headwinds that you can speak of this quarter that you observed, like reluctance to reorder or seasonality, but basically, looking for any outlook on those for Q4 that may perhaps be reversing?

147. In response, Semerjian agreed that sales remained flat throughout 2025 and admitted that the flatness was due to discontinuation of patients, stating "I agree with you. It's flattish…we are getting new patients, but ***the discontinuation of patients*** who existed or who came in on the brand, they're really later-line patients. And unfortunately, those patients are much more beaten up, and they don't stay on therapy for very long."

148. Analyst Faisal Ali Khurshid of Leerink Partners bluntly asked whether Geron was confident "that you figured out what the issues are and that you truly believe that awareness is the main lever to pull here[,]" and Semerjian responded affirmatively, "[t]he answer is yes. ***We want to make sure that physicians know how to use it***, be it in academic centers or be it in the community." However, despite the confidence, Semerjian refused to provide guidance for 2026.

149. In a November 7, 2025 report, analyst Biotech Beast observed that even with "five full quarters of the Rytelo (imetelstat) launch behind it, [] the launch isn't going from strength to strength." With a 3% decrease in demand, "[t]here is really very little to soften the blow…".

## IX. ADDITIONAL SCIENTER ALLEGATIONS

150. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding Geron, and their control over and/or receipt and/or modification of Geron's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants' scienter and that of other senior executives is properly imputed to Geron.

### A. Defendants' Actual Knowledge and/or Recklessness

#### 1. Defendants Personally Tracked Rytelo Sales Data on a Weekly Basis

151. During an earnings call to discuss Geron's fourth quarter results on February 28, 2024 ("Q4 2023 Earnings Call"), leading up to Rytelo's commercial launch, Defendant Kapur touted Geron's adoption and integration of systems and processes to report revenue: "[w]e continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues[.]"

152. Then, during the November 7, 2024 Q3 2024 Earnings Call, Defendant Ziegler likewise confirmed that Defendants used Geron's "own internal demand sales data" to project Rytelo sales growth:

> From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand.

153. During the February 26, 2025 Q4 2024 Earnings Call, Defendant Ziegler, again, confirmed Geron tracked and reviewed "weekly" and "week-over-week" sales data and patient "chart audits" to analyze Rytelo sales and sales trends.

154. CW3 corroborated Defendants' admissions, stating Geron reviewed and analyzed weekly IQVIA sales data, which reported sales nationally and by region, territory and account and received weekly reports from regional managers on patient-level data. CW3 said Geron also received monthly patient-level sales data informing Defendants what treatment line Rytelo was prescribed for.

155. Similarly, CW4 stated that Ziegler had access to daily demand data provided by Geron's distributors through a dashboard and that Ziegler acknowledged the slowdown in sales growth during a quarterly business review meeting that CW4 attended with Ziegler in October 2024.

156. Ziegler, Scarlett, and the other executives had direct access to Geron's sales data and daily demand data and ***received weekly emails*** reporting the sales data nationally and by region, territory and account. This weekly data showed that from September 2024 through the end of the Class Period (and beyond) sales flattened and remained flat due to Geron's inadequate, unclear messaging and positioning of Rytelo and failure to educate community physicians according to CW1, CW3, CW4, and Defendants' own admissions.

157. Accordingly, Defendants, admittedly, knew from Geron's weekly, "own internal sales data" (*e.g.*, IQVIA and distributor data), market sizing reports and patient chart audits that early prescriptions came mainly from academics, not community physicians, as a third-line therapy. Defendants would have also known from their sales data that by September 2024, Rytelo sales were flattening and remained flat throughout the remainder of the Class Period.

**2. Defendants Admit They Knew Sales Had Flattened by at Least November 2024 Because They Failed to Educate Community Physicians and Rytelo Was Mainly Prescribed by Academics as a Third-Line Treatment**

158. During the Q4 2024 Earnings Call, Defendant Scarlett admitted that Geron had "observed flat revenue trends over the last few months." Defendant Ziegler confirmed Scarlett's

admission and elaborated that the flatness was known "around the holidays, Thanksgiving holiday," and "continued into the prior week leading up to this call" and that "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations." In other words, contrary to Defendants' prior statements that Geron was seeing strong growth across all treatment lines from both community and academics, Rytelo was being primarily used as a third-line, last resort treatment by "academic medical centers[,]" not the community physicians that investors were led to believe.

159. Accordingly, Defendant Ziegler stated Geron would have to "***refin[e] our segmentation and targeting and improving our promotional and sales force effectiveness[.]***" To do this, Geron replaced its commercial and medical affairs leadership and Executive Vice President of Research and Development, as described below.

**3. Executive Personnel Changes Strongly Support Scienter**

160. Shortly after Rytelo's commercial launch, Geron was forced to overhaul its commercial team and sales strategy as Rytelo sales quickly flatlined.

161. First, on July 23, 2024, Geron abruptly announced the unexpected departure of Chief Commercial Officer Kapur, less than one month after Rytelo's commercial launch. As the CWs reported, Kapur repeatedly gave conflicting directives and lacked any clear strategy for Rytelo's commercial launch.

162. On September 9, 2024, Geron announced Defendant Ziegler would replace Kapur to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of Rytelo." CW3 confirmed Ziegler was hired to assess and fix Geron's flat sales problem by restarting Rytelo's growth.

163. Thus, Kapur's termination was the direct result of Rytelo being prescribed mainly by academics as a third-line treatment, which Defendants concealed from the market in hopes that Ziegler could turn things around before investors noticed.

164. Defendants openly attributed Rytelo's failed commercial launch and resulting flattened sales to the executives who had been terminated. During the February 26, 2025 Q4 2024 Earnings Call discussing Rytelo's flat sales, Defendant Scarlett stated "[a]s many of you will

recall, beginning a few months into launch, we changed our commercial and medical affairs leadership." Ziegler echoed this stating "as Chip mentioned earlier, ***our organization changed commercial and medical affairs leadership a few months into launch***." Thus, the timing of the executive changes at the same time Geron admitted sales were flattening further supports scienter.

165. Finally, Defendant Scarlett, Geron's CEO of nearly fourteen years, abruptly departed mere weeks after Geron's flat sales growth for Rytelo was revealed to the market on February 26, 2025, further contributing to the strong inference of scienter. In a March 11, 2025 report, Barclays analysts explained that they had spoken privately with Geron management, writing that "[m]anagement indicated this was a board-driven decision that was executed relatively quickly."

166. Corroborating Barclays' report that Scarlett's termination was driven by Geron's board, analysts from H.C. Wainwright issued a report on March 12, 2025, tying Scarlett's termination to the Company's lack of revenue growth:

> The [C]ompany did not share many additional details regarding the departure aside from it being a board-mediated decision. Given the recent announcement of the flat Rytelo revenues following 4Q24, we are not particularly surprised by this news.

167. Analysts from Scotiabank reported much of the same, writing in a report issued March 11, 2025 that Geron has announced Scarlett's departure "effective immediately, which coincides with recent adjustments to the commercial strategy after a weak fourth quarter of Rytelo sales[]" and that the Scotiabank analysts viewed the CEO change-up as a "[n]egative" for the Company.

**4. That Rytelo Was Geron's Only FDA-Approved Drug Product Creates a Strong Inference of Scienter**

168. Throughout the Class Period, Geron had one drug product approved for commercial sale—Rytelo. Rytelo was Geron's only source of product revenue during the Class Period accounting for 99.4% of annual revenue. Thus, Rytelo was Geron's core business operation.

169. Indeed, Defendants told investors that Rytelo is "our only product approved for marketing by the FDA, and our ability to generate revenue from product sales and achieve profitability is ***wholly dependent on our ability to successfully commercialize Rytelo in the U.S***."

170. Analysts also acknowledged Geron's dependence on Rytelo as being vital to the Company. In an October 15, 2024 report, a Scotiabank analyst determined, "[g]iven Geron's early commercial stage, the company is burning cash and the ***ability to achieve profitability will depend on successful commercialization of Rytelo*** and development in new indications."

171. Given that Rytelo comprised 99.4% of Geron's revenue, it would be absurd to suggest that Defendants were unaware of Rytelo's flattening revenues.

**5. Analysts' Negative Reactions Support Scienter**

172. An inference of scienter is further bolstered by the fact that analysts criticized Geron's admissions because they did not align with Defendants' prior misstatements about patient segment distribution.

173. For example, Stephen Ayers of Seeking Alpha wrote on February 26, 2025 that Geron revealed what Ayers originally perceived as rapid clinical uptake for Rytelo was, in reality, just early adopters, and then scaled back Rytelo's supposed $7 billion total addressable market by half:

> During the earnings call, management revealed that what I perceived to be as clinical adoption in my last update was, really, "early adopters who believed in the product." If Rytelo *is* a 3rd-line or later product, its TAM is probably less than 50% of what I projected in my DCF, suggesting peak annual revenue of no more than $350 million. The company has acknowledged their shortcomings and is working on getting Rytelo into earlier lines. However, it appears that my previous concerns are coming to fruition.

174. Prior to this revelation, Mr. Ayers was "positive on the drug following its first full quarter on the market, which indicated clinical adoption" and was "encouraged by the treatment recommendations that supported Rytelo's utilization in MDS, particularly in 2nd-line patients." But after the "unusually somber and discorded Q4 earnings call" Geron revealed that not only were new patients starts flat over the past few months, but the majority of new patients starts came from the third-line-plus patient segment with the second-line new patient starts lower than expected.

175. Scotiabank analysts likewise felt that the slowdown was a "cause for concern at this early stage of the launch." Needham analysts similarly stated they were "taking down our longer term estimates, assuming a slower than previously expected launch."

176. These reports, when taken together with Plaintiffs' other allegations, add to the overall strong inference of scienter.

### B. Defendants Were Motivated to Misrepresent Material Facts Regarding Geron's Failed Launch So Geron Would Be Acquired

177. Defendants were motivated to conceal and misrepresent the failed commercial launch of Rytelo to position Geron as an acquisition target upon Rytelo's FDA approval.

178. According to CW3, in connection with CW3's interviews prior to accepting the job at Geron, CW3 asked each executive that CW3 interviewed with, including Ziegler and Scarlett, whether Geron's pre-launch strategy had been acquisition or execution. Each person gave CW3 the same answer: acquisition.

179. It was Geron's strategy to be acquired and the executives expected that Geron would be acquired rather than actually having to launch Rytelo. This is why, CW3 believed Defendants had not set Geron up for a successful launch, including by hiring an insufficient number of sales and medical affairs personnel and investing in suboptimal systems.

## X. LOSS CAUSATION AND ECONOMIC LOSS

180. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Geron's common stock and operated as a fraud or deceit on Class Period purchasers of Geron's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market and the price of Geron's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Geron's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

181. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of Geron and its well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of Geron's business and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Geron's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock as follows.

182. On February 26, 2025, Geron revealed (among other things) that Rytelo's growth had flattened over the past few months and had remained flat into the first quarter 2025, that "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations[,]" that Geron had failed to properly educate community physicians that comprised 70% to 80% of the target prescriber base, stating while Defendants were seeing repeat prescriptions at academic medical centers, "***[i]n the community, it's a little bit more diffused***" and that physicians were not prescribing Rytelo, in part, because they were not comfortable with cytopenia management. Thus, Geron would have to "refin[e] our segmentation and targeting and improving our promotional and sales force effectiveness[.]"

183. These disclosures corrected Defendants' prior statements that, for example, Geron was experiencing "steady, consistent growth across all of the patient segments[,]" and there was "strong demand for Rytelo across community and academic settings" with "broad utilization across patient segments."

184. Upon the news, the price of Geron's common stock declined from a closing market price of $2.37 per share on February 25, 2025 to $1.61 per share on February 26, 2025, a decline of about 32.07% in the span of just a single day on unusually heavy trading volume.

185. Analysts at Needham and Wedbush understood Defendants' disclosures to correct their prior false statements. Lowering its price target, Needham understood that "[e]merging trends

suggest Rytelo has captured low-hanging patients in academic centers (primarily in the 3rd line)" and Wedbush analysts also noted that "academic center use appears to be more dominant[.]"

186. Additionally, analysts at H.C. Wainwright & Co. and Barclays understood Defendants' disclosures to correct Defendants' prior statements that Rytelo would be the standard of care in the second-line in both RS negative and RS positive, and in the frontline patients. H.C. Wainwright & Co. understood that "HCPs who are still using ESAs in 1L are likely then using luspatercept in 2L and then Rytelo in 3L[]" and Barclays understood that "the majority of new starts are coming from the 3L+LR-MDS setting[.]"

187. Also, H.C. Wainwright & Co. analysts understood the disclosures to correct Defendants' prior statements that there was strong demand for Rytelo across community and academic settings, and concluded that "2024 could have been impacted by upfront demand which may not be representative of a realistic growth rate for future quarters."

188. The decline in the price of Geron's common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' misrepresentations and/or fraudulent conduct being revealed to investors and the market. The timing and magnitude of the price declines in Geron common stock negate any inference that the losses suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' material misrepresentations and/or fraudulent conduct.

189. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' false statements that artificially inflated, or maintained the artificial inflation in the price of Geron common stock and the subsequent significant declines in the value of Geron common stock when Defendants' prior misrepresentations were disclosed.

190. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET

191. At all relevant times, the market for Geron's common stock was an efficient market for the following reasons, among others:

(a) Geron's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Geron communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Geron was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Geron was reflected in and incorporated into the Company's stock price during the Class Period.

192. As a result of the foregoing, the market for Geron's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Geron's stock price. Under these circumstances, all purchasers of Geron's common stock during the Class Period suffered similar injury through their purchase of Geron's common stock at artificially inflated prices, and a presumption of reliance applies.

193. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## XII. NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

194. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

195. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

196. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Geron who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIII. CLASS ACTION ALLEGATIONS

197. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Geron's common stock during the Class Period and were damaged thereby. Excluded

from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

198. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Geron's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Geron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 21, 2025, there were 636.9 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

199. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

200. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

201. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Geron;

(c) whether the Individual Defendants caused Geron to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Geron's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

202. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. COUNT I

***Against All Defendants for Violations of***

***<u>Section 10(b) and Rule 10b-5 Promulgated Thereunder</u>***

203. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

204. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

205. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Geron common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Geron's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

206. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Geron's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

207. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

208. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Geron's internal affairs.

209. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the

Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Geron's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Geron's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Geron's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

210. During the Class Period, Geron's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Geron's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Geron's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Geron's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

211. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## XV. COUNT II

***Against the Individual Defendants***

***<u>for Violations of Section 20(a) of the Exchange Act</u>***

213. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Geron's misstatements.

215. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Geron which had become materially false or misleading.

216. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Geron disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Geron to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Geron's common stock.

217. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of and exercised the same to cause Geron to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed

the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

218. By reason of the above conduct, the Individual Defendants and/or Geron are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XVI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XVII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 13, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/ *Adam Apton*
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com

Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
Amanda D. Foley (to be admitted *pro hac vice*)
David C. Jaynes (SBN 338917)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

Email: afoley@zlk.com
Email: djaynes@zlk.com

*Attorneys for Plaintiffs*